## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITY OF CHICAGO
121 N. Lasalle St., Room 600
Chicago, IL 60602;

     *Plaintiff*,

   vs.

ALEX M. AZAR, II, in his official capacity
   as Secretary of the United States
   Department of Health and Human
   Services,
200 Independence Ave. SW
Washington, DC 20201;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Ave. SW
Washington, DC 20201;

SEEMA VERMA, in her official capacity as
   Administrator of the Centers for Medicare
   and Medicaid Services,
7500 Security Blvd.
Baltimore, MD 21244; and the

CENTERS FOR MEDICARE AND
MEDICAID SERVICES
7500 Security Blvd.
Baltimore, MD 21244,

     *Defendants.*

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

Jurisdiction and Venue ................................................................................................. 4

Parties ......................................................................................................................... 4

Factual Allegations ...................................................................................................... 6

    I.      The ACA requires Defendants to facilitate enrollment in ACA-compliant coverage, including by providing an SEP in response to "exceptional circumstances." ................................................................................................. 6

    II.     The novel coronavirus presents a serious, ongoing threat to Americans' health .. 16

    III.    A special enrollment period is a necessary response to the pandemic. ............... 22

        A.    Americans need access to affordable, high-quality coverage. .................. 22

        B.    A special enrollment period would encourage individuals to seek coverage. ................................................................................................ 26

        C.    There is a wide consensus behind an SEP. ................................................ 31

    IV.    Defendants unlawfully rejected a special enrollment period solely to avoid "propping up" the Affordable Care Act ................................................................. 35

    V.     Defendants have repeatedly attempted to sabotage the ACA. ............................. 38

        A.    Defendants have promised to undermine the ACA. ................................. 39

        B.    Defendants have taken actions designed to undermine the ACA. ............ 42

    VI.    Defendants' unlawful decision harms Chicago. .................................................. 45

        A.    Chicago's health infrastructure ................................................................. 47

        B.    Chicago's response to the novel coronavirus ............................................ 51

        C.    Overall impact on the City ........................................................................ 54

Claims for Relief ........................................................................................................ 56

    Count One (Violation of the Administrative Procedure Act – Contrary to Law, 5 U.S.C. § 706(2), the Patient Protection and Affordable Care Act, 42 U.S.C. § 18031, and its implementing regulations, 45 C.F.R. § 155.420) ...... 56

    Count Two (Violation of the Administrative Procedure Act – Arbitrary and Capricious, 5 U.S.C. § 706(2)) ................................................................................................ 56

    Count Three (Violation of the Administrative Procedure Act – Action Unlawfully Withheld, 5 U.S.C. § 706(1)) ............................................................................... 57

Request for Relief ....................................................................................................... 57

Plaintiff the City of Chicago hereby sues Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services, the United States Department of Health and Human Services ("HHS"), Seema Verma, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, and the Centers for Medicare and Medicaid Services ("CMS"), and alleges as follows:

1.      The world is facing a global pandemic the likes of which it has not seen in over a century—the end of which is neither known nor in sight. As of the filing of this Complaint, over two million people in the United States are confirmed to have contracted the novel coronavirus,[1] and over 115,000 people are confirmed to have died from it.[2] Americans are facing severe disruptions to everyday life, from social distancing and school closures to furloughs, layoffs, and collapsing businesses. As states reopen for business, and even with the best social distancing practices in place, some experts believe that the virus may resurge, and that the world will likely face a second wave of the pandemic in the fall or winter of 2020. Even optimistic projections predict that life will not approach normal until a vaccine is developed and distributed sometime in 2021 at the earliest.

2.      During these difficult times, Americans need the security and peace of mind that affordable, high-quality health insurance coverage can offer. Congress enacted the Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA") to provide that coverage. The ACA allows Americans to purchase insurance on Exchanges established by states

---

[1]    For ease of reference, this Complaint uses "the novel coronavirus" to refer collectively to severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), as well as the disease it causes, coronavirus disease 2019 (COVID-19). *See Guidance on Preparing Workplaces for COVID-19*, U.S. Dep'ts of Labor & Health & Human Servs., https://www.osha.gov/Publications/OSHA3990.pdf (last visited June 14, 2020).

[2]    *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 14, 2020).

or by the federal government operating in their stead, during either an annual open enrollment or during special enrollment periods ("SEPs") required by the statute and its implementing regulations.

3.      Among the various SEPs provided for by the ACA, an Exchange must provide an SEP when consumers are facing "exceptional circumstances"—a broad and inclusive term that certainly encompasses a once-in-a-century health crisis. Indeed, almost every state that runs its own Exchange has reached precisely that conclusion, establishing an SEP so that all of their residents can obtain access to ACA-compliant coverage. And the federal government itself has provided for SEPs in the context of Medicare Part D and group health insurance.

4.      Yet the Trump Administration refused to provide a special enrollment period for the marketplaces administered by the federal government. Recognizing the gravity of the moment, Defendants initially decided to provide an SEP, and had even gone so far as to communicate that decision to insurers. At the last minute, however, the President countermanded that decision for fear of "propping up" the ACA[3]—an extraordinary about-face those close to the Administration characterized as "purely ideological" and "political."[4] As President Trump has made clear, time and again, he intends to undermine the ACA to the point that Congress is forced to repeal it, or failing that, to effectively repeal it on his own through executive action and/or malign neglect. To date, Defendants have offered no cogent explanation for their refusal to open an SEP.

---

[3]    Scott Bixby et al., *Biden Tells Trump: Stop the 'Pettiness' and Reopen Obamacare*, Daily Beast (Apr. 3, 2020), https://www.thedailybeast.com/biden-tells-trump-stop-the-pettiness-and-reopen-obamacare.

[4]    Adam Cancryn et al., *How Trump Surprised His Own Team by Ruling Out Obamacare*, Politico (Apr. 3, 2020), https://www.politico.com/news/2020/04/03/trump-obamacare-coronavirus-164285 (quoting an Administration official).

5.      Defendants' refusal is unlawful. The term "exceptional circumstances" plainly encompasses a global health crisis that has left millions of Americans in need of high-quality health insurance and could not have been anticipated during open enrollment. Defendants' conclusion to the contrary rests on an impermissible basis for action—the President's desire to sabotage a duly-enacted law. That desire offends the fundamental Constitutional principle that the Executive Branch "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 5. Even leaving that aside, however, Defendants' decision does not reflect the reasoned decisionmaking required by the Administrative Procedure Act, or any attempt to grapple with Americans' desperate need for comprehensive health coverage.

6.      These violations are immensely consequential to Plaintiff the City of Chicago, not to mention millions of Americans. Uninsured and underinsured Americans, including Americans who have contracted the novel coronavirus, frequently do not seek necessary care until it is too late. That is a risk the City cannot afford at a time when encouraging its residents to seek adequate testing and treatment is essential to the City's response to the pandemic. Chicago also provides forms of health services to its residents regardless of insurance status, like ambulance services and free- or reduced-cost health clinics. However, Chicago often cannot recoup the cost of providing such services to uninsured individuals. That burden on the City has been unnecessarily increased by Defendants' decision to prevent Americans from enrolling in ACA-compliant coverage—at a time when the City's operations are already under extraordinary strain.

7.      For these reasons, and as described more fully below, the Court should declare that Defendants' decision not to provide a special enrollment period in response to the novel coronavirus is unlawful, set that decision aside, and enjoin Defendants to provide a special enrollment period.

3

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law.

9.      Venue is proper in this district under 28 U.S.C. § 1391(e), because Defendants are officers and agencies of the United States and Defendants Alex M. Azar, II, and the United States Department of Health and Human Services are located in Washington, D.C.

## PARTIES

10.     Plaintiff the City of Chicago is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois. *See* Illinois Const. art. VII.

11.     Chicago, located in Cook County, is the largest city in Illinois and the third largest city in the United States.

12.     According to 2019 Census estimates, Chicago has over 2.7 million residents. Of those residents, 88%, or 2.38 million people, are under the age of 65. 6.9% of Chicago's population, or around 186,000 people, have a disability.

13.     2019 Census estimates for the proportion of Chicago's population without health insurance are unavailable. According to 2018 Census estimates, 11.9% of Chicago's population under the age of 65, or around 283,000 people, lack health insurance. That number has likely risen steeply as a result of the pandemic, which has increased unemployment and thereby pushed individuals off their employer-provided insurance. Those same estimates show that 19.5% of Chicago's population, or around 526,500 people, live in poverty.

14.     The Bureau of Labor Statistics reports that, in February 2020, the Chicago-Joliet-Naperville, Illinois metropolitan statistical area had 123,900 unemployed individuals.[5]

15.     As a result of the economic crisis caused by the novel coronavirus, the Chicago-Joliet-Naperville area's unemployment rate spiked to 640,300 in April 2020, an increase of 516,400, or roughly ~416%.[6] More recent statistics are unavailable, but given national trends, that rate has likely remained high.

16.     Similarly, while more recent uninsured rate statistics are unavailable, the uninsured rate described above is now likely much higher, given that many individuals who have lost their employment have also lost their employer-provided health insurance as a result.[7]

17.     As a major American city, Chicago provides a wide range of services on behalf of its residents, including, as relevant here, health services, public assistance through human and social services, and emergency medical care.

18.     Defendant Alex M. Azar, II, is sued in his official capacity as Secretary of the United States Department of Health and Human Services.

19.     Defendant the United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., at 200 Independence Ave. SW, Washington, DC, 20201.

20.     Defendant Seema Verma is sued in her official capacity as Administrator of the Centers for Medicare and Medicaid Services.

---

[5]     *Economy at a Glance, Chicago-Joliet-Naperville, IL*, U.S. Bureau of Labor Statistics, https://www.bls.gov/eag/eag.il_chicago_md.htm (last visited June 14, 2020).

[6]     *Id.*

[7]     Selena Simmons-Duffin, *Millions Of Americans Have Lost Health Insurance As Unemployment Soars*, NPR (May 24, 2020), https://www.npr.org/2020/05/13/855096156/millions-of-americans-have-lost-health-insurance-as-unemployment-soars.

21.     Defendant the Centers for Medicare and Medicaid Services ("CMS") is a component of Defendant HHS and is headquartered in Baltimore, Maryland, at 7500 Security Boulevard, Baltimore, MD, 21244.

## FACTUAL ALLEGATIONS

I.     **The ACA requires Defendants to facilitate enrollment in ACA-compliant coverage, including by providing an SEP in response to "exceptional circumstances."**

22.     In 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended*, Health Care Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

23.     One of the primary objectives of the ACA is "to expand coverage in the individual health insurance market." *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1315 (2020) (explaining that the Act seeks "to improve national health-insurance markets and extend coverage to millions of people without adequate (or any) health insurance"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care."); *Doe #1 v. Trump*, 957 F.3d 1050, 1063 (9th Cir. 2020) (explaining that Congress aimed "[t]o incentivize the purchase of insurance plans through ACA marketplaces").

24.     In enacting the ACA, Congress concluded that high uninsured and underinsured rates harm both individuals who lack adequate insurance and society. Specifically, Congress found that the uninsured suffer from "poorer health and shorter lifespan"; that the "cost of providing uncompensated care to the uninsured" is high; that "health care providers pass on the cost to private insurers, which pass on the cost to families" by "increas[ing] family premiums"; and that, because many "personal bankruptcies are caused in part by medical expenses,"

"significantly increasing health insurance coverage … will improve financial security for families." 42 U.S.C. § 18091(2)(E)-(G).

25.     Prior to the enactment of the ACA, individual health insurance markets were dysfunctional: "premiums for these policies were increasing more than 10% a year, on average, while the policies themselves had major deficiencies," including that they "often excluded pre-existing conditions" and "charged higher premiums for people with health risks."[8]

26.     As the Supreme Court has explained, many state efforts to reform the individual health insurance market in the 1990s were unsuccessful. *King*, 135 S. Ct. at 2485-86. The ACA "grew out of [this] long history of failed health insurance reform," *id.* at 2485, and aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms, including:

   a.     *Nondiscrimination on the basis of health status and health history.* The ACA requires "each health insurance issuer that offers health insurance coverage in the individual … market in a State [to] accept every … individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), and bars insurers from charging higher premiums on the basis of a person's health, *id.* § 300gg.

   b.     *Coverage for essential health benefits.* Insurance for individuals and families sold on ACA Exchanges must cover "essential health benefits," *id.* § 300gg-6(a), and so-called "cost-sharing" payments—for example,

---

[8]     David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What the Health Insurance Market Really Needs*, Harv. Bus. Rev. (Mar. 21, 2017), https://hbr.org/2017/03/where-both-the-aca-and-ahca-fall-short-and-what-the-health-insurance-market-really-needs.

deductibles and copayments—for such coverage are limited, *see id.* §§ 300gg-6(b), 18022(a)(2), (c).

      c.    *Subsidized coverage.* The ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line." *King*, 135 S. Ct. at 2487 (citing 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082).

27.    To help individuals learn about and enroll in the health insurance options that are available to them, the ACA "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 135 S. Ct. at 2487 (quoting 42 U.S.C. § 18031(b)(1)); *Maine Cmty. Health Options*, 140 S. Ct. at 1315 (explaining that the ACA "called for the creation of virtual health-insurance markets, or 'Health Benefit Exchanges,' in each State," to serve the "end" of increased coverage).

28.    These Exchanges, also known as health insurance marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *King*, 135 S. Ct. at 2485.

29.    An Exchange may be established by the state in which it operates or, in states that have elected not to establish Exchanges, by the federal government. *See id.* at 2487 (citing 42 U.S.C. §§ 18031(b)(1), 18041(c)(1)); 45 C.F.R. § 155.105(f)).

30.    Twelve states and the District of Columbia operate "state-based exchanges" or "SBEs" (operating their own websites rather than using the federally run HealthCare.gov), thirty-two states rely principally on the federal government to run their "federally-facilitated exchanges" or "FFEs" using HealthCare.gov, and six states have hybrid exchanges that assume

some, but not all, Exchange functions.[9] Illinois has a federally-facilitated Exchange, which, as is relevant here, means that Illinois must defer to the federal government's determinations regarding enrollment periods, although Illinois does exercise some plan certification functions.[10]

31.     Exchanges may only offer quality health insurance plans, referred to as "qualified health plans" or "QHPs" under the Act. 42 U.S.C. § 18031(b)(1), (c); *see id*. § 18021(a). Such plans must cover preexisting conditions and essential health benefits and cannot impose annual or lifetime-dollar limits on core coverage. *See*, *e.g*., *id*. §§ 300gg-3, -6, -11, 18022. Such coverage improves access to care and overall health, and reduces financial burdens for both individuals and institutions that cover the costs of uncompensated care.

32.     Individuals may enroll in qualified health plans on an Exchange during a specified annual open enrollment period, typically at the end of the calendar year. *Id*. § 18031(c)(6). On federal Exchanges, open enrollment for 2020 lasted from November 1 to December 18, 2019, and open enrollment for 2021 is likely to have a similar range of dates.[11] Typically, plans selected during open enrollment start on January 1 of the next year.[12]

33.     In addition to open enrollment, the ACA mandates that "[t]he Secretary *shall require* an Exchange to provide for ... (C) special enrollment periods specified in section 9801 of

---

9     *State Health Insurance Marketplace Types, 2020*, Kaiser Family Foundation, https://www.kff.org/health-reform/state-indicator/state-health-insurance-marketplace-types/.

10     *Id.*; Louise Norris, *Illinois Health Insurance Marketplace: History and News of the State's Exchange*, HealthInsurance.org (Jan. 1, 2020), https://www.healthinsurance.org/illinois-state-health-insurance-exchange/.

11     *When Is Open Enrollment for 2020?*, Health Markets (Apr. 15, 2010), https://www.healthmarkets.com/resources/health-insurance/open-enrollment/.

12     *FFE and Federally-Facilitated Small Business Health Options Program (FF-SHOP) Enrollment Manual*, CMS 14 (July 19, 2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/ENR_FFMSHOP_Manual_080916.pdf.

Title 26 and other special enrollment periods under circumstances similar to such periods under part D of title XVIII of the Social Security Act." *Id*. § 18031(c)(6) (emphasis added).

34.     Part D of title XVIII of the Social Security Act, colloquially known as Medicare Part D, provides for prescription drug coverage. Among the established Medicare Part D that the ACA incorporates is one for "exceptional circumstances," defined as "such exceptional conditions as the Secretary may provide." 42 U.S.C. § 1395w-101(b)(3)(C); *see also* 42 C.F.R. § 423.38.

35.     Pursuant to that statutory mandate, CMS's regulations require that an "Exchange *must* provide special enrollment periods … during which qualified individuals may enroll in QHPs and enrollees may change QHPs" when certain "triggering events" occur. 45 C.F.R. § 155.420(a)(1), (d) (emphasis added). And "the Exchange *must* allow a qualified individual or enrollee, and when specified … , his or her dependent to enroll in a QHP if one of the triggering events specified … occur." *Id.* § 155.420(a)(3) (emphasis added).

36.     Generally, "a qualified individual or enrollee has 60 days from the date of a triggering event to select a QHP." *Id.* § 155.420(c)(1).

37.     Triggering events include circumstances such as an individual losing coverage, *id.* § 155.420(d)(1), gaining a dependent, *id*. § (2), enrolling unintentionally or erroneously, *id.* §§ (4), (12), experiencing changes in eligibility or access, *id*. §§ (3), (6), (7), or having a health insurer that violated its contract, *id*. § (5). CMS recently created a special enrollment period to promote access to so-called health reimbursement arrangements (employer-funded plans that reimburse certain health care expenses). *Id*. § (14).[13]

---

[13]   Katie Keith, *Final Rule on Health Reimbursement Arrangements Could Shake Up Markets*, Health Affairs (June 14, 2019), https://www.healthaffairs.org/do/10.1377/hblog20190614.388950/full/.

38.     Another triggering event occurs if "[t]he qualified individual or enrollee, or his or her dependent, demonstrates to the Exchange, in accordance with guidelines issued by HHS, that the individual meets other exceptional circumstances as the Exchange may provide." *Id.* § (9).

39.     CMS has explained that the "flexibility afforded under § 155.420(d)(9) allows the Secretary to provide for additional special enrollment periods in the case of exceptional circumstances, as determined appropriate, and HHS will continue to exercise that authority through sub regulatory guidance."[14]

40.     CMS has set forth guidelines for the type of "exceptional circumstances" that warrant an SEP in sub-regulatory guidance, including in the FFE and Federally-Facilitated Small Business Health Options Program (FF-SHOP) Enrollment Manual. This document identifies general types of "exceptional circumstances" impacting a qualified individual (or his or her dependent's) enrollment in a QHP, including circumstances that are "the result of an unforeseen event" or that "require[] that [an individual] obtain minimum essential coverage."[15] The document does not address whether a pandemic or similarly catastrophic public health event would qualify as an "exceptional circumstance."

41.     CMS has emphasized that "exceptional circumstances" SEPs are essential for consumers impacted by unpredictable events. As the agency explained:

> The exceptional circumstances special enrollment period provides an important avenue to coverage for consumers who experience or are affected by unanticipated events, *often outside of their control*. … [T]his special enrollment period should be granted as consistently as possible based on established criteria,

---

[14]   *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. 10,750, 10,798 (Feb. 27, 2015).

[15]   *FFE Manual* at 100.

while still allowing enough flexibility to account for the inherent unpredictability of exceptional circumstances.[16]

42.    CMS views the "exceptional circumstances" standard as a meaningful term for which it can provide guidance and attempt to obtain standard outcomes for consumers. As it has explained, "the vast majority of exceptional circumstances special enrollment periods granted through the FFEs are reviewed in detail by HHS staff and evaluated based on standardized protocols. We believe this process balances the need for standardization and flexibility while ensuring that claims of exceptional circumstances can be verified." *Id.*

43.    CMS has detailed many examples of "exceptional circumstances." On its website, for example, CMS lists circumstances where individuals suffer "[a]n unexpected hospitalization or temporary cognitive disability, or were otherwise incapacitated," or where "[a] natural disaster, such as an earthquake, massive flooding, or hurricane," prevents individuals from enrolling.[17] An "exceptional circumstance" can also include circumstances like if an individual "was a victim of a house fire and was displaced during [open enrollment]."[18]

44.    CMS has also determined on multiple occasions that it has authority to issue blanket SEPs for "exceptional circumstances" affecting a large class of people. For example, in 2017, it allowed all individuals who were unable to take advantage of other SEPs for which they

---

[16]   *Patient Protection and Affordable Care Act; Market Stabilization*, 82 Fed. Reg. 18,346, 18,366 (Apr. 18, 2017) (emphasis added).

[17]   *Special Enrollment Periods for Complex Issues*, HealthCare.gov, https://www.healthcare.gov/sep-list/ (last visited June 14, 2020).

[18]   Memorandum from Randy Pate, Director, Center for Consumer Information and Insurance Oversight to All Federally-Facilitated Exchange, Qualified Health Plan, and Stand-Alone Dental Plan Issuers (Aug. 9, 2018), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/8-9-natural-disaster-SEP.pdf.

would have qualified because of a hurricane to access a blanket SEP.[19] Later, it allowed

individuals affected by an emergency or major disaster formally recognized by FEMA that

prevented them from enrolling to access an "exceptional circumstances" SEP.[20] CMS has also

provided a blanket SEP for volunteers in Americorps and similar programs.[21] And CMS has even

provided broad SEPs on an ad hoc basis in response to specific requests, such as when it gave an

"exceptional circumstances" SEP with retroactive coverage dates to a group of coal miners.[22]

45.     Similarly, when describing the Medicare Part D "exceptional circumstances"

standard, *see* 42 U.S.C. § 1395w-101(b)(3)(C), which the ACA treats as a model, 42 U.S.C.

§ 18031(c)(6), CMS has consistently expressed the view that the Secretary's authority is

necessary to respond to unanticipated situations. For example, when finalizing the first Part D

regulations, CMS explained "We believe that the Secretary's authority to establish SEPs for

exceptional circumstances should be reserved for situations that are not specifically

---

[19]   Memorandum from Randy Pate, Director, Center for Consumer Information and Insurance
Oversight to All Federally-Facilitated Exchange, Qualified Health Plan, and Stand-Alone Dental
Plan Issuers (Sept. 28, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-
Guidance/Downloads/2017-Hurricane-Disasters-Guidance.pdf.

[20]   *CMS Announces Additional Special Enrollment Periods to Help Individuals Impacted by
Hurricanes in Puerto Rico and the U.S. Virgin Islands*, CMS (Jan. 17, 2018),
https://www.cms.gov/newsroom/press-releases/cms-announces-additional-special-enrollment-
periods-help-individuals-impacted-hurricanes-puerto-rico.

[21]   *Special Enrollment Periods and Hardship Exemptions for Persons Meeting Certain Criteria*,
CMS (May 2, 2014), https://marketplace.cms.gov/technical-assistance-resources/5-6-14-
americorp-sepfinal.pdf.

[22]   Greg Johnson, *Former Blackjewel Workers Get Special Exemption from Health Marketplace*,
Gillette News Record (Sept. 5, 2019),
https://www.gillettenewsrecord.com/news/local/article_df4c2e6b-6e6f-5f74-875a-
7a2417a944ed.html.

contemplated in the statute and that this authority should be exercised on a case-by-case basis depending on the circumstances of a particular situation."[23]

46.     In an ongoing rulemaking regarding Medicare Part D, CMS explained that "[w]hile our experience with the [Medicare Advantage] program has informed the SEPs that we have established to date, and are proposing to codify in this regulation, we are mindful that exceptional circumstances may arise which may also warrant a SEP, and we note that this list is not meant to be exhaustive."[24]

47.     Further, CMS considers the best interest of the consumer in determining whether a Medicare Part D SEP is warranted based on "exceptional circumstances": it has "propose[d] to retain the authority … to create SEPs for individuals who meet other exceptional conditions established by CMS … SEPs established under this authority would be done on a case-by-case basis and in situations which we determine it is in the best interest of the beneficiary to have an enrollment (or disenrollment) opportunity."[25]

48.     Coverage selected during an SEP can begin as early as the first day of the month following enrollment, or can even be retroactive to a specific date, covering expenses incurred prior to enrollment. 45 C.F.R. § 155.420(b).[26] The regulations also provide that, for "exceptional circumstances" SEPs, "the Exchange must ensure that coverage is effective on an appropriate date based on the circumstances of the special enrollment period." *Id.* § 155.420(b)(2)(iii).

---

[23]   *Medicare Program; Medicare Prescription Drug Benefit*, 70 Fed. Reg. 4,194, 4,437 (Jan. 28, 2005).

[24]   *Medicare and Medicaid Programs; Contract Year 2021 and 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly*, 85 Fed. Reg. 9,002, 9,120 (Feb. 18, 2020).

[25]   *Id.*

[26]   *See also FFE Manual* at 92.

Indeed, the Manual provides that coverage effective dates for enrollment during an SEP will

"[v]ary based on circumstances," and can be retroactive in nature.[27] CMS has therefore reiterated

that, depending on the nature of the circumstances, "exceptional circumstances" SEPs may offer

retroactive coverage dates.[28]

      49.     Finally, HHS also has special duties when facing a pandemic or comparable

health emergency. Specifically,

> If the Secretary determines, after consultation with such public health officials as
> may be necessary, that—
> (1) a disease or disorder presents a public health emergency; or
> (2) a public health emergency, including significant outbreaks of infectious
> diseases or bioterrorist attacks, otherwise exists,
> the Secretary may take such action as may be appropriate to respond to the public
> health emergency.

42 U.S.C. § 247d(a). In exercising that authority, the Secretary may also waive certain

statutory and regulatory requirements to ensure that health services are fully available to

the public. *Id.* § 1320b-5.

      50.     Moreover, the HHS Secretary "shall … assist States and their political

subdivisions in the prevention and suppression of communicable diseases and with respect to

other public health matters." *Id.* § 243(a). To that end, "[t]he Secretary is authorized to develop

(and may take such action as may be necessary to implement) a plan under which" HHS

resources "may be effectively used to control epidemics of any disease or condition and to meet

other health emergencies or problems." *Id.* § 243(c)(1).

---

[27]  *Id.* at 100, 129-30.

[28]  *2018 Pate Memorandum.*

II.      **The novel coronavirus presents a serious, ongoing threat to Americans' health.**

51.      "Coronavirus disease 2019 (COVID-19) is a respiratory illness that can spread from person to person."[29]

52.      According to the CDC,

- You can become infected by coming into close contact (about 6 feet or two arm lengths) with a person who has COVID-19. COVID-19 is primarily spread from person to person.

- You can become infected from respiratory droplets when an infected person coughs, sneezes, or talks.

- You may also be able to get it by touching a surface or object that has the virus on it, and then by touching your mouth, nose, or eyes.[30]

53.      "People with COVID-19 have had a wide range of symptoms reported—ranging from mild symptoms to severe illness," including "fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, [and] diarrhea."[31]

54.      Even those who recover from the novel coronavirus may nonetheless suffer debilitating long-term health effects, including respiratory and heart issues.[32]

55.      According to the CDC, "**older adults and people of any age who have serious underlying medical conditions**," including chronic conditions like asthma, lung disease, heart

---

[29]   *What Law Enforcement Personnel Need to Know About Coronavirus Disease 2019 (COVID-19)*, CDC (Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-law-enforcement.html.

[30]   *What You Should Know About COVID-19 to Protect Yourself and Others)*, CDC (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[31]   *Symptoms of Coronavirus*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

[32]   Erin Schumaker, *What We Know About Coronavirus' Long-Term Effects*, ABC News (Apr. 17, 2020), https://abcnews.go.com/Health/coronavirus-long-term-effects/story?id=69811566.

conditions, immune compromising conditions, obesity, diabetes, kidney disease, and liver

disease, "might be at higher risk for severe illness from COVID-19."[33]

56.     The novel coronavirus likely burdens racial and ethnic minorities

disproportionately.[34] The CDC has observed an "overrepresentation of blacks among

hospitalized patients" and data that suggests a "death rate … substantially higher" for African

American and Latino persons than for others.[35]

57.     Moreover, the CDC has instructed individuals to "[f]ollow care instructions from

your healthcare provider and local health department," and to "seek emergency medical care

immediately" if they observe any "emergency warning signs," like trouble breathing.[36]

58.     "There is currently no vaccine to prevent coronavirus disease 2019,"[37] nor have

any "drugs or other therapeutics [been] approved by the U.S. Food and Drug Administration

(FDA) to prevent or treat COVID-19."[38]

59.     The current outbreak of the novel coronavirus is expected to last for at least

several months, and potentially years. Experts forecast several possible scenarios, but often

conclude that, even with the best precautions in place, "we must be prepared for at least another

---

[33]   *People Who Are At Higher Risk for Severe Illness*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
(last updated May 14, 2020).

[34]    *COVID-19 in Racial and Ethnic Minority Groups*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-
minorities.html (last updated June 4, 2020).

[35]    *Id.*

[36]   *What to Do If You Are Sick*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-
sick/steps-when-sick.html (last updated May 8, 2020).

[37]   *How to Protect Yourself & Others*, CDC, https://www.cdc.gov/coronavirus/2019-
ncov/prevent-getting-sick/prevention.html (last updated April 24, 2020).

[38]   *Information for Clinicians on Investigational Therapeutic for Patients with COVID-19*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/hcp/therapeutic-options.html (last updated Apr. 25,
2020).

18 to 24 months of significant COVID-19 activity, with hot spots popping up periodically in diverse geographic areas."[39] Among these scenarios is the possibility that the current first wave of the virus is followed by a larger wave in the fall or winter of 2020.[40]

60.     Some experts had projected that numbers of novel coronavirus infections and deaths may increase as states reopen their economies.[41] Early data suggests that such fears may be true as several states have seen a sharp uptick in cases in recent days.[42]

61.     Models have projected that tens or even hundreds of millions of people in the United States could eventually be infected with the novel coronavirus, with well upwards of 100,000 deaths, or as many as 1.5 million in the worst projections.[43] Very recently, the Director

---

[39]     Kristine A. Moore et al., *COVID-19: The CIDRAP Viewpoint*, *Part 1: The Future of the COVID-19 Pandemic: Lessons Learned from Pandemic Influenza,* Ctr. for Infectious Disease Res. and Pol'y 6 (April 30, 2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf; *see also COVID-19 Is Here. Now How Long Will It Last?*, Yale Sch. of Med. (Mar. 27, 2020), https://medicine.yale.edu/news-article/23446/ ("[W]e may get into a cycle of periodic social distancing measures until it is possible to develop and mass-produce a vaccine, which experts say will take 12-18 months, or we can find effective ways to treat COVID-19.").

[40]     *COVID-19: The CIDRAP Viewpoint*; *see also* Alexis Keenan, *COVID-19 Could Make a Resurgence this Fall Depending on US Response, Infectious Disease Specialist*, Yahoo Finance (Mar. 20, 2020), https://finance.yahoo.com/news/covid-19-could-make-a-us-resurgence-this-fall-depending-on-national-response-122231894.html.

[41]     *Models Project Sharp Rise in Deaths as States Reopen*, N.Y. Times, https://www.nytimes.com/2020/05/04/us/coronavirus-live-updates.html (last updated May 15, 2020).

[42]     Emma Court & David R. Baker, *Second U.S. Virus Wave Emerges as Cases Top 2 Million*, Bloomberg (June 10, 2020), https://www.bloomberg.com/news/articles/2020-06-10/second-u-s-virus-wave-emerges-after-state-reopenings.

[43]     *Id.*; Jesse Yomtov, *US Now Has More Coronavirus Deaths than Any Other Country, but the Worst of Epidemic May Not Be Far Off*, USA Today (Apr. 11, 2020), https://www.usatoday.com/story/news/health/2020/04/11/coronavirus-us-more-covid-19-deaths-than-italy-any-country/5121962002/.

of the Harvard Global Health Institute said that the United States may reach 200,000 deaths from the novel coronavirus in September, with a hoped-for vaccine still many months off.[44]

62.     As of June 15, there were over 7.8 million confirmed or probable cases of the novel coronavirus across the world, with 430,000 confirmed or probable deaths.[45] In the United States, there were over two million confirmed cases, with over 115,000 confirmed deaths.[46]

63.     On March 13, 2020, President Trump declared that "the COVID-19 outbreak in the United States constitutes a national emergency," and conferred authority to the HHS Secretary to waive or modify certain statutory and regulatory requirements.[47]

64.     The novel coronavirus pandemic has had a dramatic effect on daily life in the United States and around the world. The White House and the CDC have repeatedly issued guidance instructing Americans to "[w]ork or engage in schooling **FROM HOME** whenever possible," to "**AVOID SOCIAL GATHERINGS** in groups of more than 10 people," to "[a]void eating or drinking at bars, restaurants, and food courts," to "**AVOID DISCRETIONARY TRAVEL,** shopping trips, and social visits," and to "**NOT VISIT** nursing homes or retirement or long-term care facilities unless to provide critical assistance."[48]

---

[44]   Maura Hohman, *Coronavirus Deaths Could Reach 200,000 by Early Fall, Harvard Doctor Warns*, Today (June 11, 2020), https://www.today.com/health/us-coronavirus-deaths-could-reach-200-000-september-harvard-doctor-t183984.

[45]   *Cases in the US.*

[46]   *Coronavirus Map: Tracking the Global Outbreak*, N.Y. Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last updated June 15, 2020).

[47]   *Proclamation 9994, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020).

[48]   *30 Days to Slow the Spread*, White House & CDC, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited June 14, 2020).

65.     State and local governments have responded by issuing stay-at-home or shelter-in-place orders that require residents to suspend all non-essential travel and business for periods of weeks or months. As a result, "at least 316 million people in at least 42 states, three counties, ten cities, the District of Columbia and Puerto Rico [have been] urged to stay home."[49]

66.     States and local governments have also ordered the closures of schools,[50] courts,[51] and administrative offices and service centers,[52] and have even postponed certain elections.[53] Similarly, many federal courts[54] and agencies[55] have adjusted their operations in response to the pandemic.

---

[49]   *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last updated Apr. 20, 2020).

[50]   *Map: Coronavirus and School Closures*, Ed. Week, https://www.edweek.org/ew/section/multimedia/map-coronavirus-and-school-closures.html (last updated May 15, 2020).

[51]   *State Court Closures in Response to the Coronavirus (COVID-19) Pandemic, 2020*, Ballotpedia, https://ballotpedia.org/State_court_closures_in_response_to_the_coronavirus_(COVID-19)_pandemic,_2020 (last visited June 14, 2020).

[52]   Alan Greenblatt, *What Government Functions — Other Than Schools — Are Starting to Close?*, Governing (Mar. 16, 2020), https://www.governing.com/now/What-Government-Functions-Other-Than-Schools-Are-Starting-to-Close.html.

[53]   Nick Corasaniti & Stephanie Saul, *16 States Have Postponed Primaries During Coronavirus. Here's a List.*, N.Y. Times, https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html (last updated May 27, 2020).

[54]   *U.S. Court Closings, Cancellations and Restrictions Due to COVID-19*, Paul Hastings, https://www.paulhastings.com/about-us/advice-for-businesses-in-dealing-with-the-expanding-coronavirus-events/u.s.-court-closings-cancellations-and-restrictions-due-to-covid-19 (last updated June 12, 2020).

[55]   Lisa Rein & Kimberly Kindy, *IRS and Social Security Close Field Offices Across the Country as Some Federal Services Start Shrinking in Response to the Coronavirus*, Wash. Post (Mar. 17, 2020), https://www.washingtonpost.com/politics/irs-and-social-security-close-field-offices-across-the-country-as-federal-services-start-contracting-to-contain-the-coronavirus/2020/03/17/b612958e-6864-11ea-9923-57073adce27c_story.html; *see also Operating Status*, U.S. Off. of Personnel Mgmt., https://www.opm.gov/policy-data-oversight/snow-dismissal-procedures/current-status/ (last updated May 7, 2020).

67.     Because of the pandemic, "U.S GDP is collapsing as we enter what is expected to be the worst economic contraction since the Great Depression. Goldman Sachs and Morgan Stanley project second-quarter GDP will fall by 34% and 38% respectively."[56] And the Federal Reserve has explained that the pandemic has "induced sharp declines in economic activity and a surge in job losses," and projected that the crisis "poses considerable risks to the economic outlook over the medium term."[57]

68.     Unemployment rose to over 30 million people in April 2020, and remains high.[58] In the twelve weeks since the pandemic took hold in mid-March, more than 44 million people in the United States have applied for unemployment benefits, about 29 percent of the workforce.[59]

69.     The economic collapse is causing immense suffering. For example, recent research shows "a rise in food insecurity without modern precedent," with nearly 1 in 5 children in the U.S. now not getting enough to eat.[60]

70.     Beginning in May, some state and local governments began taking steps to reopen their economies, which some experts warn may increase the spread of the novel coronavirus

---

[56]   Mike Patton, *Coronavirus Response Brings Economic Hardship: How Will Stocks React?*, Forbes (Apr. 6, 2020), https://www.forbes.com/sites/mikepatton/2020/04/06/covid-19-response-brings-economic-hardship-how-will-stocks-react/#31ed7745ae5b.

[57]   *Federal Reserve Issues FOMC Statement*, Fed. Reserve (June 10, 2020), https://www.federalreserve.gov/newsevents/pressreleases/monetary20200610a.htm.

[58]   *April's Job Losses Show Many Workers Are Still Connected to Their Employers*, Council of Econ. Advisors (May 8, 2020), https://www.whitehouse.gov/articles/aprils-job-losses-show-many-workers-still-connected-employers/.

[59]   Eli Rosenberg, *Another 1.5 Million Workers Filed for Unemployment Insurance*, Wash. Post (June 11, 2020), https://www.washingtonpost.com/business/2020/06/11/unemployment-claims-coronavirus/.

[60]   *Nearly 1 in 5 Young Children in the U.S. Don't Get Enough to Eat, Research Found*, N.Y. Times (May 6, 2020) https://www.nytimes.com/2020/05/06/us/coronavirus-updates.html#link-ba9024b.

even with the best precautions in place.[61] Whether and when America will be able to fully reopen largely depends on when particular states meet a complicated set of gating criteria based on specific epidemiological thresholds.

### III.   A special enrollment period is a necessary response to the pandemic.

71.     To reduce the spread and the impact of the novel coronavirus pandemic, it is essential that individuals be able to access testing and treatment without any concerns as to availability or cost.[62] That concern weighs in favor of expanding access to affordable, high-quality health insurance as quickly as possible through a special enrollment period available to all Americans who lack coverage.

### A.   Americans need access to affordable, high-quality coverage.

72.     Before the novel coronavirus, there were approximately 27.9 million uninsured and 44 million underinsured people in the United States.[63] At that time, Gallup data indicated that the number of uninsured had increased by 7 million since President Trump was inaugurated.[64]

---

[61]   *Models Project Sharp Rise*.

[62]   *See, e.g.*, Justin Fox, *Testing Is the Key to Getting Coronavirus Under Control*, Bloomberg (Mar. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-03-06/coronavirus-testing-is-the-key-to-countering-outbreak-of-covid-19 ("Widespread testing changes the equation by allowing public health authorities to identify and isolate people with the disease even if they don't have any symptoms yet.").

[63]   Alison Griswold, *The Cost of American Health Care Could Help Coronavirus Spread in the US*, Quartz (Feb. 28, 2020), https://qz.com/1809382/us-health-care-costs-could-help-coronavirus-spread/.

[64]   Sarah Kliff, *Under Trump, the Number of Uninsured Americans Has Gone Up by 7 Million*, Vox (Jan. 23, 2019), https://www.vox.com/2019/1/23/18194228/trump-uninsured-rate-obamacare-medicaid.

73.     Those numbers have risen sharply since the pandemic began. The Kaiser Family Foundation estimates that nearly 27 million people have lost their employer-provided health insurance as a consequence of losing their jobs since the beginning of the pandemic.[65]

74.     As the Kaiser Family Foundation has explained, the "uninsured are likely to face significant barriers to testing for COVID-19 and any care they may need should they contract the virus." Uninsured and underinsured individuals are generally less likely to seek care, in part because they may lack a usual healthcare provider and because they fear the out-of-pocket cost of accessing medical treatment. "In the context of a public health emergency, decisions to forego care because of costs can have devastating consequences."[66] Others may be unable to obtain care at all, like a 17-year-old boy in Los Angeles who died from complications of the novel coronavirus after he was denied treatment at an urgent care center.[67]

75.     Seeking treatment for the novel coronavirus can be costly for the uninsured and underinsured. For example, one woman who tested positive and required a hospital stay received a bill for $34,927.43.[68] The average cost of hospital treatment can average from $20,000-$40,000.[69] And while Congress has taken action to attempt to make testing free, there is some

---

[65]    Rachel Garfield et al., *Eligibility for ACA Health Coverage Following Job Loss*, Kaiser Family Found. (May 13, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/eligibility-for-aca-health-coverage-following-job-loss/.

[66]    Jennifer Tolbert, *What Issues Will Uninsured People Face with Testing and Treatment for COVID-19?*, Kaiser Family Found. (Mar. 16, 2020), https://www.kff.org/uninsured/fact-sheet/what-issues-will-uninsured-people-face-with-testing-and-treatment-for-covid-19/.

[67]    Matt Novak, *Teen Who Died of Covid-19 Was Denied Treatment Because He Didn't Have Health Insurance*, Gizmodo (Mar. 27, 2020), https://gizmodo.com/teen-who-died-of-covid-19-was-denied-treatment-because-1842520539.

[68]    Abigail Abrams, *Total Cost of Her COVID-19 Treatment: $34,927.43*, Time (Mar. 19, 2020), https://time.com/5806312/coronavirus-treatment-cost/.

[69]    Jacqueline Stenson, *Obamacare's Health Care Protections Face First True Test in Coronavirus Crisis*, NBC News (Apr. 5, 2020), https://www.nbcnews.com/health/health-news/obamacare-s-health-care-protections-face-first-true-test-coronavirus-n1176231.

chance that uninsured and underinsured individuals may still be charged for testing, particularly

for serological or antibody-based testing, or for testing-related expenses (like doctor visits or

hospital stays).[70]

76.   Uninsured and underinsured individuals also face some of the highest risks from

the novel coronavirus. "Many uninsured adults work in jobs that may increase their risk of

exposure to COVID-19."[71] And "data analysis finds that nearly six million adults who are at

higher risk of getting a serious illness if they become infected with coronavirus are uninsured."[72]

Ultimately, as many as 2 million uninsured individuals could eventually be hospitalized with the

novel coronavirus.[73]

77.   The United States's high uninsured rate is contributing to the spread of the

pandemic nationwide. "Americans face higher out-of-pocket costs for their medical care than

citizens of almost any other country, and research shows people forgo care they need, including

for serious conditions, because of the cost barriers."[74] As a result, early numbers suggest that

"[c]ountries with universal health care are testing more people and seem to be faring better with

Covid-19 death rates than the United States."[75]

---

[70]   *See* Abigail Abrams, *COVID-19 Testing Is Supposed to Be Free. Here's Why You Might Still Get Billed*, Time (Mar. 20, 2020), https://time.com/5806724/coronavirus-testing-costs/; Michael Liu & Joy Jin, *Coverage of COVID-19 Serology Testing Must Include the Uninsured*, Health Affairs (Apr. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200424.409047/full/.

[71]   *What Issues Will Uninsured People Face*.

[72]   *Id.*

[73]   *Analysis Estimates Up To 2 Million Uninsured People Could Require COVID-19 Hospitalization*, Kaiser Family Found. (Apr. 7, 2020), https://www.kff.org/uninsured/press-release/analysis-estimates-up-to-2-million-uninsured-people-could-require-covid-19-hospitalization/.

[74]   Dylan Scott, *Coronavirus Is Exposing All of the Weaknesses in the US Health System*, Vox (Mar. 16, 2020), https://www.vox.com/policy-and-politics/2020/3/16/21173766/coronavirus-covid-19-us-cases-health-care-system.

[75]   *Id.*

24

78.     The Trump Administration's existing coronavirus-related measures are wholly inadequate to redress the effects of the coverage gap. Although the Administration has agreed to legislation eliminating insurance cost-sharing payments for testing, that of course only benefits individuals who already have insurance.

79.     Similarly, although the Administration plans to reimburse hospitals for the costs of providing novel coronavirus-related treatment from the $100 billion fund authorized by Congress in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, that does not relieve many of the burdens on the uninsured and underinsured. Among other things, "uninsured patients could still be on the hook if they test negative for coronavirus."[76] At least as important, even patients who test positive have no guarantee that they will be covered if they receive treatment outside the hospital, which may be the most cost-effective and safest way of receiving care; for necessary follow-on treatment, including, for example, rehabilitative or mental health care; or for conditions that exacerbate the risks of the novel coronavirus.[77] More broadly, there is concern that simply reimbursing hospitals for providing care fails to provide adequate "peace of mind" to the consumer that they will not be billed, unlike ACA-compliant insurance, which provides a guarantee that all essential treatment will be covered.[78]

80.     Providers themselves also face shortfalls. They can receive reimbursement only at Medicare rates, and are prohibited from billing consumers for the balance.[79] Even so, the Kaiser

---

[76]   Sara Hansard, *Treating Uninsured Could Soak Up 40% of Hospital Virus Fund*, Bloomberg Law (Apr. 7, 2020), https://news.bloomberglaw.com/health-law-and-business/treating-uninsured-could-soak-up-40-of-hospital-virus-fund.

[77]   Christen Linke Young et al., *Responding To COVID-19: Using the CARES Act's Hospital Fund to Help The Uninsured, Achieve Other Goals*, Health Affairs (Apr. 11, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200409.207680/full/.

[78]   *Treating Uninsured Could Soak Up 40% of Hospital Virus Fund*.

[79]   *Responding To COVID-19*.

Family Foundation estimates that reimbursing hospitals for such costs could consume as much as $41.8 billion of the fund, which has to cover all provider-related costs.[80] Thus, the American Enterprise Institute has suggested that "even this substantial sum is unlikely to be enough to cover the costs of the uninsured and the other expenses hospitals and other providers will incur as they scale up capacity to handle the coming surge of patients."[81] Moreover, as the President and CEO of the American Hospital Association has explained, hospitals are under extraordinary financial strain, "given that virtually all regular operations have come to a halt."[82]

81.     In sum, the Administration's existing measures are inadequate to meet the scale of the threat posed by the novel coronavirus pandemic.

**B.      A special enrollment period would encourage individuals to seek coverage.**

82.     An SEP would redress these concerns by providing uninsured and underinsured individuals with an easy, quick, and subsidized method of obtaining health insurance.

83.     Twelve of the thirteen state-based marketplaces have announced special enrollment periods in response to the novel coronavirus.[83] In opening these SEPs, multiple states referred to the pandemic as an "exceptional circumstance" or generally as an "emergency."[84] The

---

[80]   *Treating Uninsured Could Soak Up 40% of Hospital Virus Fund*.

[81]   Joseph Antos & James C. Capretta, *Blocking Open Enrollment for ACA Insurance Is Another Pandemic Mistake*, Am. Enter. Inst. (Apr. 2, 2020), https://www.aei.org/health-policy/blocking-open-enrollment-for-aca-insurance-is-another-pandemic-mistake/.

[82]   Rick Pollack, President and CEO, Am. Hosp. Ass'n, *AHA Statement on the Use of the CARES Act*, Am. Hosp. Ass'n (Apr. 3, 2020), https://www.aha.org/press-releases/2020-04-03-aha-statement-use-cares-act.

[83]   *See* Katie Keith, *CMS Could Do More in Light of the Coronavirus Crisis*, Health Affairs (Mar. 25, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200325.501048/full/; Louise Norris, *Exceptional Circumstances for Special Enrollment*, HealthInsurance.org (Apr. 28, 2020), https://www.healthinsurance.org/special-enrollment-guide/exceptional-circumstances-for-special-enrollment/.

[84]   *See, e.g.*, Office of the Governor, *Governor Lamont Provides Update on Connecticut's Coronavirus Response Efforts*, HamletHub (Apr. 5, 2020),

exception is Idaho, which is sparsely populated and has relatively few cases of the novel
coronavirus.[85]

84.     At least 60,000 people have already enrolled in health insurance via the
coronavirus-related SEPs offered by seven of those Exchanges, as opposed to SEPs offered for
qualifying life events, with roughly 237,000 enrollees projected over a 60-day period.[86]

85.     If Defendants provide an SEP for the 38 federally-facilitated and hybrid
Exchanges, one analysis suggests that as many as 1.8 million individuals might seek to enroll.[87]
Another suggests that marketplace enrollment might rise by as many as 2 million individuals on
net, which likely represents a much higher number of new enrollees as prior enrollees leave the
Exchanges and go on Medicaid.[88] These estimates are consistent with the massive increase in
calls by consumers seeking assistance with enrollment, many of whom cannot enroll because

---

https://news.hamlethub.com/newfairfield/events/todays-events/47538-governor-lamont-provides-update-on-connecticut-s-coronavirus-response-efforts (Connecticut); *Coronavirus Emergency Extends Special Enrollment Period Until June 15*, Md. Health Connection, https://www.marylandhealthconnection.gov/coronavirus-sep/ (last visited June 14, 2020) (Maryland); *Silver State Health Insurance Announces Exceptional Circumstance Enrollment Period*, NBC News 4 (Mar. 17, 2020), https://mynews4.com/news/local/silver-state-health-insurance-announces-exceptional-circumstance-enrollment-period (Nevada); *Special Enrollment Period (SEP) Available to Purchase Coverage Through Healthsource RI as a Part of the State's Response to COVID-19*, What's Up Rhode Island (Mar. 15, 2020), https://whatsupnewp.com/2020/03/special-enrollment-period-sep-available-to-purchase-coverage-through-healthsource-ri-as-a-part-of-the-states-response-to-covid-19/ (Rhode Island); State Health Exchange Offers Special Enrollment Period Due to Virus, KomoNews (Mar. 11, 2020), https://komonews.com/news/coronavirus/state-health-exchange-offers-special-enrollment-period-due-to-virus (Washington).

[85]   *Cases in the US.*

[86]   *See* Charles Gaba, *UPDATE: 1.8 - 2.4 Million More Americans Would Likely #GetCovered if HealthCare.Gov Launched #COVID19 SEP*, ACASignups.net (Apr. 14, 2020), http://acasignups.net/20/04/14/exclusive-least-600k-18-million-more-americans-would-likely-getcovered-if-healthcaregov.

[87]   *See id.*

[88]   *See COVID-19 Impact.*

they do not have access to an SEP.[89] Even less robust enrollment, however, would extend

coverage to hundreds of thousands of individuals.

86.     The Urban Institute has also found that a nationwide special enrollment period

"could significantly increase health insurance coverage and reduce financial burdens" on

workers in vulnerable industries who were uninsured before the pandemic.[90]

87.     Thus, providing an SEP would significantly increase the proportion of Americans

who seek testing and treatment in response to the novel coronavirus, as well as for health

conditions more broadly.

88.     Providing access to coverage would also substantially alleviate the financial

strains facing families, many of whom may have lost jobs or sources of revenue, by offering

them access to high-quality, cost-effective health insurance.

89.     Existing special enrollment periods for circumstances like losing job-related

insurance coverage are inadequate. Such periods do not cover sizable groups of uninsured

individuals, including individuals who never had insurance coverage as part of their

employment; individuals who had atypical employment circumstances, like "freelancers or part-

time employees who have had sources of income disappear," but did not lose job-related

---

[89]   *See* Lydia Wheeler, *Newly Unemployed Scramble to Enroll in Obamacare in Time*,
Bloomberg Law (Apr. 10, 2020), https://news.bloomberglaw.com/health-law-and-
business/newly-unemployed-scramble-to-enroll-in-obamacare-in-time.

[90]   Linda J. Blumberg et al., *Potential Eligibility for Medicaid, CHIP, and Marketplace
Subsidies Among Workers Losing Jobs in Industries Vulnerable to High Levels of COVID-19-
Related Unemployment*, Urban Inst. (Apr. 24,2020),
https://www.urban.org/research/publication/potential-eligibility-medicaid-chip-and-marketplace-
subsidies-among-workers-losing-jobs-industries-vulnerable-high-levels-covid-19-related-
unemployment; *see also id.* at 2 (estimating that "2 million additional people are ineligible" to
access the Exchanges because of the lack of a special enrollment period in their states).

insurance coverage;[91] or individuals who simply wish to obtain insurance coverage in response to a once-in-a-generation pandemic, whether or not they had it before. Making matters worse, there is substantial overlap between industries most impacted by coronavirus-related job losses and industries with high rates of uninsured or underinsured individuals.[92]

90.     Even for individuals who lost insurance coverage as a result of losing their job, a categorical SEP is necessary. "Several studies suggest that the SEP reserved for workers who lose [insurance] has failed to reach most of its intended target population."[93] That is in part because the process of applying for an SEP is time-consuming and requires the submission of documentation, which may be challenging to assemble amidst the pandemic.[94] Moreover, "announcing an emergency SEP would help raise awareness of the availability of coverage through HealthCare.gov among important groups, including for those who might already be eligible for an SEP but unaware of their options."[95] It would also encourage healthy individuals to enroll, knowing that the enrollment process will be simpler and easier.

91.     There is also no good reason to lock people into their prior decisions made during the 2020 open enrollment period. "[T]he open enrollment process for 2020 was plagued by

---

[91]   Lauren Peller, *Obamacare Marketplace Won't Extend Open Enrollment Period Amid Coronavirus*, CBS News (Apr. 3, 2020), https://www.cbsnews.com/news/obamacare-marketplace-wont-up-extend-open-enrollment-period-amid-coronavirus-2020-04-03/.

[92]   *See* Amy Goldstein, *First, The Coronavirus Pandemic Took Their Jobs. Then, It Wiped Out Their Health Insurance*, Wash. Post (Apr. 18, 2020), https://www.washingtonpost.com/health/first-the-coronavirus-pandemic-took-their-jobs-then-it-wiped-out-their-health-insurance/2020/04/18/1c2cb5bc-7d7c-11ea-8013-1b6da0e4a2b7_story.html.

[93]   *Responding to COVID-19*.

[94]   Margot Sanger-Katz & Reed Abelson, *Obamacare Markets Will Not Reopen, Trump Decides*, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/2020/04/01/upshot/obamacare-markets-coronavirus-trump.html.

[95]   *CMS Could Do More*; *see also Newly Unemployed Scramble*.

technical issues, leading to the possibility that more people wanted to enroll in coverage but were

unable to."[96] Indeed, it is possible that "at least 1.26 million more people would be enrolled in

marketplace coverage today if not for the Trump administration's attacks on the ACA."[97]

Moreover, individuals choosing whether to enroll in the Fall of 2019 cannot possibly have

predicted that the world would face a once-in-a-generation pandemic.

92.    Concerns over adverse selection[98] are also less pressing given that sick and

healthy individuals alike seek the peace of mind that enrolling in health insurance coverage

would provide. This view is further confirmed by the support that the insurance industry—the

constituency most incentivized to raise adverse selection-based concerns—have shown for the

opening of an "exceptional circumstances" SEP.[99]

93.    In sum, a "special enrollment period would … enable[] Americans who have lost

their jobs to obtain new health insurance more easily and with less paperwork at an urgent time,

---

[96]   *CMS Could Do More.*

[97]   Charles Gaba & Emily Gee, *How Trump's Policies Have Hurt ACA Marketplace Enrollment*, Ctr. for Am. Progress (Apr. 16, 2020), https://www.americanprogress.org/issues/healthcare/news/2020/04/16/483362/trumps-policies-hurt-aca-marketplace-enrollment/.

[98]   "'Adverse selection' is an economic term of art that describes problems that can arise in insurance markets when the healthy have insufficient incentive to purchase health insurance, and thus the resulting pool of insureds consists predominantly of the sick and those actively using their insurance." *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1176 n.1 (D.C. Cir. 2015).

[99]   Letter from Matthew Eyles, President & CEO, Am.'s Health Insurance Plans & Scott Serota, President & CEO, Blue Cross Blue Shield Ass'n to Nancy Pelosi, Speaker of the House et al. (Mar. 19, 2020), https://www.ahip.org/wp-content/uploads/AHIP-and-BCBSA-Legislative-Recommendations-03.19.2020.pdf (the "AHIP Letter").

… as well as give those who have already been uninsured another chance to purchase insurance as the pandemic ramps up."[100]

### C.   There is a wide consensus behind an SEP.

94.     The Trump Administration has already received letters of support from governors and other state officials,[101] members of Congress,[102] and over 200 non-profits, including

---

[100]  Alison Durkee, *Americans Can't Sign Up for Health Insurance During a Global Pandemic, Trump Decides*, Vanity Fair (Apr. 2, 2020), https://www.vanityfair.com/news/2020/04/trump-rejects-aca-special-enrollment-period-coronavirus.

[101]  *See, e.g.*, Letter from Douglas A. Ducey, Governor of Arizona, to Alex M. Azar II, HHS Sec'y (Mar. 25, 2020), https://azgovernor.gov/sites/default/files/20200325131134559.pdf; Letter from Tom Wolf, Governor of Pennsylvania, To Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Mar. 16, 2020), https://www.insurance.pa.gov/Documents/Press%20and%20Communications/Testimonies%2c%20Remarks%2c%20Speeches/03.16.20%20TWW%20COVID%2019%20SEP%20letter.pdf; Letter from Gretchen Whitmer, Governor of Michigan et al. to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Apr. 13, 2020), https://content.govdelivery.com/attachments/MIEOG/2020/04/13/file_attachments/1425515/ACA%20Special%20Enrollment%20Letter%204.13.2020.pdf; Letter from Gretchen Whitmer, Governor of Michigan to Donald Trump, President of the United States, https://content.govdelivery.com/attachments/MIEOG/2020/03/12/file_attachments/1399533/Governor%20Whitmer%20Letter%20to%20President%20Trump.pdf; Letter from Christopher T. Sununu, Governor of New Hampshire to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator, https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/secretary-azar.pdf (last visited June 14, 2020); Letter from Philip D. Murphy, Governor of New Jersey to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Mar. 15, 2020), http://d31hzlhk6di2h5.cloudfront.net/20200315/8f/63/22/fb/f333ac94f2e2ebf477b14898/Governor_Murphy_Letter_to_Secretary_Azar_and_Administrator_Verma_03152020.pdf; Letter from Kate Brown, Governor of Oregon to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Mar. 23, 2020), https://healthcare.oregon.gov/marketplace/Documents/032320-OR-SEP-request-secAzar-adminVerma-COVID19.pdf;  Letter from Coalition of State Att'ys General to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Apr. 3, 2020), https://www.oag.ca.gov/system/files/attachments/press-docs/CA%20NC%20COVID-19%20healthcare%20exchange%20letter%20plus%20IA.pdf.

[102]  Letter from Christopher S. Murphy, Senator, et al. to Alex M. Azar II, HHS Sec'y (Apr. 7, 2020), https://www.manchin.senate.gov/imo/media/doc/SEP%20Letter%20to%20Azar%204.7.20%20Final.pdf?cb; Letter from Jack Reed, Senator, et al. to Alex M. Azar II, HHS Sec'y & Seema Verma, CMS Administrator (Mar. 12, 2020), https://www.peters.senate.gov/imo/media/doc/03.12.20%20Ltr%20to%20HHS%20CMS%20Re

providers' associations, patient groups, and policy and advocacy organizations,[103] which echo

these points.

95.     America's Health Insurance Plans and Blue Cross Blue Shield also encouraged

the Administration to provide a special enrollment period, writing that it would "give people the

opportunity to get the security and peace of mind that health care coverage provides."[104] Both

entities, along with other insurers and the U.S. Chamber of Commerce, also sent another letter

advocating for "a new, one-time SEP for enrollment in the Marketplaces specifically for those

individuals who are uninsured and not otherwise eligible for an existing SEP."[105] In neither letter

did the insurance industry mention any concerns regarding potential adverse selection, which

would typically affect insurers the most.

---

%20Coronavirus%20Special%20Enrollment.pdf; Letter from Lloyd Doggett, Representative, et
al. to Alex M. Azar II, HHS Sec'y (Mar. 13, 2020),
https://doggett.house.gov/sites/doggett.house.gov/files/2020.3.13%20Azar%20Letter_0.pdf.

[103]  Letter from Organizations to Alex M. Azar II, HHS Sec'y et al. (Mar. 20, 2020),
https://younginvincibles.org/wp-content/uploads/2020/03/Request_Emergency-Special-
Enrollment-Period-to-Combat-COVID-19.pdf; Letter from Ingrida Lusis, Vice-President, Policy
& Government Affairs, Am. Nurses Ass'n to Alex M. Azar II, HHS Sec'y (Apr. 2, 2020),
https://www.nursingworld.org/~495ff2/globalassets/practiceandpolicy/work-environment/health-
-safety/coronavirus/special-open-enrollment---hhs---04032020---final.pdf; Letter from Robert M.
McLean, President, Am. College of Physicians to Mike Pence, Vice President of the United
States et al. (Apr. 28, 2020),
https://www.acponline.org/acp_policy/letters/letter_to_vice_president_pence_and_hhs_regarding
_a_special_enrollment_period_for_federally-facilitated_exchanges_april_2020.pdf.

[104]  AHIP Letter.

[105]  Letter from Insurers and Others to Nancy Pelosi, Speaker of the House at 2 (Apr. 28, 2020),
https://www.aha.org/system/files/media/file/2020/04/Letter%20COVID%20Coverage%20Coaliti
on.pdf.

96.     The Association for Community Affiliated Plans has similarly noted that it is "already seeing stories of people who are afraid to come forward for testing or treatment because they do not have comprehensive health coverage."[106]

97.     The American Enterprise Institute has also supported a special enrollment period, arguing that failing to do so would "needlessly make matters worse for millions of Americans who lose both their jobs and their health insurance in the coming weeks."[107]

98.     HHS itself has emphasized the exceptional nature of the pandemic and the need for aggressive regulatory responses. HHS Secretary Azar formally declared a "public health emergency" to enable HHS to issue certain waivers,[108] which have been designed to alleviate regulatory burdens on insurers, providers, and other major companies.[109] In issuing one set of waivers, CMS Administrator Verma explicitly referenced "President Trump declar[ing] the rapidly evolving COVID-19 situation a national emergency"; asserted that "it remains vital that our healthcare system be equipped to respond effectively to the additional cases that do arise, that federal requirements designed for periods of relative calm do not hinder measures needed in an emergency"; and noted that such waivers "are reserved for the rarest of situations."[110]

---

[106]  Allison Bell, *Pressure For National COVID-19 Special Enrollment Period Builds*, ThinkAdvisor (Mar. 20, 2020), https://www.thinkadvisor.com/2020/03/20/pressure-for-national-covid-19-special-enrollment-period-builds/?slreturn=20200301200529.

[107]  *Blocking Open Enrollment.*

[108]  *Determination that A Public Health Emergency Exists*, Pub. Health Emergency (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[109]  *Coronavirus Waivers & Flexibilities*, CMS, https://www.cms.gov/about-cms/emergency-preparedness-response-operations/current-emergencies/coronavirus-waivers (last updated June 10, 2020); *Emergency Use Authorization*, FDA, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#2019-ncov (last updated June 13, 2020).

[110]  *Emergency Declaration Press Call Remarks by CMS Administrator Seema Verma*, CMS (Mar. 13, 2020), https://www.cms.gov/newsroom/press-releases/emergency-declaration-press-call-remarks-cms-administrator-seema-verma.

99.     Citing the "national emergency" posed by the pandemic, the IRS and the Employee Benefits Security Administration recently extended deadlines for enrolling in group health plans and other benefit plans until 60 days after the end of the pandemic, as well as for enrolling in COBRA continuation coverage. *Extension of Certain Timeframes for Employee Benefit Plans, Participants, and Beneficiaries Affected by the COVID-19 Outbreak*, 85 Fed. Reg. 26,351, 26,351 (May 4, 2020). In doing so, the agencies recognized the need to "take steps to minimize the possibility of individuals losing benefits because of a failure to comply with certain pre-established timeframes," and stated that "such relief is immediately needed to preserve and protect the benefits of participants and beneficiaries in all employee benefit plans across the United States during the National Emergency." *Id.*

100.     HHS reviewed and expressly concurred with the agencies, noting that it would "exercise enforcement discretion to adopt a temporary policy of measured enforcement to extend similar timeframes otherwise applicable to non-Federal governmental group health plans and health insurance issuers." *Id.* The notice also referenced the legal requirement that Labor, Treasury, and HHS "ensure through an interagency Memorandum of Understanding (MOU) that regulations, rulings, and interpretations issued by each of the Departments relating to the same matter over which two or more departments have jurisdiction, are administered so as to have the same effect at all times." *Id.* at 26,351 n.6 (citing 42 U.S.C. § 300gg-92 n.).

101.     Separately, CMS has announced that, in the context of Medicare Advantage and Medicare Part D, it would interpret "the exceptional conditions Special Enrollment Period (SEP) adopted under 42 CFR 422.62(b)(4) and 423.38(c)(8)(ii) for Individuals Affected by a FEMA-Declared Weather Related Emergency or Major Disaster" to apply to "beneficiaries who were

eligible for—but unable to make—an election because they were affected by the COVID-19 pandemic."[111]

102.    For other Medicare parts, CMS has also announced that it will provide "equitable relief" to "eligible individuals who could not submit a timely enrollment due to the impact COVID-19 pandemic-related national emergency had on SSA's processing." However, CMS will not require such individuals to "show proof they were impacted."[112]

103.    In other words, in response to the pandemic, HHS and its sub-components have provided extraordinary flexibility to regulated industries, and have provided for expanded enrollment opportunities for other sources of health coverage, but inexplicably have not provided a special enrollment period for federally-facilitated and hybrid ACA Exchanges.

## IV.    Defendants unlawfully rejected a special enrollment period solely to avoid "propping up" the Affordable Care Act.

104.    Notwithstanding the many reasons to provide a special enrollment period along the same lines as the state Exchanges, the Trump Administration ultimately elected not to provide a special enrollment period for the 32 federally-facilitated Exchanges and 6 hybrid Exchanges.

---

[111]  Memorandum from Jerry Mulcahy to All Medicare Advantage Organizations, Part D Sponsors, and Medicare-Medicaid Plans (May 5, 2020), https://www.cms.gov/files/document/special-enrollment-period-sep-individuals-affected-fema-declared-weather-related-or-other-major.pdf.

[112]  *Enrollment Issues for COVID-19 Pandemic-Related National Emergency Questions and Answers for Medicare Beneficiaries*, CMS, https://www.cms.gov/files/document/enrollment-issues-covid-ab-faqs.pdf (last visited June 14, 2020).

105.    A CMS spokesperson confirmed on March 21 that the Trump Administration was "considering whether to create a special enrollment period for Obamacare coverage because of the coronavirus emergency."[113]

106.    The Trump Administration "had been considering the action for several weeks."[114]

107.    The planning for a special enrollment period was sufficiently advanced that "[i]nsurers said they had expected Trump to announce a special enrollment period … based on conversations they had with officials at [CMS]."[115] Indeed, "by late March, administration officials sent word to insurers that the call would soon be official: They were reopening Obamacare."[116]

108.    However, "the situation suddenly became 'fluid,' in the description of one executive," while "[a]nother described the administration as divided about whether to proceed, especially given the president's support for the lawsuit that would overturn the law."[117]

109.    Defendants ultimately decided not to provide a special enrollment period.

---

[113]  Mohana Ravindranath, *Trump Officials Weigh Reopening Obamacare Enrollment Over Coronavirus*, Politico (Mar. 21, 2020), https://www.politico.com/news/2020/03/21/trump-administration-obamacare-coronavirus-140806.

[114]  *Obamacare Markets Will Not Reopen.*

[115]  Susannah Luthi, *Trump Rejects Obamacare Special Enrollment Period Amid Pandemic*, Politico (Mar. 31, 2020), https://www.politico.com/news/2020/03/31/trump-obamacare-coronavirus-157788.

[116]  *How Trump Surprised His Own Team.*

[117]  *Obamacare Markets Will Not Reopen; see Texas v. United States*, 945 F.3d 355, 373 (5th Cir. 2019), *cert. granted*, 140 S. Ct. 1262 (2020).

110.    The decision was first communicated publicly on March 31, when a White House official told Politico that the Trump Administration had decided not to provide a special enrollment period.[118]

111.    HHS Secretary Azar defended the decision on the grounds that allowing providers to seek reimbursement through two legislatively-created funds is "better for … uninsured individuals" because it provides "disease-specific support of care to make sure that people get treatment."[119]

112.    Defendants have not provided a written explanation of why the novel coronavirus pandemic did not qualify as an "exceptional circumstance," or why reopening the Exchanges would constitute bad policy.

113.    Defendants' decision not to reopen the Exchanges ultimately rested on a political calculation made by the White House and reached because "[t]he president opposed reopening the Obamacare marketplaces when presented with the option."[120]

114.    President Trump's contempt for the ACA is well known, and guided Defendants' ultimate decision. "In meetings at the White House in the time between his stated consideration and his announced rejection of the idea, Trump on multiple occasions … referred to Obamacare as 'a failure,' and questioned why the administration should bother helping to prop it up."[121]

115.    A member of the President's party "close to the administration" characterized the decision as "purely ideological," while an administration official characterized it as "a bad

---

[118]   *Trump Rejects Obamacare Special Enrollment Period.*
[119]   *How Trump Surprised His Own Team.*
[120]   *Id.*
[121]   *Biden Tells Trump.*

decision opticswise" because it "politicizes people's access to health services during a serious national health emergency."[122]

116.    The decision "surprised even some officials in the Health and Human Services Department, who believed the concept was still under consideration," and worried officials who "viewed the verdict as an unforced error in the middle of a historic pandemic."[123]

117.    The Trump Administration has also "declined to publicize the existing options for Americans who have recently lost health benefits through job reductions."[124]

118.    Defendants' decision not to provide a special enrollment period, their denial of requests to do so, their apparent interpretation of the term "exceptional circumstances," and their conclusion that the novel coronavirus does not constitute an "exceptional circumstance," all constitute "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704; *see id.* § 702.

## V.    Defendants have repeatedly attempted to sabotage the ACA.

119.    The Trump Administration's decision not to open a special enrollment period "follows a long-established pattern by the administration to weaken and discourage enrollees to the ACA at nearly every turn possible" in an effort to sabotage the law.[125] That history reveals that the decision not to open an "exceptional circumstances" SEP resulted from President Trump's hatred of the ACA, not the reasoned decisionmaking required by the APA.

---

[122] *How Trump Surprised His Own Team.*

[123] *Id.*

[124] *Obamacare Markets Will Not Reopen.*

[125] Katelyn Burns, *Trump Could Have Reopened Enrollment for the Affordable Care Act for Coronavirus. He Chose Not to.*, Vox (Apr. 1, 2020), https://www.vox.com/policy-and-politics/2020/4/1/21202841/trump-enrollment-affordable-care-act-coronavirus.

**A.      Defendants have promised to undermine the ACA.**

120.    Specifically, President Trump and his advisors have repeatedly promised to undermine the Affordable Care Act as a substitute for repealing it legislatively.

121.    On January 25, 2017, President Trump stated, "[T]he best thing we could do is nothing for two years, let [the ACA] explode. And then we'll go in and we'll do a new plan and—and the Democrats will vote for it. Believe me … . So let it all come [due] because that's what's happening. It's all coming [due] in '17. We're gonna have an explosion. And to do it right, sit back, let it explode and let the Democrats come begging us to help them because it's on them."[126]

122.    After Congress declined to repeal the Affordable Care Act on July 28, 2017, President Trump tweeted, "3 Republicans and 48 Democrats let the American people down. As I said from the beginning, let ObamaCare implode, then deal. Watch!"[127]

123.    On October 13, 2017, President Trump stated, "We're taking a little different route than we had hoped, because getting Congress—they forgot what their pledges were. … So we're going a little different route. But you know what? In the end, it's going to be just as effective, and maybe it'll even be better."[128]

---

[126] *Transcript: ABC News Anchor David Muir Interviews President Trump*, ABC News (Jan. 25, 2017), http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

[127] Donald J. Trump (@realDonaldTrump), Twitter (July 28, 2017, 2:25 AM), https://twitter.com/realDonaldTrump/status/890820505330212864.

[128] *President Trump Addresses Values Voters Summit*, CNN (Oct. 13, 2017), http://www.cnn.com/TRANSCRIPTS/1710/13/cnr.04.html.

124.    In late April 2018, at a rally in Michigan, President Trump bragged, "Essentially, we are getting rid of Obamacare …. Some people would say, essentially, we have gotten rid of it."[129]

125.    In signing a bill unrelated to the ACA on May 30, 2018, President Trump stated: "For the most part, we will have gotten rid of a majority of Obamacare."[130] He went on to confirm that his Administration's objective is to achieve by executive action alone what Congress has refused to do: "Could have had it done a little bit easier, but somebody decided not to vote for it, so it's one of those things."[131]

126.    At a rally on June 23, 2018, according to an observer, President Trump complained about Congress's decision not to repeal the ACA and told audience members that "'it doesn't matter. We gutted it anyway.'"[132]

127.    On August 1, 2018, President Trump returned to the same theme, stating that even though Congress declined to repeal the ACA, "I have just about ended Obamacare," but "we're doing it a different way. We have to go a different route."[133]

---

[129]  Alan Rappeport, *Trump Says He Got Rid of Obamacare. The I.R.S. Doesn't Agree*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/business/trump-obamacare-irs.html.

[130]  *Remarks by President Trump at S.204, "Right to Try" Bill Signing*, The White House (May 30, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-s-204-right-try-bill-signing/.

[131]  *Id.*

[132]  Laura Litvan (@LauraLitvan), Twitter (June 23, 2018, 4:04 PM), https://twitter.com/LauraLitvan/status/1010614472946352128; *see also* Jake Sherman et al., *Overheard at the DSCC Retreat on Martha's Vineyard*, Politico (June 24, 2018), https://www.politico.com/newsletters/playbook/2018/06/24/overheard-at-the-dscc-retreat-on-marthas-vineyard-281247.

[133]  *President Trump Calls the Show!*, The Rush Limbaugh Show (Aug. 1, 2018), https://www.rushlimbaugh.com/daily/2018/08/01/president-trump-calls-the-show/amp/ (emphasis added).

128.   On October 2, 2018, President Trump referenced the ACA and stated, "We had it repealed and replaced. A little shock[] took place early in the morning. But the fact is, we didn't get one Democrat vote…. But we've pretty much dismantled it."[134]

129.   On November 2, 2018, President Trump boasted that his Administration is "decimating [the ACA] strike by strike;"[135] "we've decimated Obamacare."[136]

130.   On March 5, 2020, President Trump reiterated that he wanted to "totally kill" the Affordable Care Act.[137]

131.   On May 6, 2020, during a press availability in the Oval Office, President Trump declared that his Administration would continue arguing to invalidate the ACA, stating that "Obamacare is a disaster," that "[w]hat we want to do is terminate it," and that his Administration had "already pretty much killed it."[138]

---

[134]  *Speech: Donald Trump Holds a Political Rally in Southaven, MS – October 2, 2018*, Factbase, https://factba.se/transcript/donald-trump-speech-maga-rally-southaven-ms-october-2-2018.

[135]  *Speech: Donald Trump Holds a Political Rally in Huntington, West Virginia – November 2, 2018*, Factbase, https://factba.se/transcript/donald-trump-speech-maga-rally-huntington-wv-november-2-2018.

[136]  Jim Acosta (@Acosta), Twitter (Nov. 2, 2018, 8:19 PM), https://twitter.com/acosta/status/1058514065595777024?s=21.

[137]  *Remarks by President Trump at a Fox News Town Hall*, White House (Mar. 6, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-fox-news-town-hall-scranton-pa/.

[138]  Nikki Carvajal, *Trump Says Administration Will Continue Legal Fight to Eliminate Obamacare*, CNN (May 6, 2020), https://www.cnn.com/2020/05/06/politics/trump-obamacare/index.html.

132.    On May 26, 2020, during a press availability in the Oval Office, President Trump claimed that "[w]e slashed Obamacare's crippling requirements," and that "essentially we got rid of Obamacare, if you want to know the truth. You can say that in the truest form."[139]

**B.    Defendants have taken actions designed to undermine the ACA.**

133.    President Trump and his Administration have made good on their threats to undermine the ACA through executive action, although the ACA has continued to function and remains the law of the land.

134.    Hours after he was sworn in, President Trump signed Executive Order No. 13,765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal*, 82 Fed. Reg. 8,351 (Jan. 20, 2017). The Order turned what had been candidate Trump's promises to repeal the ACA into President Trump's official policy. *Id.* § 1 ("It is the policy of my Administration to seek the prompt repeal of the Patient Protection and Affordable Care Act …."). "[P]ending such repeal," the Order directs Administration officials to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the Act." *Id.*; *see id.* §§ 2-4.

135.    On October 12, 2017, President Trump signed Executive Order No. 13,813, entitled *Promoting Healthcare Choice and Competition Across the United States*, 82 Fed. Reg. 48,385 (Oct. 12, 2017). The Order directs the Administration to "prioritize three areas for improvement in the near term: association health plans (AHPs), short-term, limited-duration insurance (STLDI), and health reimbursement arrangements (HRAs)," *id.* § 1(b). All three provide coverage, often bare-bones, that does not need to comply with the ACA's requirements.

---

[139] *Remarks by President Trump on Protecting Seniors with Diabetes*, White House (May 26, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-protecting-seniors-diabetes/.

In keeping with Executive Order No. 13,813's directive, the Administration has issued rules expanding access to AHPs,[140] and STLDI,[141] and HRAs.[142] Such plans provide especially meager protection against the novel coronavirus, including major coverage gaps and high cost-sharing.[143]

136.    Section 1332 of the ACA, 42 U.S.C. § 18052, permits states to apply for waivers of some of the law's requirements in order to promote innovative policies that satisfy certain statutorily-prescribed guardrails, *see id.* § 18052(b)(1). Although the Trump Administration has encouraged states to apply for Section 1332 waivers,[144] it has either denied or not responded to many of the requests for waivers that it has received,[145] especially when it believes that granting the waivers would faithfully implement the Act by expanding access to coverage. By contrast, the Administration has eagerly processed state waivers that are designed to reduce access to quality health insurance.[146]

---

[140]  *See Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans*, 83 Fed. Reg. 28,912 (June 21, 2018).

[141]  *See Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 38,212 (Aug. 3, 2018).

[142]  *See Health Reimbursement Arrangements and Other Account-Based Group Health Plans*, 84 Fed. Reg. 28,888 (June 20, 2019).

[143]  Emily Curran et al., *In the Age of COVID-19, Short-Term Plans Fall Short for Consumers*, Commonwealth Fund (May 12, 2020), https://www.commonwealthfund.org/blog/2020/age-covid-19-short-term-plans-fall-short-consumers.

[144]  *See, e.g.*, Letter from Thomas E. Price, former HHS Sec'y, to state governors (Mar. 13, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Downloads/March-13-2017-letter_508.pdf ("We welcome the opportunity to work with states on Section 1332 State Innovation Waivers….").

[145]  *See* Alison Kodjak, *Administration Sends Mixed Signals On State Health Insurance Waivers*, NPR (Oct. 19, 2017), http://www.npr.org/sections/health-shots/2017/10/19/558310690/administration-sends-mixed-signals-on-state-health-insurance-waivers. *See generally Section 1332: State Innovation Waivers*, CMS, https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-.html (listing pending, approved, and denied waiver requests).

[146]  *See* Bruce Japsen, *Trump's Medicaid Work Rules Hit States With Costs And Bureaucracy*, Forbes (July 22, 2018), https://www.forbes.com/sites/brucejapsen/2018/07/22/trumps-medicaid-

137.    As reflected by the statements catalogued above, the Administration's communications strategy is aimed at creating a false public impression about the ACA and reducing public confidence in the law and its Exchanges, thereby discouraging individuals from enrolling in ACA-compliant insurance and weakening the Exchanges. Indeed, Senators Schatz, Booker, and Murphy have collected numerous examples where HHS social media accounts published "anti-ACA content."[147]

138.    The Trump Administration has repeatedly shortened the period for open enrollment, cutting the open enrollment period for 2018 plans in half compared to prior years.[148] The Administration again shortened open enrollment in 2019 and 2020.[149] Shortening the open enrollment period is designed to make it more difficult for individuals to enroll in health insurance coverage and further destabilize the Exchanges.

139.    The Trump Administration has repeatedly slashed funding for outreach and advertising for open enrollment,[150] even though robust evidence known to HHS demonstrates

---

work-rules-hit-states-with-costs-and-bureaucracy/#745af26066f5; *see also Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. June 29, 2018).

[147]  Letter from Brian Schatz, Senator, et al. to Thomas E. Price, former HHS Sec'y, at 1 (July 21, 2017), https://www.schatz.senate.gov/imo/media/doc/7.21.17%20Schatz-Booker-Murphy%20Letter%20to%20Sec.%20Price.pdf.

[148]  *Patient Protection and Affordable Care Act; Market Stabilization*, 82 Fed. Reg. 18,346, 18,353-54 (Apr. 18, 2017); *see* 45 C.F.R. § 155.410(e).

[149]  Clary Estes, *We Are Midway Through ACA's 2020 Enrollment Period, but The Trump Administration Is Hoping You Won't Notice*, Forbes (Nov. 23, 2019), https://www.forbes.com/sites/claryestes/2019/11/23/we-are-midway-through-acas-2020-enrollment-period-but-the-trump-administration-is-hoping-you-wont-notice/#45ab958f6bb1.

[150]  Paul Demko, *Trump White House Abruptly Halts Obamacare Ads*, Politico (Jan. 26, 2017), http://www.politico.com/story/2017/01/trump-white-house-obamacare-ads-234245; *Policies Related to the Navigator Program and Enrollment Education for the Upcoming Enrollment Period*, CMS 1 (Aug. 31, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/Policies-Related-Navigator-Program-Enrollment-Education-8-31-2017.pdf

robust advertising, and television advertising in particular, is critical to fulfilling the ACA's goal
of increasing enrollment.[151] The Administration has also slashed funding for navigators, groups
which assist individuals in the enrollment process.[152]

140.    In sum, there is substantial reason to believe that the Trump Administration's
decision not to provide a special enrollment period in response to the novel coronavirus
pandemic was motivated by President Trump's intent to unlawfully sabotage the Affordable Care
Act, as has been publicly reported.

## VI.    Defendants' unlawful decision harms Chicago.

141.    By definition, Defendants' unlawful decision to bar uninsured and underinsured
individuals from enrolling in health insurance in response to a global pandemic will mean that
more individuals are uninsured and underinsured than would have been the case with a blanket
SEP. As explained above, providing a special enrollment period would make it easier and more
attractive for families to enroll in ACA-compliant coverage—which could give as many as *two
million people* insurance through the federally-facilitated and hybrid Exchanges. But Defendants
did not, and so those people will not.

142.    The consequences of that failure are immense. "[C]ompared to the insured
population, the uninsured are more likely to skip or postpone needed care due to cost."[153] Then,
"when uninsured persons do use services, they are likely to need more costly health services

---

[151]  *See id.*

[152]  *GAO-18-567, Health Insurance Exchanges: HHS Should Enhance Its Management of Open
Enrollment Performance*, U.S. Gov't Accountability Office 23 (2018),
https://www.gao.gov/assets/700/693362.pdf; *see also Sabotage Watch*.

[153]  James Benedict, *Chronic Disease Management of the Uninsured Patient at Ohio Free
Clinics*, Walden Univ. 5 (Aug. 2016),
https://scholarworks.waldenu.edu/cgi/viewcontent.cgi?article=3816&context=dissertations.

because of delays in seeking care."[154]  Defendants' decision therefore impedes efforts to test for

and treat the novel coronavirus, exacerbating the pandemic's spread—not to mention a wide

range of acute and chronic conditions that individuals face even in ordinary times.

143.    When uninsured and underinsured individuals do seek care, they obtain it from

uncompensated care providers, like local governments. As a general matter, local governments

often provide a variety of health services to those who, lacking adequate health insurance, cannot

pay for medical treatment. For that reason, "local governments (municipalities, counties, and

special-purpose health or hospital districts) bear a large share of the direct financing of public

hospital and clinic services."[155] In 2013, for example, state and local governments spent $19.8

billion to cover uncompensated care.[156] Thus, a higher "number of uninsured and … amount of

uncompensated care …. will translate into increased pressure on state and local government to

finance the growing cost of the uninsured."[157]

144.    By preventing Americans from enrolling in ACA-compliant coverage,

Defendants' refusal to provide a special enrollment period further strains Chicago's public health

and emergency response infrastructure at a time when Chicago is least equipped to bear it. And it

---

[154]  Institute of Medicine, *A Shared Destiny: Community Effects of Uninsurance* 125 (2003), https://www.ncbi.nlm.nih.gov/books/NBK221329/.

[155]  *Id.* at 128.

[156]  Patrick Kaiser & Eric Cochling, *Increasing Access to Quality Healthcare for Low-Income Uninsured Georgians Policy Recommendations for the State of Georgia*, Ga. Ctr. for Opportunity 12 (June 2014), https://georgiaopportunity.org/assets/2014/06/Charity-Care-Report.pdf.

[157]  John Holahan & Bowen Garnett, *The Cost of Uncompensated Care With and Without Health Reform*, Urban Inst. 4 (Mar. 2010), https://www.urban.org/sites/default/files/publication/28431/412045-The-Cost-of-Uncompensated-Care-with-and-without-Health-Reform.PDF; *see also* Erin F. Taylor et al., *Community Approaches to Providing Care for the Uninsured*, 25 Health Aff. 173, 173 (2006), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.25.w173 ("Increases in the number of uninsured people often strain local safety nets and health systems.").

will frustrate Chicago's efforts to control the spread of the novel coronavirus by discouraging its residents from seeking testing and treatment. These dynamics harm the City's budget, as well as its overall health and well-being.

### A.    Chicago's health infrastructure

145.    Chicago has a Department of Public Health that generally seeks to promote and improve the health of city residents. The Department has an annual budget of around $221 million and is staffed by over 600 full-time employees.[158]

146.    The Chicago Department of Public Health operates free clinics. Specifically, the Department operates five clinics that provide free vaccinations;[159] five clinics that provide mental-health services at no cost for uninsured and underinsured Chicago residents;[160] and three clinics that provide free testing and treatment for sexually transmitted infections.[161] The City also provides certain at-home or in-field health programs, such as nursing home support for pregnant women and newborn babies and directly observed therapy for tuberculosis. Collectively, these clinics and services serve thousands of uninsured and underinsured city residents and, in particular, provide services that may not be covered by non-ACA-compliant health coverage.

---

[158]  *2020 Budget Overview*, City of Chicago 126 https://www.chicago.gov/content/dam/city/depts/obm/supp_info/2020Budget/2020BudgetOverview.pdf.

[159]  *Walk-In Immunization Clinics*, City of Chicago, https://www.chicago.gov/city/en/depts/cdph/supp_info/health-protection/immunizations_walk-inclinics.html.

[160]  *Mental Health Centers*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/supp_info/behavioral-health/mental_health_centers.html.

[161]  *STI/HIV Testing and STI Treatment*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/provdrs/health_services/svcs/get_yourself_evaluatedforstihivaids.html.

147.    Each of these clinics faces greater demand when there is an increase in either the health needs of Chicago residents or in the number of uninsured or underinsured individuals who cannot obtain those services or other forms of health care elsewhere.

148.    The Chicago Department of Public Health also partners with, and provides funding to, community-based health centers to offer a wide array of medical services, including for uninsured and underinsured patients.[162]

149.    The higher the uninsured and underinsured rate, the more that the clinics operated by the Department of Public Health and its community-based partners will necessarily have to provide forms of free or reduced-cost care to patients. In that event, Chicago either must provide the Department and its partners with more funding, or the Department and its partners must decrease the services that they provide.

150.    The Department of Public Health also conducts citywide surveillance and response efforts for communicable and vaccine-preventable diseases, including 31 employees and around $3.5 million for communicable disease, 32 employees and around $11.5 million for vaccine-preventable disease, 44 employees and around $28.5 million for emergency preparedness, and 25 employees and around $5 million for epidemiology and IT/informatics.[163]

151.    The Department of Public Health also partners with all hospitals and healthcare organizations in the City of Chicago through the Healthcare System Preparedness Program, which supports the Chicago Health System Coalition for Preparedness and Response.[164] This

---

[162] *Health Services*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/provdrs/health_services.html.

[163] *2020 Chicago Budget Overview* at 126-28.

[164] *Healthcare System Preparedness Program*, City of Chicago, https://www.chicago.gov/city/en/depts/cdph/supp_info/health-protection/healthcare-system-preparedness-program.html (last visited June 14, 2020).

program includes coordination of all thirty five acute care and specialty hospitals, 110 long term care facilities, 50 dialysis centers, all Federally Qualified Healthcare Centers, and other organizations that provide health care services within the City.

152.    This program includes safety net hospitals which, as part of their participation, demonstrate their ability to react to patient surges and complete accreditation requirements. Safety net hospitals provide healthcare for individuals regardless of their insurance status or ability to pay, and typically serve a higher proportion of uninsured, low-income, and other vulnerable individuals than do other hospitals.

153.    Chicago's partnership with these hospitals includes financial support such as situational awareness communication, support for data collection and reporting, disaster exercises, clinical trainings, and providing supplies, such as personal protective equipment, mechanical ventilators, and radios. In particular, this program benefits patients during surge events, like the novel coronavirus pandemic.

154.    The Chicago Fire Department provides ambulance transportation services to its residents, including its uninsured and underinsured residents. The Department receives around $94 million in annual funding for emergency medical services, employing more than 800 people to provide those services.[165]

155.    The Department's paramedics provide ambulance-transportation services approximately 250,000 times per year, with over 260,000 in 2019.

---

[165] *2020 Chicago Budget Overview* at 121.

156.    The Chicago Fire Department provides ambulance services regardless of the patient's income or insurance status. Chicago generally seeks reimbursement for ambulance services from the patient or, if applicable, the patient's insurer.[166]

157.    However, Chicago usually does not receive full reimbursement for ambulance services from its uninsured and underinsured residents. In 2018, for example, the Chicago Fire Department provided ambulance services to 60,007 patients for whom no insurance was identified. Chicago charged these patients $63,717,638 for ambulance services but collected just $1,028,713—a loss of $62,688,925. These numbers increased in 2019, during which the Chicago Fire Department provided ambulance services to 61,377 patients for whom no insurance was identified. Chicago charged these patients $65,970,368 for ambulance services but collected just $1,564,799—a loss of $64,958,819.[167]

158.    In Chicago's experience, the uninsured and underinsured disproportionately rely on ambulance service for transport to the emergency department.[168] A higher number of uninsured and underinsured individuals or an increase in acute health needs will therefore result in more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget.

---

[166]  *Ambulance Bills*, City of Chicago, https://www.cityofchicago.org/city/en/depts/fin/supp_info/revenue/ambulance_bills.html (last visited June 14, 2020).

[167]  Because efforts to collect for 2019 are ongoing, these figures may change with time.

[168]  Benjamin T. Squire et al., *At-Risk Populations and the Critically Ill Rely Disproportionately on Ambulance Transport to Emergency Departments*, 56(4) Annals of Emergency Med. 341, 347 (2010), https://www.ncbi.nlm.nih.gov/pubmed/20554351; *see also* Zachary F. Meisel et al., *Variations in Ambulance Use in the United States: The Role of Health Insurance*, 18(10) Acad. Emergency Med. 1036, 1041 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3196627/pdf/nihms314403.pdf ("EMS use is higher among those who historically have had difficulty accessing routine medical care, specifically poor and uninsured patients.").

B.    **Chicago's response to the novel coronavirus.**

159.    As of June 14, 2020, over 49,000 people have been confirmed to have been diagnosed with the novel coronavirus in the City of Chicago, and over 2,300 people have been confirmed to have died from it.[169]

160.    Chicago has been subject to the State of Illinois's stay at home orders and other coronavirus-related guidance, which generally provide that City residents "should stay home as much as possible, only leave home for essential tasks, and always practice social distancing and good hand hygiene."[170] The City's Department of Public Health has issued several COVID 19-related Executives Orders and guidance available on the City's website,[171] as well as disseminated guidance to health care providers through the Chicago Department of Public Health's Health Alert Network.

161.    In response to the novel coronavirus, Chicago has mounted a comprehensive effort to connect city residents to necessary health, food, housing, financial, and other resources.[172]

162.    At the same time, the pandemic has necessarily created a new and widespread need for health care services.

---

[169] *Coronavirus Response Center*, City of Chicago, https://www.chicago.gov/city/en/sites/covid-19/home.html (last updated June 14, 2020).

[170] *Latest Guidance*, City of Chicago, https://www.chicago.gov/city/en/sites/covid-19/home/latest-guidance.html (last visited June 14, 2020). As of June 14, 2020, Chicago was in Phase 3, which permits certain additional industries to reopen cautiously, following specific safety guidelines. *Phase III Cautiously Reopen: Industry Guidelines for Reopening*, City of Chicago, https://www.chicago.gov/city/en/sites/covid-19/home/reopening-business-portal.html (last visited June 14, 2020).

[171] *Id.*

[172] *See Coronavirus Response Center*.

163.     Specifically, Chicago has directed its uninsured and underinsured residents to its clinics and other community health centers to receive necessary health services during the pandemic.[173] Where in-person services are not possible or are unnecessary, Chicago is committed to using telemedicine and technology to continue the health services it provides directly to Chicago residents (*e.g.*, mental health services, nursing home services, and WIC support).

164.     Chicago also supports seven coronavirus testing sites within the City, operated by the nonprofit CORE Foundation, and which are available to symptomatic residents, asymptomatic residents with known exposure to the novel coronavirus, and asymptomatic frontline workers.[174] The City provides the funding for all testing kits and lab work for these sites.

165.     The Department of Public Health operates a mobile app, Chi COVID Coach, which "allows people who have coronavirus questions—or symptoms—to connect with trained public health employees who can answer questions about symptoms, quarantine, testing locations and more."[175] It has also established a call center and email address to take questions from the public.[176]

166.     Although Chicago advises that individuals isolate themselves at home and receive telephonic medical care, individuals who believe they have contracted the novel coronavirus

---

[173]  *Managing Your Health*, City of Chicago, https://www.chicago.gov/city/en/sites/covid-19/home/managing-your-health.html?#tab-shouldtest.

[174]  *Managing Your Health.*

[175]  Kelly Bauer, *City's New Chi COVID Coach App Lets You Sign Up For Vaccine Alerts, Testing Information And More*, Block Club Chi. (Apr. 27, 2020), https://blockclubchicago.org/2020/04/27/citys-new-chi-covid-coach-app-lets-you-sign-up-for-vaccine-alerts-testing-information-and-more/.

[176]  *Coronavirus Response Center.*

and/or are in medical distress sometimes use ambulance services to receive necessary care.[177] If those individuals are uninsured or underinsured, the City will provide transport but, for the reasons explained above, is unlikely to receive reimbursement for the expense.

167.    Indeed, ambulance services are under extraordinary strain in response to the pandemic. "COVID-19 cases in the United States are expanding exponentially and already overwhelming the capabilities of many public safety agencies."[178] Moreover, "[o]vercrowded hospitals strained by the coronavirus crisis are increasingly asking ambulance services to bring only critically ill patients to emergency rooms," and instead "treat[] 911 callers wherever they were," which often does not result in reimbursement. That, plus the "rising cost of protective gear," has resulted in a "financial squeeze."[179]

168.    Even though Chicago provides certain forms of care to its uninsured and underinsured residents, Chicago is concerned that those residents may be less likely to obtain necessary testing and treatment for the novel coronavirus. In the City's experience, uninsured and underinsured individuals are more likely to skip or postpone needed care due to cost.[180]

169.    If residents do not obtain testing and treatment, the novel coronavirus will necessarily continue to spread.

---

[177] *See* Mark Guarino, *This Hospital Was Built for A Pandemic*, Wash. Post (Apr. 9, 2020), https://www.washingtonpost.com/health/2020/04/09/rush-hospital-coronavirus/.

[178] Emily Pearce*, EMS Surge Capacity: Where to Find More Caregivers for COVID-19 Response*, EMS1.com (Mar. 22, 2020), https://www.ems1.com/coronavirus-covid-19/articles/ems-surge-capacity-where-to-find-more-caregivers-for-covid-19-response-Y5M0LvliaDYE3ymh/.

[179] Sarah Krouse, *Hospitals' Covid-19 Surge Puts EMS Providers in Financial Squeeze*, Wall St. J. (May 6, 2020), https://www.wsj.com/articles/hospitals-covid-19-surge-puts-ems-providers-in-financial-squeeze-11588766657.

[180] *See, e.g.*, *The Chicago Health Care Access Puzzle*, City of Chicago 8 (Nov. 2008), https://www.chicago.gov/dam/city/depts/cdph/policy_planning/PP_ChgoHealthCareAccessRpt-1-.pdf.

170.    As of June 9, 2020, Chicago has distributed over 7 million pieces of personal protective equipment, including over 4 million gloves and over 3 million masks.[181]

C.    **Overall impact on the City**

171.    The pandemic has had effects across all of Chicago's programs. Many City agencies and programs are closed or only offering telephonic services as a result of the pandemic and have had to redirect their personnel and resources and adjust their operations in response. For example, Chicago's clinics that provide vaccinations and treat sexually transmitted infections have been closed since mid-March, and the staff at those clinics diverted to Chicago's pandemic response. Some City employees have also contracted the novel coronavirus, making it harder for the City to operate effectively.

172.    Chicago expects to face a budget shortfall of at least $700 million, in part as a result of the pandemic.[182] That "conservative" figure "depend[s] on how long it takes for consumers to regain confidence and whether coronavirus cases surge again."[183] Specifically, Chicago faces hundreds of millions of dollars in lost revenue.[184] At the same time, Chicago is facing extraordinary strain on its health, emergency response, and other services.[185]

---

[181]  *Health Care Workers*, City of Chicago, https://www.chicago.gov/city/en/sites/health-care-workers/home.html (last updated May 8, 2020).

[182]  Gregory Pratt & John Byrne, *Mayor Lori Lightfoot: Chicago's Coronavirus Budget Shortfall at Least $700 Million*, Chicago Trib. (June 9, 2020), https://www.chicagotribune.com/politics/ct-coronavirus-chicago-budget-shortfall-lori-lightfoot-20200609-d6pb4n7drje6xfe4tzaioesrgu-story.html.

[183]  Fran Spielman, *Estimated 2020 Budget Shortfall Is $700 Million, Says Mayor, Who Won't Rule Out Property Tax Increase*, Chicago Sun-Times (June 9, 2020), https://chicago.suntimes.com/city-hall/2020/6/9/21285650/chicago-city-budget-shortfall-700-million-coronavirus-federal-help-lightfoot.

[184]  *Id.*

[185]  Becky Vevea, *How COVID-19 Could Hit Chicago's Budget*, NPR (May 8, 2020), https://www.npr.org/local/309/2020/05/08/852760731/how-c-o-v-i-d-19-could-hit-chicago-s-budget.

173.    Aside from these budgetary impacts, Chicago is harmed as a whole when its residents feel they cannot obtain necessary medical care, especially when an effective response to the novel coronavirus requires that residents be able to seek testing and treatment. Multiple studies have shown that "in areas with many uninsured people, the quality of care was lower as well," in part because "it is difficult for health providers to maintain services in areas with large numbers of patients who cannot pay for care."[186] More broadly, "[f]or the communities in which uninsured individuals and families live, the lack or loss of health insurance coverage by some may undermine the shared economic and social foundations of the entire community."[187] The more uninsured individuals that do not seek care, the more the novel coronavirus will spread, further harming the City, its budget, its economy, and its overall well-being.

174.    Chicago has begun to partially reopen; however, it is not clear whether Chicago, or other cities, will need to impose restrictions again in the face of another wave of the novel coronavirus.

175.    Each of these harms would be redressed by setting aside Defendants' unlawful decision not to provide a special enrollment period, thereby providing uninsured individuals with the ability to obtain coverage.

176.    The coverage date for any SEP should be retroactive, either to the beginning of the pandemic or to a certain number of days prior to the opening of such an SEP, to allow individuals to enroll who were unable to do so because of Defendants' unlawful failure to open an SEP.

---

[186]  Julie Rovner, *Millions More Uninsured Could Impact Health of Those With Insurance, Too*, Kaiser Health News (July 14, 2018), https://khn.org/news/millions-more-uninsured-could-impact-health-of-those-with-insurance-too/.

[187]  *IOM Shared Destiny* at 120.

# CLAIMS FOR RELIEF

## Count One
### (Violation of the Administrative Procedure Act – Contrary to Law, 5 U.S.C. § 706(2), the Patient Protection and Affordable Care Act, 42 U.S.C. § 18031, and its implementing regulations, 45 C.F.R. § 155.420)

177.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

178.    Under the Administrative Procedure Act, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

179.    Defendants' decision that the novel coronavirus does not present an "exceptional circumstance" warranting a special enrollment period, and/or their refusal to provide a special enrollment period, is contrary to law.

180.    Defendants' decision that "exceptional circumstances" refers only to circumstances that prevent individuals from enrolling in ACA-compliant health insurance when they would otherwise be permitted to enroll is contrary to law.

## Count Two
### (Violation of the Administrative Procedure Act – Arbitrary and Capricious, 5 U.S.C. § 706(2))

181.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

182.    Defendants' failure to publicly explain the basis for their decision that the novel coronavirus does not present an "exceptional circumstance" warranting a special enrollment period, and/or their refusal to provide a special enrollment period, is arbitrary and capricious.

183.    Defendants' decision that the novel coronavirus does not present an "exceptional circumstance" warranting a special enrollment period, and/or their refusal to provide a special

enrollment period, "relied on factors which Congress has not intended [them] to consider, entirely failed to consider an important aspect of the problem, [and] offered an explanation for [their] decision that runs counter to the evidence before [them]" and that "is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is therefore arbitrary and capricious.

### Count Three
### (Violation of the Administrative Procedure Act – Action Unlawfully Withheld, 5 U.S.C. § 706(1))

184.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

185.    Under the Administrative Procedure Act, a "reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

186.    Defendants are obligated to "provide for ... special enrollment periods … similar to such periods under [Medicare Part D]," 42 U.S.C. § 18031(c)(6), including in response to "exceptional circumstances," 42 U.S.C. § 1395w-101(b)(3)(C); 45 C.F.R. §§ 155.420(a)(1), (d), 155.420(a)(3).

187.    By refusing to provide a special enrollment period in response to the novel coronavirus, Defendants have unlawfully withheld or unreasonably delayed agency action.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.    declare that Defendants' decision not to provide a special enrollment period is unlawful;

2.    vacate and set aside Defendants' decision;

3.    enjoin Defendants to provide a special enrollment period;

4.      award Plaintiff its costs, attorneys' fees, and other disbursements for this action;

and

5.      grant any other relief this Court deems appropriate.

Dated: June 15, 2020                           Respectfully submitted,


                                               */s/ John T. Lewis*
                                               John T. Lewis (D.C. Bar No. 1033826)
                                               Robin F. Thurston (D.C. Bar No. 1531399)
                                               Benjamin Seel (D.C. Bar No. 1035286)
                                               Sean A. Lev (D.C. Bar No. 449936)
                                               Democracy Forward Foundation
                                               1333 H Street NW
                                               Washington, DC 20005
                                               (202) 448-9090
                                               jlewis@democracyforward.org
                                               rthurston@democracyforward.org
                                               bseel@democracyforward.org
                                               slev@democracyforward.org

                                               Mark A. Flessner
                                               Stephen J. Kane
                                               Rebecca Hirsch
                                               Affirmative Litigation Division
                                               City of Chicago Department of Law
                                               121 N. LaSalle St., Room 600
                                               Chicago, IL 60602
                                               mark.flessner@cityofchicago.org
                                               stephen.kane@cityofchicago.org
                                               rebecca.hirsch2@cityofchicago.org

                                               *Counsel for Plaintiff*