# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CITY OF CHICAGO,                        )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )        Case No. 1:20-cv-01566 (TJK)
                                        )
ALEX M. AZAR, in his official capacity, U.S.  )
DEP'T OF HEALTH AND HUMAN               )
SERVICES, SEEMA VERMA, in her official  )
Capacity, and CENTERS FOR MEDICARE AND  )
MEDICAID SERVICES,                      )
                                        )
        Defendants.                     )
_____)


## COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ........................................................................................................... 4

I.  STATUTORY AND REGULATORY FRAMEWORK ..................................... 4

II.  THE PANDEMIC AND CONSIDERATION OF ADDITIONAL SEP GUIDANCE.... 10

III.  THIS LITIGATION.................................................................................... 14

ARGUMENT ............................................................................................................. 15

I.  THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF CANNOT DEMONSTRATE STANDING. .................................................................... 15

   A.  Plaintiff Bears the Burden to Demonstrate Standing............................... 15

   B.  The City of Chicago Cannot Assert the Interests of its Citizens as Parens Patriae. ............................................................................................ 17

   C.  Plaintiff Has Not Demonstrated a Concrete and Redressable Injury of its Own.. 19

   D.  Plaintiff Also Lacks Statutory Standing Because the City is not an "Aggrieved Person" Within the Zone of Interests of the SEP Requirements. ......................... 22

II.  PLAINTIFF'S SECTION 706(2) CLAIMS FAIL BECAUSE IT IDENTIFIES NO FINAL AGENCY ACTION BUT INSTEAD CHALLENGES AGENCY INACTION. 24

   A.  Section 706(1) Is the Only Appropriate Means to Challenge Agency Inaction. .. 24

   B.  Plaintiff's Section 702(2) Claims Do Not Challenge "Final Agency Action." .... 26

III.  PLAINTIFF's 706(1) CLAIM FAILS BECAUSE IT HAS NOT ESTABLISHED THAT AGENCY ACTION WAS UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED.......................................................................................... 28

   A.  Plaintiff Has Not Established that An SEP Was Unlawfully Withheld Because It Has Not Identified a Specific and Unequivocal Command to Act. ..................... 28

   B.  HHS Is Not Required to Establish a COVID-19 SEP. ........................................ 30

      1.  The Pandemic is Extraordinary, But That Observation Does Not Mandate an SEP.................................................................................................. 30

      2.  The Purposes of the ACA Do Not Mandate a Broad COVID-19 SEP..... 33

      3.  Recent Actions by States or Defendants Do Not Require an SEP Here... 34

4.      Prior, Unrelated Action Does Not Require a Broad COVID-19 SEP....... 35

IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE
       HHS HAS ACTED REASONABLY IN NOT OFFERING A SEP AT THIS TIME...... 37

V.     PLAINTIFF'S REQUESTED RELIEF IS OVERBROAD............................................. 44

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Aera Energy LLC v. Salazar*,
   691 F. Supp. 2d 25 (D.D.C. 2010) ............................................................... 36

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982) ...................................................................................... 17

*Am. Freedom Law Ctr. v. Obama*,
   821 F.3d 44 (D.C. Cir. 2016) ....................................................................... 20

*American Anti-Vivisection Society v. USDA*,
   946 F.3d 615 (D.C. Cir. 2020) ............................................................... 24, 36

*\*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) .............................................................. *passim*

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150 (1970) ...................................................................................... 22

*\*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................... 26

*Biodiversity Legal Found. v. Norton*,
   180 F. Supp. 2d 7 (D.D.C. 2001) ................................................................. 37

*Cal. By & Through Brown v. EPA*,
   940 F.3d 1342 (D.C. Cir. 2019) ................................................................... 26

*Califano v. Sanders*,
   430 U.S. 99 (1977) .......................................................................................... 6

*California v. Texas*,
   140 S. Ct. 1262 (2020) .................................................................................... 5

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) .............................................................................. *passim*

*City of Bos. Delegation v. Fed. Energy Regulatory Comm'n*,
   897 F.3d 241 (D.C. Cir. 2018) ................................................................ 17, 18

*City of Olmsted Falls, OH v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ..................................................................... 17

*City of Sausalito v. O'Neill,*
     386 F.3d 1186 (9th Cir. 2004) ............................................................... 18

*Clapper v. Amnesty Int'l USA,*
     568 U.S. 398 (2013) ............................................................... 15, 16, 19

*Clarke v. Sec. Industry Ass'n,*
     479 U.S. 388 (1987) ............................................................... 23

*Clifford v. Pena,*
     77 F.3d 1414 (D.C. Cir. 1996) ............................................................... 6

*Colo. River Indian Tribes v. Town of Parker,*
     776 F.2d 846 (9th Cir. 1985) ............................................................... 18

*Ctr. for Biological Diversity v. EPA,*
     794 F. Supp. 2d 151 (D.D.C. 2011) ............................................................... 28

*Ctr. for Law & Educ. v. Dep't of Educ.,*
     396 F.3d 1152 (D.C. Cir. 2005) ............................................................... 22

*DaimlerChrysler Corp. v. Cuno,*
     547 U.S. 332 (2006) ............................................................... 16

*Davis v. FEC,*
     554 U.S. 724 (2008) ............................................................... 16

*\*Dep't of Commerce v. New York,*
     139 S. Ct. 2551 (2019) ............................................................... 42

*Doe v. Va. Dep't of State Police,*
     713 F.3d 745 (4th Cir. 2013) ............................................................... 20

*Double R Ranch Tr. v. Nedd,*
     284 F. Supp. 3d 21 (D.D.C. 2018) ............................................................... 22

*Fla. Audubon Soc'y v. Bentsen,*
     94 F.3d 658 (D.C. Cir. 1996) ............................................................... 20

*Fla. Power & Light Co. v. Lorion,*
     470 U.S. 729 (1985) ............................................................... 37, 43

*Frank Krasner Enters., Ltd. v. Montgomery Cty. Md.,*
     401 F.3d 230 (4th Cir. 2005) ............................................................... 20, 21

*Friends of the Clearwater v. Dombeck,*
     222 F.3d 552 (9th Cir. 2000) ............................................................... 37

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) ............................................................... 43

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ............................................................... 16, 44

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ............................................................... 17

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ............................................................... 37

*Hi-Tech Pharmacal Co. v. FDA*,
   587 F. Supp. 2d 1 (D.D.C. 2008) ............................................................... 26

*Ill. Dep't Transp. v. Hinson*,
   122 F.3d 370 (7th Cir. 1997) ............................................................... 19

*In re Abbott*,
   954 F.3d 772 (5th Cir. 2020) ............................................................... 18

*Independence Min. Co. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997) ............................................................... 37, 39

*Kansas v. United States*,
   16 F.3d 436 (D.C. Cir. 1994) ............................................................... 17

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ............................................................... 4, 5, 33

*Lewis* v. *Casey*,
   518 U.S. 343 (1996) ............................................................... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................... 22

*Louisiana v. United States*,
   948 F.3d 317 (5th Cir. 2020) ............................................................... 25

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................... 15, 16, 20

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ............................................................... 36

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................... 17

v

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................... 38

*NAACP v. Bureau of the Census*,
945 F.3d 183 (4th Cir. 2019)............................................................................. 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ............................................................................... 4, 5, 33

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*,
842 F. Supp. 2d 127 (D.D.C. 2012) .................................................................. 37

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) .......................................................................... 26

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ..................................................................... 38, 39

*Nicopure Labs, LLC v. FDA*,
266 F. Supp. 3d 360 (D.D.C. 2017) .................................................................. 38

*\*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ......................................................................... 25, 28, 29

*Olivares v. TSA*,
819 F.3d 454 (D.C. Cir. 2016) ............................................................................ 6

*Palisades Gen'l Hosp. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005) .......................................................................... 43

*Pennsylvania v. Kleppe*,
533 F.2d 668 (D.C. Cir. 1976) .......................................................................... 20

*Raines v. Byrd*,
521 U.S. 811 (1997) .......................................................................................... 15

*Soundboard Ass'n v. Fed. Trade Comm'n*,
888 F.3d 1261 (D.C. Cir. 2018) ........................................................................ 26

*Summers* v. *Earth Island Inst.*,
555 U.S. 488 (2009) .......................................................................................... 16

*Swanson Grp. Mfg. LLC v. Jewell*,
790 F.3d 235 (D.C. Cir. 2015) .......................................................................... 15

*Telecomms. Research & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ............................................................................ 36

*Texas v. California*,
140 S. Ct. 1262 (2020) ............................................................................. 5

*Texas v. United States*,
945 F.3d 355 (5th Cir. 2019) ..................................................................... 5

*Town of Chester* v. *Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ............................................................................ 16

*Tozzi v. HHS*,
271 F.3d 301 (D.C. Cir. 2001) ................................................................ 20

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
173 F.3d 438 (D.C. Cir. 1999) ................................................................ 20

*U.S. Army Corps of Engineers v. Hawkes Co.*,
136 S. Ct. 1807 (2016) ............................................................................ 26

*W. Org. of Resource Councils v. Zinke*,
892 F.3d 1234 (D.C. Cir. 2018) .............................................................. 25

*Webster v. Doe*,
486 U.S. 592 (1988) ................................................................................ 38

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ................................................................................ 16

*Wyoming ex rel. Sullivan v. Lujan*,
969 F.2d 877 (10th Cir. 1992) ................................................................ 19

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) ................................................................................ 17

**Statutes**

5 U.S.C. § 551(13) ............................................................................ 25, 26

5 U.S.C. § 702 ......................................................................................... 22

5 U.S.C. § 704 ......................................................................................... 26

5 U.S.C. § 706 ............................................................................... 6, 24, 37

16 U.S.C. § 1852(c) ................................................................................ 25

26 U.S.C. § 9801(f)(1) .............................................................................. 7

42 U.S.C. § 1395w–101 ........................................................................... 7

42 U.S.C. § 1396d(y)(1) ......................................................................... 5

*42 U.S.C. § 18031 ........................................................................ *passim*

42 U.S.C. § 18091(2)(I) ......................................................................... 4

42 U.S.C. § 18081 ................................................................................ 4

Pub. L. No. 115-97 ................................................................................ 4

Pub. L. No. 116-12 ............................................................................. 12

Pub. L. No. 116-139 ...................................................................... 12, 13

Pub. L. No. 116-136 ...................................................................... 12, 13

**Regulations**

45 C.F.R. § 155.105(f) .......................................................................... 5

45 C.F.R. § 155.410 .............................................................................. 6

45 C.F.R. § 155.420 .................................................................... *passim*

76 Fed. Reg. 41 .......................................................................... 9, 32, 35

77 Fed. Reg. 18 ............................................................................. 9, 32

80 Fed. Reg. 10 .................................................................................... 9

82 Fed. Reg. 18 .................................................................................. 35

85 Fed. Reg. 26 .................................................................................. 34

## <u>INTRODUCTION</u>

In the Patient Protection and Affordable Care Act ("ACA"), Congress provided for the establishment of an Exchange in each State – either established by individual States or operated by the federal Government – through which eligible Americans can purchase health insurance during limited timeframes if they do not have, for example, employer-provided coverage. Congress recognized that the separate requirement in the ACA that insurers provide coverage to all consumers regardless of pre-existing conditions, age, or other factors that might predict the use of health services could lead individuals to avoid purchasing insurance until they became ill. This well-documented phenomenon, known as adverse selection, drives up the cost of health insurance, to everyone's detriment.  To avoid adverse selection, Congress provided that eligible individuals can purchase insurance on the Exchanges only during a limited "open enrollment period" each year or during a "special enrollment period" ("SEP") – an opportunity for consumers who have experienced certain life events, such as loss of health coverage, or birth or adoption of a child, to sign up for health insurance outside the annual open enrollment period. Special enrollment periods are intended, in part, to promote continuous coverage by allowing those who were previously enrolled in an insurance plan to obtain new coverage without a lapse or gap in coverage.  Congress also gave the agency broad discretion to provide for an SEP under "exceptional circumstances," and the agency has explained in a rulemaking that this provision is intended to address circumstances that impede an individual's ability to enroll in coverage on a timely basis.

Facing a global health crisis in the COVID-19 pandemic, the Executive Branch is constantly evaluating its policy options for responding to the crisis.  Among many other policy initiatives, the Department of Health and Human Services ("HHS") has been considering whether to offer an exceptional circumstances SEP due to the COVID-19 public health

1

emergency ("COVID-19 SEP") to allow uninsured individuals who do not qualify for an already existing SEP to enroll in insurance plans offered through Exchanges operated by the federal Government. HHS has not done so at this time. Allowing for a broad COVID-19 SEP permits enrollment of those who failed to enroll during the open enrollment period (or during an existing SEP for which they were eligible) and creates the very adverse selection problem the ACA was designed to avoid. Other SEPs remain available – for example, to permit those who lost their employer-provided coverage as a result of job loss to enroll in insurance on an Exchange. For those who were unable to take advantage of an otherwise available SEP because of the pandemic, HHS allows for an exceptional circumstances SEP to permit those individuals to enroll. Separately, HHS is facilitating the distribution of billions of dollars in direct reimbursements for COVID-19 testing and treatment of uninsured individuals. Offering a broad COVID-19 SEP, however, would have significant downstream consequences: Among other things, it would allow large numbers of uninsured individuals to enroll in coverage that includes all benefits offered by the insurance plan – not just those related to COVID-19 testing and treatment – and risk creating the very adverse selection problem the ACA was designed to avoid.

Plaintiff City of Chicago is located in a State that chose not to establish an Exchange and instead relies on an Exchange operated by the federal Government. Plaintiff brings this action to force the federal Government to provide a COVID-19 SEP that would consider the pandemic itself as an individual's "exceptional circumstance" justifying enrollment outside the open enrollment period. As an initial matter, Plaintiff lacks standing to bring these claims. It cannot assert the interests of its residents and has not established that the City itself is suffering a concrete and non-speculative injury that is fairly traceable to the lack of a special enrollment period and which is redressable by this Court. Rather, Plaintiff's assertion of injury is based on a long and speculative causal chain of events that does not suffice to establish Article III standing.

2

Nor can the City show statutory standing because the pecuniary interests of a municipality are not within the zone of interests of the relevant provisions of the ACA.

Second, Plaintiff's challenges to "final agency action" fail for lack of an agency action that is, in fact, final on this issue. The APA divides the scope of judicial review into two categories: agency inaction and agency action. Fundamentally, Plaintiff is challenging inaction, which is not subject to review under the portions of the APA authorizing review of final agency action. Because Plaintiff has not identified a "final agency action" at issue, Defendants are entitled to judgment on those claims.

Third, Plaintiff's challenge to agency inaction fails because they have not identified a specific, non-discretionary duty to open a broad COVID-19 SEP. The statute does not create such a duty, much less provide a specific and unequivocal command to do so. Indeed, the plain text of the statute grants the agency broad discretion to determine what conditions an individual must meet to invoke an "exceptional circumstances" SEP, referring only to such conditions as the Secretary "may" provide. A broad SEP available to all uninsured would be a significant departure from the usual uses of SEPs because it is untethered to the circumstances that led a specific individual not to enroll. Plaintiff elevates its own policy goals to the status of a statutory mandate, but the ACA contains no such mandate.

Finally, Plaintiff's claims fail because the agency has acted reasonably. The structure and plain language of the statute disfavor the use of such a broad special enrollment period, and there is insufficient information that such a SEP is necessary or justified at this time. Rather, many of the newly uninsured are covered by other, preexisting SEPs, and many of the costs of testing for and treatment of COVID-19 for the uninsured will be paid directly by the Government. The statute gives HHS broad latitude to determine when to provide for a exceptional circumstances SEP, and Plaintiff fails to show that the agency's current course is

3

unreasonable given these alternatives and legitimate concerns about adverse selection.  At

bottom, both Plaintiff and the amici disagree with the current policy choices of the Executive

Branch.  But it is not the role of the Court to choose between viable and reasonable policy

options, particularly in the midst of a crisis.  Plaintiff's demand that the Court create the terms

and scope of an SEP that applies on all federal Exchanges misunderstands the role of the Court.

## BACKGROUND

### I.      STATUTORY AND REGULATORY FRAMEWORK

In 2010, Congress enacted the ACA with the aim of "increas[ing] the number of

Americans covered by health insurance and decreas[ing] the cost of health care."  *Nat'l Fed'n of*

*Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("*NFIB*").  As the Supreme Court has

explained, some states had previously experimented with reforms, such as prohibiting insurers

from denying insurance or charging higher premiums to people who were ill.  *King v. Burwell*,

135 S. Ct. 2480, 2485-87 (2015).  These reforms "had an unintended consequence:  They

encouraged people to wait until they got sick to buy insurance," which dramatically drove up the

cost of insurance.  *Id.*  As a result, when Congress adopted similar provisions as part of the ACA,

"Congress recognized that, without an incentive, 'many individuals would wait to purchase

health insurance until they needed care.'"  *Id.* (quoting 42 U.S.C. § 18091(2)(I)).  As the Court

acknowledged, "Congress adopted a coverage requirement to 'minimize this adverse selection

and broaden the health insurance risk pool to include healthy individuals, which will lower

health insurance premiums.'"  *Id.*[1]  And to make coverage more affordable, Congress provided

tax credits to offset the cost of premiums for those with lower incomes.  *Id.* (citing 42 U.S.C. §§

18081, 18082).  The ACA also gave States the option to expand their Medicaid programs,

---

[1] The tax penalty originally associated with this coverage requirement was eliminated in
the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11081 (Dec. 22, 2017).

providing enhanced matching funds to the States that elect to provide specified healthcare to all citizens whose income falls below a certain threshold.  *See generally NFIB*, 567 U.S. 519.[2]

In addition to these reforms, the ACA "requires the creation of an 'Exchange' in each State—basically, a marketplace that allows people to compare and purchase insurance plans. The Act gives each State the opportunity to establish its own Exchange, but provides that the Federal Government will establish such Exchange if the State does not."  *King*, 135 S. Ct. at 2485; *see generally* 42 U.S.C. § 18031(b) (providing for State-established Exchanges), § 18041(c) (providing for federal Exchanges where the State elects not to establish an Exchange); 45 C.F.R. § 155.105(f) (same).  Exchanges in States that establish and operate their own Exchanges are called State-based Exchanges (SBEs); Exchanges in States where the federal Government establishes and operates the Exchanges are called Federally-facilitated Exchanges (FFEs); Exchanges in States that established the Exchange but use the federal eligibility and enrollment platform and information technology infrastructure are called State-based Exchanges – Federal Platform (SBE-FP).  *See generally State-based Exchanges*, available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/state-marketplaces (last visited July 20, 2020).   Exchanges, whether established by the federal Government or the States, are subject to a number of statutory and regulatory requirements.  *See, e.g.*, 45 C.F.R. Pt. 155 (requirements for SBEs); 45 C.F.R. § 155.105(f)(1) (identifying which of those requirements also apply to federal Exchanges).  The SEP provisions apply to all such Exchanges.  *Id*.  States administer special enrollment periods in the SBEs, but the Centers for Medicare & Medicaid

---

[2] In other litigation, the Government has taken the position that the individual mandate in the ACA as amended is unconstitutional, and that other provisions of the ACA are not severable. *See generally Texas v. United States*, 945 F.3d 355 (5th Cir. 2019), *as revised* (Dec. 20, 2019), *as revised* (Jan. 9, 2020), *cert. granted sub nom. California v. Texas*, 140 S. Ct. 1262 (2020), and *cert. granted sub nom. Texas v. California*, 140 S. Ct. 1262 (2020).  The Government intends to continue to enforce and apply the ACA until there is a final judgment on this issue.  *Id*. at 375.

Services (CMS) administers special enrollment periods in the FFEs and SBE-FPs.  There are currently 13 SBEs, six SBE-FPs, and 32 FFEs.  Illinois has an FFE.  Declaration of Randolph W. Pate, dated July 20, 2020, ¶ 8.[3]

   Among other standards, the Exchanges must have "annual open enrollment periods [('OEPs')]," during which individuals may purchase health insurance meeting certain minimum standards.  *See* 42 U.S.C. § 18031(c)(6)(B); 45 C.F.R. § 155.410.  The Exchanges must also provide for "special enrollment periods [('SEPs')]."  *See* 42 U.S.C. § 18031(c)(6)(C); 45 C.F.R. § 155.420.  SEPs provide an opportunity for consumers who have experienced certain life events to sign up for health insurance outside the annual OEP.  Qualifying life events include losing health coverage that qualifies as minimum essential coverage, certain moves, getting married, having a baby, or adopting a child.  Consumers typically have a limited time following the event to select a plan.  "While the annual open enrollment period allows previously uninsured individuals to enroll in new coverage, special enrollment periods are intended, in part, to promote continuous enrollment in health coverage during the plan year by allowing those who were previously enrolled in a health plan to obtain new coverage without a lapse or gap in coverage."  Pate Decl. ¶ 6.

---

[3] The Declaration of Randolph Pate, Deputy Director of CMS, is attached hereto.  Because there has not been a final agency action here, this Declaration provides background information about SEPs on the Exchanges and explains why a COVID-19 SEP is unwarranted at this time.  *See Olivares v. TSA*, 819 F.3d 454, 464 (D.C. Cir. 2016) (explaining that agency declaration can provide further explanation of the administrative record to facilitate review); *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (similar).  It also authenticates the documents listed in the attached index as the materials HHS considered when evaluating whether or not to establish a COVID-19 SEP.  *See* Pate Decl. ¶ 16.  Those materials constitute the administrative record ("AR") in this case.  Claims under the APA typically require the Court to review "the full administrative record that was before the Secretary at the time he made his decision."  *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); 5 U.S.C. § 706 (requiring review on an administrative record).

Like other cost-control mechanisms built into the ACA, the purpose of limited enrollment periods is to mitigate adverse selection.  *See id.* ¶¶ 3-6.  Limited enrollment periods are intended to accommodate two essential market reforms under the ACA.  First, the ACA's guaranteed issue provision requires issuers of qualified health plans to provide coverage to all consumers, regardless of health status, age, gender, or other factors that might predict the use of health services.  *Id.* ¶ 3.  Second, the ACA's community rating provision limits the factors issuers may use to set premium levels for individual members.  *Id.*  For example, health status is not included as an allowable rating factor.  *Id.*  Issuers instead must set prices based on the expected health of the overall risk pool.  *Id.*  Without limiting enrollment to annual and special enrollment periods, due to the ACA's guaranteed issue and community rating requirements, there would be nothing to prevent people from waiting to purchase insurance until they get sick (and potentially dropping coverage after utilizing care).  *Id.* ¶ 4.  This type of adverse selection would increase the expected risk of the insured pool and require issuers to raise premiums, which, in turn, results in additional adverse selection.  *Id.*  If this cycle continues unchecked, premiums would rise to unaffordable levels and the market would no longer be viable.  *Id.*  Accordingly, limiting enrollment periods is necessary to mitigate adverse selection.  *Id.* ¶¶ 3-6.

The ACA states that the Secretary must require Exchanges to provide for an initial OEP; annual OEPs; and SEPs "specified in section 9801 of title 26 and other [SEPs] under circumstances similar to such periods under part D of title XVIII of the Social Security Act [42 U.S.C. § 1395w–101(b)(3).]."  *See* 42 U.S.C. § 18031(c)(6)(A)-(C).  The cited portion of Title 26 provides for a few SEPs for individuals with respect to employer-sponsored group health plans when those individuals are facing changed personal circumstances, such as the birth of a dependent or the loss of other coverage.  *See, e.g.*, 26 U.S.C. § 9801(f)(1), (f)(2).  The cited portion of the Social Security Act, which concerns prescription drug coverage under Medicare

7

Part D, similarly provides for SEPs for eligible individuals who meet specified criteria, such as a

coverage loss or an enrollment error, and for eligible individuals "who meet such exceptional

conditions . . . as the Secretary may provide."  42 U.S.C. § 1395w-101(b)(3)(C).

The regulations implementing the SEP requirement typically permit a limited amount of

time for individuals who demonstrate a triggering event listed in 45 C.F.R. § 155.420(d).  The

regulation lists 14 different categories of triggering events relating to the individual's

circumstances, including, for example, the following:  loss of minimum essential coverage (such

as might occur through job loss), gaining or becoming a dependent, new eligibility for

enrollment, new eligibility of an enrollee for premium tax credits, error or misconduct by HHS,

contract violations by a health plan, moving to a location where new qualified health plans

(QHPs) become available, gaining status as an Indian, domestic abuse, and a material error in

purchasing related to QHP benefits and availability that impacted an individual's enrollment.  *Id*.

In addition to these specifically described events, the regulations provide for a triggering event

when "the qualified individual or enrollee, or his or her dependent, demonstrates to the

Exchange, in accordance with guidelines issued by HHS, that the individual meets other

exceptional circumstances as the Exchange may provide."  *Id*. § 155.420(d)(9).  This language

provides an Exchange discretion to permit additional SEPs, and CMS has published an

enrollment manual that provides guidance on SEPs and applicable standards.  *See* AR 481-514

(Excerpts From *Federally-facilitated Exchanges (FFEs) and Federally-facilitated Small*

*Business Health Options Program (FF-SHOP) Enrollment Manual*, at 62-86 (July 10, 2019),

*available at* https://www.regtap.info/uploads/library/ENR_EnrollmentManualForFFEandFF-

SHOP_v1_5CR_092519.pdf ("Enrollment Manual")); *id*. at AR 505 (specific information about

the exceptional circumstances SEP).[4]  The SEP was originally intended to provide relief to those

who had experienced exceptional circumstances that specifically impeded their individual ability

to enroll in coverage during the annual OEP or an SEP for which the consumer qualified.  *See,*

*e.g.*, *Establishment of Exchanges and Qualified Health Plans* (Proposed Rule), 76 Fed. Reg.

41,866, 41,884 (July 15, 2011) ("This special enrollment period could be used for a variety of

situations, including natural disasters such as hurricanes or floods.  Exceptional circumstances

include circumstances that would impede an individual's ability to enroll on a timely basis,

through no fault of his or her own."); Final Rule, 77 Fed. Reg. 18,310, 18,393 (Mar. 27, 2012);

*see also* Pate Decl. ¶ 7.

  In 2018, CMS, through guidance, provided that an Exceptional Circumstances SEP is

available for individuals who were prevented from enrolling in Exchange coverage during

another SEP or during an OEP by an event that the Federal Emergency Management Agency

(FEMA) declared a national emergency or major disaster.  Pate Decl. ¶ 11; AR 515-19 (also

*available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/8-9-

natural-disaster-SEP.pdf) ("FEMA SEP").  The website for enrollment lists a variety of other

complex, individual circumstances that may qualify one for an SEP; most involve circumstances

in which someone was unable to enroll during an otherwise available OEP or SEP due to

unforeseen circumstances.  *See* AR 520-24, 558-62.

  Nothing in the SEP statute or regulations requires that SEPs on the SBEs and FFEs be

identical.  HHS has previously explained that an SBE may establish additional SEPs so long as

they are more consumer protective than those listed in Section 155.420.  *See Notice of Benefit*

---

  [4] Plaintiff includes an older version of this Manual in its request for judicial notice.  *See*
RJN Ex. A-3 (dated July 19, 2016).  The current version is more appropriately considered by the
Court.

*and Payment Parameters for 2016*, 80 Fed. Reg. 10,750, 10,798 (Feb. 27, 2015), *available at*

https://www.govinfo.gov/content/pkg/FR-2015-02-27/pdf/2015-03751.pdf.  And twelve of the

thirteen SBEs have created COVID-specific SEPs.  While the general requirements of Section

155.420 apply to FFEs/SBE-FPs and SBEs, the "exceptional circumstances" SEP is subject to

the Exchange's discretion, so it is possible that FFEs could offer an exceptional circumstances

SEP under Section 155.420(d)(9) even if an SBE is not required to do so.

## II.    THE PANDEMIC AND CONSIDERATION OF ADDITIONAL SEP GUIDANCE

The world is facing a deadly pandemic – an outbreak of the Coronavirus Disease 2019

(COVID-19), caused by a novel coronavirus known as severe acute respiratory syndrome

coronavirus 2, or SARS-CoV-2.  The communicable disease spreads easily and quickly and has

killed over 100,000 Americans, and there is currently no approved vaccine or cure.  In the United

States, the President has declared a national emergency, and all fifty states and the District of

Columbia have also declared a state of emergency.  Federal, state, and local governmental bodies

across the country are taking steps to address the public health emergency, including by

improving access to healthcare.

In March 2020, HHS began considering whether to offer an exceptional circumstances

SEP in accordance with 45 C.F.R. § 155.420(d)(9) due to the COVID-19 public health

emergency to allow enrollment in QHPs through the thirty-eight FFEs and SBE-FPs.  Pate Decl.

¶ 8.  From that time through the present, HHS received input from multiple stakeholders about

this issue, including the Governor of Illinois.  *Id.*; *see, e.g.*, AR 994-95 (letter signed by, among

others, the Governor of Illinois); AR 1006-1010 (letter signed by, among others, the Attorney

General of Illinois).

Although HHS has had internal deliberations and external consultations about whether

the pandemic is an appropriate basis for a making available such an SEP, HHS has not made

available such an SEP on the SBE-FPs or FFEs.  HHS is not offering a COVID-19 exceptional circumstances SEP at this time for uninsured individuals who did not timely enroll during the previous annual Open Enrollment Period, as it has communicated to state officials who have inquired.  Pate Decl. ¶ 10; *see, e.g.*, AR 917-29 (communications with state officials, communicating, for example, that CMS "is not currently offering a Special Enrollment Period specifically designated for COVID-19" in light of other SEPs, and indicating that CMS "will continue to work closely with states and health plans around the country to assess what additional actions are necessary").  Opening such an SEP would be in tension with ordinary insurance principles and could increase adverse selection, but HHS has not foreclosed exercising its discretion to open an SEP in response to COVID-19, and continues to consider whether to establish a COVID-19 SEP in the future.  Pate Decl. ¶¶ 9-10, 15.

A number of considerations are relevant to this issue, and show that a COVID-19 SEP is unwarranted at this time.  First, previously existing SEPs continue to be available, and current SEPs will apply to many of the currently uninsured who wish to purchase insurance through an Exchange as a result of the pandemic.  Pate Decl. ¶ 11.  For example, there is an SEP applicable to anyone who lost minimum essential coverage during the pandemic; typically, this would apply to individuals who have lost access to employer-provided coverage as a result of job loss.  *See* 45 C.F.R. § 155.420(d)(1).  There is also an SEP available to already enrolled individuals who are newly eligible for certain tax credits or cost-sharing as a result of decreased income.  *Id*. § 155.420(d)(6).  And if any uninsured individual has been unable to take advantage of these or other SEPs as a result of the pandemic, they may be eligible for the FEMA SEP.  *See* Pate Decl. ¶ 11; AR 515-19 (FEMA SEP).  HHS has specifically clarified that "If you qualified for [an SEP] but missed the deadline due to COVID-19 (like if you were sick with COVID-19 or were caring for someone who was sick with COVID-19), you may be eligible for another SEP."  *Id*.;

*see* AR 558-62.  Furthermore, HHS has updated the HealthCare.Gov website – the enrollment platform for both FFEs and SBE-FPs – with this guidance to make it easier for certain individuals to access the FEMA SEP and to help consumers find important information on how best to access available SEP opportunities.  Pate Decl. ¶ 11.  HHS also temporarily suspended its verification program under which SEP applicants may be required to provide documentation supporting their eligibility for a special enrollment period prior to enrollment.  *Id*.  Although the suspension was lifted on July 16, 2020, applicants for the FEMA SEP are only required to attest that they meet the eligibility requirements for the FEMA SEP, which a caseworker will evaluate.  *See id*; AR 0515, 0518.

Many people are taking advantage of these existing SEPs.  Pate Decl. ¶ 11; AR 575-85 (SEP report).  At the time of the June 2020 SEP Report, there had been a 46% increase over the previous year in the number of consumers seeking an SEP for reasons of loss of coverage.  AR 577.  And overall, there has been a 27% increase in the number of people seeking SEPs.  *Id*.  From January to May 2020, 892,141 people gained coverage through an SEP.  AR 579.

Moreover, HHS has actively leveraged coronavirus-related congressional appropriations to mitigate the impact of COVID-19-related expenses for the uninsured during the pandemic.  *See* Pate Decl. ¶ 12.  For example, HHS is offering direct reimbursements through a new COVID-19 Uninsured Program Portal to healthcare providers who have conducted COVID-19 testing or provided treatment to uninsured individuals with COVID-19.  *See id.*; AR 533-34.[5] Congress appropriated $1 billion in the Families First Coronavirus Response Act (FFCRA), and another $1 billion in The Paycheck Protection Program and Health Care Enhancement Act (PPP

---

[5] *See also COVID-19 Claims Reimbursement to Health Care Providers & Facilities for Testing and Treatment of the Uninsured*, available at https://www.hrsa.gov/CovidUninsuredClaim (last visited July 20, 2020).

Act), to cover the costs of COVID-19 testing for uninsured individuals. *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 177, 182 (Mar. 18, 2020); PPP Act, Pub. L. No. 116-139, 134 Stat. 620, 622-26 (Apr. 24, 2020). Although Congress has not specifically appropriated money to cover the costs of treating uninsured COVID-19 patients, HHS has taken steps to ensure that these patients can receive COVID-19 treatment with no cost sharing obligations imposed on them. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") provided $100 billion for COVID-19-related healthcare expenses and provider lost revenue that are not eligible for reimbursement from other sources; the PPP Act added an additional $75 billion. *See* Pub. L. No. 116-136, 134 Stat. 281, 563 (Mar. 27, 2020); *see* PPP Act, 134 Stat. at 622-23. The CARES Act gave the Secretary significant discretion to disburse this money to eligible healthcare providers, and HHS chose to allocate a portion of this funding to cover the claims of healthcare providers who administered COVID-19 treatment to uninsured individuals. *See* CARES Act, 134 Stat. at 563.[6] *See* Pate Decl. ¶ 12. Through these programs, HHS is offering significant financial assistance targeted specifically to addressing the cost of uncompensated COVID-19-related care provided to uninsured individuals, and HHS is working to ensure not only that providers have the means to offer needed COVID-19 care to uninsured patients. Pate Decl. ¶ 14.[7]

---

[6] Under the Terms and Conditions HHS has attached to its reimbursement, providers must commit to accept HHS's reimbursement as payment in full and forego balance billing those uninsured patients for their COVID-19 testing or treatment costs. *See* AR 533; *see also Uninsured Relief Fund Payment Terms and Conditions, available at* https://www.hhs.gov/sites/default/files/terms-and-conditions-uninsured-relief-fund.pdf (last visited July 20, 2020); *FFCRA Relief Fund Payment Terms and Conditions, available at* https://www.hhs.gov/sites/default/files/terms-and-conditions-ffcra-relief-fund.pdf (last visited July 20, 2020).

[7] *See Claims Reimbursement to Health Care Providers and Facilities for Testing and Treatment of the Uninsured, available at* https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3 (last visited July 20, 2020) (containing detailed information about the claims HHS has paid out under this program).

In light of all of these factors, "granting a broad [SEP] to all uninsured individuals is not an appropriate remedy for the problem of uncompensated COVID-19-related healthcare costs for the uninsured.  Such a broad special enrollment period would significantly increase the risk of adverse selection . . . ."  Pate Decl. ¶ 13.  "Given the availability of other SEPs and reimbursement options, the significant adverse selection risk presented by a COVID-19 SEP, and the related negative impacts on the individual market risk pool, current information does not establish that a COVID-19 SEP is warranted at this time."  *Id*. ¶ 15.  This could, however, change in the future, depending, for example, on the availability of reimbursement funds, overall costs, and whether there is data suggesting that the COVID-19 public health emergency has impeded consumers' ability to enroll in individual market coverage.  *Id*.

## III.   THIS LITIGATION

Plaintiff the City of Chicago filed suit and sought a preliminary injunction on June 15, 2020, alleging that HHS has unlawfully refused to provide an SEP for all individuals for enrollment during the pandemic.  Count I argues that HHS's alleged refusal to provide an SEP is "contrary to law" under the APA because the statute requires a finding that the pandemic itself is an exceptional circumstance.  *See* Compl., ECF No. 1, ¶¶ 177-80.  Count II argues that HHS's alleged refusal to open an SEP is "arbitrary and capricious" under the APA.  *Id*. ¶¶ 181-83.  Count III argues that HHS's alleged refusal to provide an SEP is "unlawfully withheld or unreasonably delayed agency action."  *Id*. ¶¶ 184-87.  Plaintiff seeks declaratory and injunctive relief that would direct Defendants to provide for an SEP.  *See* Pl.'s Mot. for a Prelim. Inj. or Expedited Summ. J., ECF No. 4 ("Pl.'s Mot.").  Pursuant to a Joint Status Report submitted by the parties, the Court set a schedule whereby the motion for a preliminary injunction was converted to a motion for summary judgment on an expedited schedule.  *See* ECF No. 14.

14

**ARGUMENT**

Plaintiff's claims fail because HHS's consideration of policy options does not constitute final agency action, because the City identifies no nondiscretionary duty that could support the crux of its case, which is fundamentally a challenge to inaction, and because HHS has in any event acted reasonably under the circumstances.  But the Court need not even reach these issues, because Plaintiff's claim fail for a more fundamental reason: lack of standing.

## I.  THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF CANNOT DEMONSTRATE STANDING.

Plaintiff cannot demonstrate standing because it has not shown the existence of a concrete, specific injury of its own that is both caused by the Defendants and redressable by this Court.

### A.  Plaintiff Bears the Burden to Demonstrate Standing.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).  One element of this constitutional limitation is that a plaintiff must establish that he has standing to sue.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  The requirement is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper*, 568 U.S. at 408.

"[T]he irreducible constitutional minimum of standing requires [1] an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, . . . [2] a causal connection between the injury and the conduct complained of . . . , [and] [3] it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Swanson*

*Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239-40 (D.C. Cir. 2015).  At summary judgment, a

plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other

evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to

be true."  *Id.*  Moreover, where a plaintiff's standing is based on alleged future injuries, the

Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to

constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient."

*Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also*

*Lujan*, 504 U.S. at 564 n.2 (plaintiff who "alleges only an injury at some indefinite future time"

has not shown an injury in fact; "the injury [must] proceed with a high degree of immediacy, so

as to reduce the possibility of deciding a case in which no injury would have occurred at all").

The future injury may not be based on a "speculative chain of possibilities."  *Clapper*, 568 U.S.

at 410.

 Moreover, the injury must be tied to the specific relief sought.  This is because "standing

is not dispensed in gross."  *Town of Chester* v. *Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)

(quoting *Davis* v. *FEC*, 554 U.S. 724, 734 (2008), in turn quoting *Lewis* v. *Casey*, 518 U.S. 343,

358 n.6 (1996)).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and

for each form of relief that is sought."  *Id.* (citation omitted).  So, too, any judicial "remedy must

of course be limited to the inadequacy that produced the injury in fact that the plaintiff has

established," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis*, 518

U.S. at 357), and cannot go beyond redressing the plaintiff's own specified injury, *see Gill v.*

*Whitford*, 138 S. Ct. 1916, 1929-1931 (2018); *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 494-

97 (2009).

**B.** **The City of Chicago Cannot Establish Standing by Asserting the Interests of its Citizens as Parens Patriae.**

To the extent that Plaintiff is attempting to assert the interests of its residents as parens patriae, it cannot do so. The City's memorandum relies in part on the pandemic itself and ongoing public health emergency as part of the injury at issue. *See* Pl.'s Mot. at 16, 36-40 & n.4. It explicitly invokes "the spread of COVID-19 and the government's critical interest in protecting the public health," and argues that uninsured individuals are more likely to "further spread" the virus. *Id*. at 36-38. The City of Chicago, however, cannot file suit against the federal Government on behalf of its residents' interests; rather, Plaintiff must assert the interests of the City itself as an entity. The City's standing depends on the capacity in which it initiates a lawsuit. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019) (citing Erwin Chemerinsky, Federal Jurisdiction 121 (7th ed. 2016) ("[A] distinction must be drawn between a government entity suing to remedy injuries that it has suffered and suing in a representative capacity on behalf of its citizens.")); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 448–49 (1992) (distinguishing between "parens patriae standing" and "allegations of direct injury to the State itself").

First, it is well-settled that a State may not sue the federal Government on behalf of its citizens as parens patriae. *See Kansas v. United States*, 16 F.3d 436, 439 (D.C. Cir. 1994); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16 (1982). While a state may in some circumstances be able to sue as parens patriae, "it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field, it is the United States, and not the state, which represents them as parens patriae." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) (internal citation omitted). "As municipalities derive their existence from the state and function as political subdivisions of the state, presumably they too

17

cannot sue the federal Government under the doctrine of parens patriae." *See City of Olmsted Falls, OH v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (explaining the applicability of parens patriae but not squarely deciding the issue); *cf. City of Bos. Delegation v. Fed. Energy Regulatory Comm'n*, 897 F.3d 241, 249 (D.C. Cir. 2018) ("[W]e have no occasion to consider whether the City, if it were a party, could establish standing based on a parens patriae theory."). Accordingly, like the State, a municipality cannot assert its residents' rights against the federal Government.

Moreover, even if a State could bring the instant lawsuit against the federal Government, because municipalities' "power is derivative and not sovereign," municipalities cannot claim the ability to sue as parens patriae on behalf of their residents; municipalities are not treated like the States in this regard. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985)). Rather, a municipality may only "sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens." *City of Sausalito*, 386 F.3d at 1197. Accordingly, the City of Chicago cannot assert standing based on purported general interests of city residents; only the State has the power to assert that interest. Here, the State has not joined the City's lawsuit as a party, just as it has not chosen to establish its own Exchange. Plaintiff's assertions regarding the general welfare of Chicago residents do not establish its standing.[8]

---

[8] The cases cited by Plaintiff are not to the contrary. *See* Pl.'s Mot. at 36-37. In each instance, the State or other public entity was a defendant who argued that the public interest weighed against the relief sought. For example, in *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020), the Fifth Circuit granted mandamus relief to the State as the defendant in a civil action. The court found that the State government's interest in controlling the epidemic, along with the clear error of the district court in second-guessing the Government's public health expertise, justified mandamus. *Id*. As in all of the cited cases, the case did not present any question of a municipality's standing to assert the interests of its citizens against the federal Government.

**C.      Plaintiff Has Not Demonstrated a Concrete and Redressable Injury of Its Own.**

Plaintiff asserts that it will suffer harm caused by the existence of additional uninsured residents, but the harms that it alleges directly to the City itself are highly speculative and contingent; they are insufficient to establish a current or certainly impending injury that is fairly traceable to Defendants' conduct and redressable by this Court.

While Plaintiff relies on the general harms of the pandemic itself, Pl.'s Mot. at 36-37, these harms are not "fairly traceable" to the Defendant, or redressable by the order sought.  The question instead is whether Plaintiff has established some specific injury caused by HHS having not yet opened an additional SEP specific to COVID-19, in addition to the already available SEPs, that this Court could redress by ordering HHS to do so.  According to Plaintiff, about 11.9% of its residents were uninsured in 2018, and that the number has "likely" risen as result of the pandemic because of the increased numbers of unemployed.  Pl.'s Mot. at 14-15.  Plaintiff builds on that supposition by speculating that, in general, insurance expansions can reduce the costs of uncompensated care provided by the City and that uninsured people are generally less likely to seek testing and treatment and more likely to spread the virus.  *Id*. at 16; 36-38.

Even assuming Plaintiff's claims were accurate, this is precisely the sort of "speculative chain of possibilities" that fails to establish standing.  *Clapper*, 568 U.S. at 410.  Plaintiff cannot show with any certainty that people are uninsured specifically as a result of the lack of a COVID-19 SEP, or that these particular uninsured will get sick and cause a drain on City resources, much less that these individuals are more likely to engage in risky behavior that spreads the virus.  Indeed, the hundreds of thousands of newly uninsured people that Plaintiff describes in the Chicago area are presumably all covered by existing SEPs, because the loss of minimum essential coverage is already a basis for an SEP.  And if they missed the timeframe for

enrollment because of the pandemic, the FEMA SEP provides an additional basis for them to purchase insurance.  No injury related to those individuals could possibly be considered traceable to the lack of a COVID-19-specific SEP.  Plaintiff also provides no concrete reason to think that the preexisting uninsured (allegedly around 123,000 in the Chicago metropolitan area) are causing a specific injury to Chicago, particularly in light of significant existing federal reimbursement for COVID-19 testing and treatment of the uninsured.  The link between the challenged federal action and the alleged injury must be more than "a conjecture based on speculation that is bottomed on surmise."  *See Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992); *see Ill. Dep't Transp. v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976).  Plaintiff has not established that it is experiencing or will experience a specific injury caused by the lack of a COVID-19 SEP.

Moreover, the alleged injury, Defendants' role, and the redressability of that injury all depend on the actions of third parties; *i.e.*, the uninsured individuals and their providers.  The Supreme Court has warned that the injury underlying standing cannot be "th[e] result [of] the independent action of some third party not before the court," and that it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61.  "The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."  *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (citing *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc)).  Where an intermediary "st[ands] between the plaintiff and the challenged action[]," standing is generally lacking.  *See Frank Krasner Enters., Ltd. v. Montgomery Cty. Md.*, 401 F.3d 230, 235 (4th Cir. 2005).  "This is so because[] 'the existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot

20

presume either to control or to predict.'" *Id.* (quoting *Lujan*, 504 U.S. at 562). Accordingly, "where the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that the agency action is at least a substantial factor motivating the third parties' actions." *Am. Freedom Law Ctr*, 821 F.3d at 49 (citing *Tozzi v. HHS,* 271 F.3d 301, 308 (D.C. Cir. 2001); *see also Univ. Med. Ctr. of S. Nev. v. Shalala,* 173 F.3d 438, 442 (D.C. Cir. 1999).

Plaintiff cannot establish even the first link in their speculative chain of causation because they cannot show that HHS inaction was a "substantial factor" in Chicago's injuries, based on the purported ineligibility of some additional residents to purchase insurance. Anyone who lost minimum essential coverage as a result of the pandemic is already eligible for an SEP, *see* 45 C.F.R. § 155.420(d)(1), and thus their behavior or risk presumably is not affected by the lack of a COVID-19-specific SEP. And anyone who has been unable to take advantage of existing SEPs as a result of the pandemic is eligible for the FEMA SEP. *See* Pate Decl. ¶ 11; AR 515-19; 558-62. Plaintiff cannot establish with any certainty that some unidentified, additional number of Chicago residents who are currently uninsured (and who perhaps chose not to purchase insurance during the last OEP) both (1) will cause nonreimbursable harm to the city now or in the immediate future; and (2) would purchase insurance now if a COVID-specific SEP were available. These residents are independent actors, not before the Court, whose discretion to purchase insurance the Court cannot predict or control. *See Frank Krasner Enters*., Ltd., 401 F.3d at 235.

Even if Plaintiff could establish that more Chicago residents would purchase insurance if this Court ordered HHS to offer the requested SEP, the alleged injury to the City from lack of availability of such insurance depends on the specific future conduct, choices, and unpredictable circumstances of those particular third parties and speculation about the downstream effect on

the finances of the city.  Under Plaintiff's theory, these specific uninsured individuals could

cause harm if they delay care or engage in risky behavior that could spread the virus and have a

downstream effect on City services or finances that cannot be recouped by other existing

reimbursement measures.  Here, Plaintiff has not identified any risk to the City from that specific

cohort of individuals, only some risk from the existence of uninsured generally.  For there to be

an injury caused by the lack of a COVID-19 SEP and redressable by this Court, those individuals

who allegedly cause the increased spread of the virus and the drain on the City's resources would

have to be the same individuals who are not eligible for current SEPs, but would purchase

insurance under a new SEP.  *See, e.g.*, *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152,

1161 (D.C. Cir. 2005) (finding that "increased risk" of harm from third parties was insufficient,

even if agency decision may have played a role in the chain of causation); *Double R Ranch Tr. v.*

*Nedd*, 284 F. Supp. 3d 21, 30-32 (D.D.C. 2018) (finding, inter alia, that alleged injuries were not

sufficiently specifically tied to the challenged action).  Plaintiff would also have to show that

these are the specific individuals who, without insurance, get sick and behave in ways that

contribute to the spread of the virus.  Plaintiff's declarations simply do not establish, or even

attempt to establish, these speculative causal links with any specificity, much less that an order

from the Court will redress such harms.  Plaintiff therefore lacks standing to bring these claims.

### D.    Plaintiff Also Lacks Statutory Standing Because the City is not an "Aggrieved Person" Within the Zone of Interests of the SEP Requirements.

Even if Plaintiff could establish Article III standing, it has not established statutory (or

"prudential") standing because it is not within the zone of interests of the SEP requirements in

the ACA.  The APA grants standing to persons "adversely affected or aggrieved by agency

action within the meaning of a relevant statute." 5 U.S.C. § 702.  This requirement is satisfied

only if the plaintiff is "arguably within the zone of interests to be protected or regulated by the

statute" that the plaintiff says was violated.  *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  Whether a plaintiff comes within the "zone of interests" is an issue that requires the Court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).  In cases where the plaintiff is not a subject of contested regulatory action, the zone of interests test does not permit review if the plaintiff's interests are so marginally related to or inconsistent with purposes implicit in statute that it cannot reasonably be assumed that Congress intended to permit suit. *See Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399-400 (1987).

As a municipality, Plaintiff lacks statutory standing under the ACA to claim that individuals are entitled to an SEP for enrollment in an FFE.  *See* 42 U.S.C. § 18031(c)(6)(C). The City of Chicago is not the subject of the contested action here, because it is not an individual who may be entitled to purchase health insurance during the SEP.  Nor is the City an insurer who may provide qualifying health plans on the Exchange during the SEP.  Nor is the City charged with establishing or running an Exchange.  Nor, for that matter, did the City even make a request for an SEP.  In short, they are in no way directly affected by the alleged agency action here. Plaintiff's downstream interest in protecting its own finances and resources is at best marginally related to the purpose of the SEP provisions, which are intended to provide some flexibility for individuals to enroll outside the open enrollment periods while maintaining limited enrollment periods.  Pate Decl. ¶¶ 3-6.  A new SEP is intended to balance the interests of the individual in obtaining health insurance outside an OEP with the risk of adverse selection.  The City of Chicago's pecuniary interest is not a relevant statutory consideration, and the ACA includes no indication that Congress intended to permit litigation brought by any municipality who disagrees with the federal policy decisions at issue.

The statutory and regulatory structure support this conclusion.  Plaintiff, after all, is a

political subdivision of the State of Illinois, which has elected not to establish an Exchange itself.

The ACA permits the State to run its own Exchange, but if the State chooses not to do so, these

enrollment decisions are not in the hands of the State and instead the Exchange is established and

run by the federal Government.  Here, a subdivision of a State that has elected not to run its own

Exchange should not be permitted to attempt to control federal enrollment policy through

litigation.  To borrow Plaintiff's words, "Illinois has a federally-facilitated Exchange, which as is

relevant here, means that Illinois must defer to the federal government's determinations

regarding enrollment periods."  Pl.'s Mot at 6.  So too must a political subdivision of the State,

which is bound by the State's decision not to establish an Exchange that would make these

decisions on behalf of its residents.

Thus, even if Plaintiff had shown Article III standing, it lacks statutory standing and its

claims should be dismissed.

## II.    PLAINTIFF'S SECTION 706(2) CLAIMS FAIL BECAUSE IT IDENTIFIES NO FINAL AGENCY ACTION BUT INSTEAD CHALLENGES AGENCY INACTION.

Defendant is entitled to judgment on Counts I and II of the Complaint, which purport to

challenge "final agency action."  Plaintiff in fact is challenging only agency inaction, and these

counts therefore fail.

### A.    Section 706(1) Is the Only Appropriate Means to Challenge Agency Inaction.

The APA divides the scope of judicial review into two categories:  agency inaction and

agency action.  *Compare* 5 U.S.C. § 706(1) *with id.* § 706(2).  Courts are empowered to compel

action, if it has been unlawfully withheld or unreasonably delayed, or to set aside action for a

variety of reasons.  *Id.* § 706(1), (2).  Because the gravamen of Plaintiff's complaint is that HHS

has *not* acted, the only bases on which the Court can compel the action that Plaintiffs desire is if

that action has been "unlawfully withheld" or "unreasonably delayed." *Id.* § 706(1).  By the

same token, Counts I and II should be dismissed because 5 U.S.C. § 706(2) is the means of

setting aside agency *action*.  *See, e.g.*, *American Anti-Vivisection Society v. USDA*, 946 F.3d 615,

620 (D.C. Cir. 2020) (affirming dismissal, in a case involving no final agency action, of the

plaintiff's 706(2) claim while allowing the 706(1) claim to proceed).

The D.C. Circuit's decision in *Anglers Conservation Network v. Pritzker*, 809 F.3d 664

(D.C. Cir. 2016) ("*Anglers*"), is instructive.  There, the statute at issue, the 1976 Fishery-

Conservation Act, incorporated the judicial-review provisions in § 706(2) but not § 706(1).  *Id.* at

668.  When the plaintiffs in *Anglers* sought to compel a regional fishery council to propose

amendments to a fishery management plan, which amendments by statute "shall" be proposed

when "necessary from time to time," the district court dismissed the suit, and the D.C. Circuit

affirmed.  *Id.* at 667 (citing 16 U.S.C. § 1852(c)).  The "nub of [plaintiffs'] grievance," the court

explained, was "agency inaction."  *Id.* at 670.  But the "rather glaring problem" was that, because

the relevant statute had incorporated only § 706(2), plaintiffs had no cause of action to compel

agency action:  "§ 706(1) is excluded, yet this is the APA subsection giving courts the authority

to 'compel agency action unlawfully withheld.'"  *Id.* (quoting *Norton v. Southern Utah*

*Wilderness Alliance*, 542 U.S. 55, 62 (2004) ("*SUWA*")).[9]

_____

[9] Courts have observed that 5 U.S.C. § 551(13) (defining "agency action" to include
"failure to act") is "perplexing" when read in connection with § 706(2).  *See W. Org. of Resource*
*Councils v. Zinke*, 892 F.3d 1234, 1247-48 (D.C. Cir. 2018) (Edwards, J., concurring)
(acknowledging that incorporating § 551(13) into § 700 *et seq.* raises "perplexing" questions).  But
rather than render § 706(1) superfluous, most courts have merely read *SUWA* and § 551(13) to
require that the withheld action be "discrete" in nature and required by law.  *Louisiana v. United*
*States*, 948 F.3d 317, 323 (5th Cir. 2020); *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th
Cir. 2019); *W. Org. of Res. Councils*, 892 F.3d at 1241 ("*SUWA* teaches that the only action a court
may compel an agency to take under § 706(1) is discrete action that the agency has a duty to
perform.").

Plaintiff faces the same glaring problem here.  Because § 706(2) does not empower courts to compel agency action withheld, Plaintiffs cannot seek review under that subsection (as they do in Counts I and II), and Plaintiff must instead rest on Count III (alleging violations of § 706(1)).

### B.     Plaintiff's Section 702(2) Claims Do Not Challenge "Final Agency Action."

Plaintiff has not established the existence of a "final agency action" that can be challenged under the APA.  Section 706(2) permits review only of "agency action," defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Two additional conditions must be met for an agency action to be considered "final," and thus reviewable, for purposes of the APA.  5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  The challenged action must be the "consummation of the agency's decisionmaking process" and it must be an action in which "rights or obligations have been determined" or "legal consequences will flow."  *Bennett,* 520 U.S. at 175; *see also Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).  The Supreme Court has described this second inquiry as a "pragmatic" one.  *U.S. Army Corps of Engineers v. Hawkes Co*., 136 S. Ct. 1807, 1815 (2016).  "The court here primarily looks to 'the actual legal effect (or lack thereof) of the agency action in question on regulated entities.'"  *Cal. By & Through Brown v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019) (*quoting Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)).

Here, Plaintiff has not established the existence of a reviewable "agency action," much less a "final" one.  Plaintiff puts forward no evidence of "an agency rule, order, license, sanction" or the equivalent.  *Cf*. 5 U.S.C. § 551(13).  While it claims, in a footnote, that HHS has "presumably" issued "an agency rule that the pandemic is not an 'exceptional circumstance,'" Pl.'s Mot. at 17-18 n.3, the agency has done no such thing.  In fact, while the agency has not

opened a COVID-19 SEP, and believes it is not warranted at this time, HHS has not ruled it out in the future.  Pate Decl. ¶¶ 10, 15.  Accordingly, there is no identifiable action at issue that finally determines legal rights or benefits.[10]

Plaintiff's motion cites to several media reports alleging policy disagreements within the Executive Branch.  *See* Orbea Decl. B-1, B-2, B-3, B-4.  For example, one *Politico* article describes purported disagreements between those who believed that the lack of an SEP was "purely ideological" and those who believed that the "insurers calling loudly for re-opening the markets would return weeks later seeking a bailout, as their new enrollees racked up medical expenses."  Orbea Decl. Ex. B-2.  Plaintiff cites two specific articles for the proposition that HHS has "refused" to act, *see id*. Exs. B2, B5, which Plaintiff construes as a "denial" under the APA.  *See* Pl.'s Mot. at 12-13.  The mere fact that Plaintiff is relying on hearsay reported in the media lends support to the conclusion that this is not a "rule, order, license, sanction" or similar.  And the hearsay, in any event, does not support Plaintiff's conclusion.  A *Politico* article reports that an anticipated announcement about an SEP "never came" and that an unidentified White House source informed *Politico* that "the administration was exploring alternative options."  Orbea Decl. Ex. B-2.  This is consistent with the agency's position that "current information does not establish that a COVID-19 SEP is warranted at this time" and notes that this "conclusion could change in the future, depending, for example, on the availability of reimbursement funds, overall costs, and whether there is data suggesting that the COVID-19 public health emergency has impeded consumers' ability to enroll in individual market coverage.'"  Pate Decl. ¶ 15.  The

---

[10] When a failure to act is the basis for an APA claim pursuant to Section 706(2), a plaintiff must show that it is the functional equivalent of final agency action.  *See, e.g.*, *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 10 (D.D.C. 2008).  Here, neither the statements to the press, nor the communications with stakeholders are the "functional equivalent" of final agency action.  They do not prohibit the use of a COVID-19 SEP, and the agency continues to explore options.  Pate Decl. ¶ 15.

fact that HHS has not at this time provided for a COVID-19-specific SEP is not an agency action, and it is not final.  The current absence of Plaintiff's demanded action does not create legal rights or obligations, and it does not bind Plaintiff or Defendant to any course of action.  It has no legal effect on anyone, and HHS remains just as capable of opening an SEP now as it was before the purported "decision" to explore alternatives.[11]

In short, Plaintiff's policy preference for additional SEP guidance is not actionable under the APA because the agency has taken no action that would prohibit or establish such an SEP.

## III.   PLAINTIFF's 706(1) CLAIM FAILS BECAUSE IT HAS NOT ESTABLISHED THAT AGENCY ACTION WAS UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED.

Plaintiff has not established a claim under Section 706(1) because it cannot show that Defendants failed to take discrete action that they are specifically required to take.

### A.   Plaintiff Has Not Established that An SEP Was Unlawfully Withheld Because It Has Not Identified a Specific and Unequivocal Command to Act.

Section 706(1) permits judicial review of agency inaction, but only within strict limits. *See Anglers*, 809 F.3d at 670 (citing 5 U.S.C. § 706(1)).  Courts can only compel "discrete agency action that it is *required to take*."  *SUWA*, 542 U.S. at 64 (emphasis in original).  This standard reflects the common-law writ of mandamus, which the APA "carried forward" in § 706(1).  *SUWA*, 542 U.S. at 63.  Thus, Section 706(1) grants judicial review of withheld or delayed agency action only if a federal agency has a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command."  *Id*. at 63-64.  This standard applies whether a

---

[11] The cited *New York Times* article, by contrast, characterizes the lack of an SEP as a "decision," and reports that White House discussions were "over," apparently based on information provided by an unidentified White House official.  Orbea Decl. Ex. B-3.  But the official is not identified, no specific language is quoted, and in any event, the article confirms that "officials have the capacity to establish a special enrollment period at any time."  B-3.  This too is therefore consistent with the agency declaration that it continues to consider the issue.  *See* Pate Decl. ¶ 10, 15.

plaintiff alleges an unlawful withholding or an unreasonable delay.  *See, e.g.*, *Ctr. for Biological Diversity v. EPA,* 794 F. Supp. 2d 151, 157 (D.D.C. 2011) ("[A]n unreasonable-delay claim requires that the agency has a duty to act in the first place.").  "The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ."  *SUWA*, 542 U.S. at 65.

Plaintiff has made no such showing here.  Nothing in the statutory or regulatory language constitutes a "specific, unequivocal command" to issue any defined "exceptional circumstances," much less to define "exceptional circumstances" so as to include the COVID-19 pandemic.  The only command in the statute states that the Secretary "shall require" the Exchange to provide for SEPs "similar" to those required in other statutes, including a statute that includes an SEP for eligible individuals "who meet such exceptional conditions . . . *as the Secretary may provide*."  *See* 42 U.S.C. § 1395w-101(b)(3)(C); 42 U.S.C. § 18031(c)(6)(C) (requiring "similar" SEPs).  The agency thus has discretion both as to whether to set forth any exceptional conditions and as to how to define those conditions.  HHS has implemented the statute by providing for several SEPs, specifically using similarly permissive and discretionary language to provide for a triggering event when "the qualified individual or enrollee, or his or her dependent, demonstrates to the Exchange, in accordance with guidelines issued by HHS, that the individual meets other exceptional circumstances as the Exchange may provide."  45 C.F.R. § 155.420(d)(9).

Accordingly, the statute requires only that the Secretary provide for a "similar" SEP to one that permits the Secretary broad discretion to determine whether any "exceptional circumstances" exist and, if so, how those circumstances are to be defined.  Specifically, the Secretary "*may* provide" for the conditions of exceptional circumstances that warrant an SEP.  Neither the direction for "similar" SEPs, nor the discretionary option to define exceptional circumstances, constitute an "unequivocal command" for a broad, COVID-19 SEP.  *See SUWA*,

542 U.S. at 63.  As the D.C. Circuit has explained, "[o]rdinarily, legislation using 'shall' indicates a mandatory duty while legislation using 'may' grants discretion."  *Anglers*, 809 F.3d at 671.  And while "matters are not always so clear cut,"  "when a statutory provision uses both 'shall' and 'may,' it is a fair inference that the writers intended the ordinary distinction."  *Id*. Here, Congress drew such a distinction.  Defendants have fully complied with the statutory direction to provide for "similar" SEPs, under such circumstances as the Secretary "may" provide.  *See generally* 45 C.F.R. § 155.420.[12]

> **B.      HHS Is Not Required to Establish a COVID-19 SEP.**

Plaintiff argues that HHS has a specific duty to establish a COVID-19 SEP, but its argument that the phrase "exceptional circumstances" necessarily encompasses the pandemic is wrong, and certainly does not identify a "specific" and "unequivocal" mandate for action that has been unlawfully withheld.[13]

> **1.      The Pandemic is Extraordinary, But That Observation Does Not Mandate an SEP.**

First, Plaintiff appears to argue that because the pandemic itself is an exceptional and extraordinary event, it necessarily is an "exceptional circumstance" and *requires* an SEP.  *See* Pl.'s Mot. at 22-24 (citing cases for the proposition that the pandemic is extraordinary). Defendants, of course, have no quibble with the characterization of the pandemic itself as "exceptional" or "extraordinary" in general.  *Id*.  But every exceptional event does not

---

[12]   The amicus brief submitted by several States appears to acknowledge the broad discretion provided by the ACA, emphasizing the "flexibility" built into the statutory language. *See* ECF No. 9, at 4-5.

[13]   Plaintiff addresses this question under the rubric of arguing that HHS's actions are "contrary to law."  *See* Pl.'s Mot. at 22-29.  Because this claim should only be reviewable under Section 706(1), we respond to Plaintiff's arguments here instead.  Under either framework, HHS has fulfilled its legal obligations and is entitled to summary judgment on any claim that it is required to open a COVID-19 SEP.

necessarily create "exceptional circumstances" as that phrase is used in the Affordable Care Act, and there is no statutory mandate to create an SEP in response to a pandemic.  Plaintiff cites no law, much less a "specific, unequivocal" command, for the proposition that a public health emergency necessarily requires an exceptional circumstances SEP.  Indeed, public health emergency declarations are hardly unprecedented,[14] and Congress could have easily directed HHS to open an SEP during the declaration of a public health emergency – yet it chose not to do so.  Instead, it gave HHS significant discretion to define when exceptional circumstances necessitating an SEP arise.

Indeed, the proposal of a broad SEP is in tension with the statutory and regulatory text, both of which suppose that the "exceptional circumstances" are the circumstances of the individual, not a generalized public health threat that necessarily imposes quite variable effects on individuals.  For example, the statutory language requires an SEP for "eligible individuals who meet such exceptional conditions . . . as the Secretary may provide."  42 U.S.C. § 1395w-101(b)(3)(C).  The plain text of the statute therefore supposes that the "exceptional conditions" at issue are applicable to the individual, who must "meet" those conditions.  The existence of the global pandemic does not sound at all like "exceptional conditions" applicable to a particular individual.  The OEP created by statute provides broad, general eligibility for the uninsured; an SEP typically requires an individual to meet specified conditions.  This is consistent with how HHS has typically interpreted this provision in the ACA context.  *See* Pate Decl. ¶¶ 6-7.  For example, the Enrollment Manual provides three categories of exceptional circumstances:  (1) when non-enrollment "is the result of an exceptional circumstance, . . . including being incapacitated or experiencing a natural disaster;" (2) when non-enrollment is "the result of an

---

[14]    *See* Public Health Emergency Declarations, https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx (last visited July 17, 2020).

unforeseen event or reflects a first-time requirement for Exchange enrollees (such as the Tax Season SEP for individuals impacted by the individual shared responsibility payment);" and (3) when non-enrollment "is the result of a significant life event resulting in lack of access to his or her application or account and the individual, enrollee, or dependent has experienced a change in situation or status that now requires that he or she obtain minimum essential coverage."  AR 505. This last category "includes victims of domestic abuse or spousal abandonment" and "AmeriCorps servicemen and women who are starting or ending their service."  *See id.*  But these SEPs are usually tied to the effect of the unforeseen event on the particular person's previous ability to enroll.

Setting aside the problem with the pandemic's highly variable impact on individuals, the exceptional circumstances SEP has usually been interpreted much more narrowly than Plaintiff proposes here, to extend to exceptional circumstances interfering with a particular person's ability to enroll in a health plan.  *See* Pate Decl. ¶ 6; s*ee, e.g.*, Proposed Rule, 76 Fed. Reg. 41,866, 41,884 (July 15, 2011); Final Rule, 77 Fed. Reg. 18,310, 18,393 (Mar. 27, 2012).  The exceptional circumstances SEP has not generally been extended to someone simply because that individual has experienced something exceptional (like a major illness); rather, it has typically been used to provide for enrollment when something exceptional interfered with the particular individual's ability to enroll during an OEP or SEP.  *See, e.g.*, FEMA SEP, AR 515-19; Manual, AR 505.  Plaintiff's proposed expansion of exceptional circumstances, even if not explicitly foreclosed by the statutory language, would be a novel expansion of this authority because it would include people who simply chose not to enroll in the most recent OEP or applicable SEPs, although they were able to do so.  It is therefore in tension with the original purpose of limited enrollment periods.  *See* Pate Decl. ¶¶ 3-6 (explaining risk of adverse selection); *id*. ¶ 9 (COVID-19 SEP "would reflect an entirely new approach to administering special enrollment periods

32

under the ACA by allowing any individual to access the special enrollment period as an exceptional circumstance regardless of their individual circumstances.").  It certainly cannot be said that there is an unequivocal statutory mandate for this novel expansion of the SEP.

### 2.    The Purposes of the ACA Do Not Mandate a Broad COVID-19 SEP.

Plaintiff argues that creation of an SEP is consistent with the purpose of the ACA because a purpose of the ACA was to expand health insurance coverage.  Pl.'s Mot. 24-25.  As an initial matter, Plaintiff's suggestion that expanded coverage is good health policy and "consistent" with legislative objectives is a far cry from showing a non-discretionary duty under *SUWA*; thus, even if Plaintiff were correct, it would not prevail on the claim that agency action was unlawfully withheld.  Moreover, this somewhat blinkered account of the ACA's purpose omits relevant portions of the cited cases and fails to grapple with the specific legislative purpose of limited enrollment periods.  The ACA's purpose certainly includes expansion of quality health insurance coverage, but it was also intended to contain rising healthcare costs and the cost of insurance.  *See e.g.*, *NFIB*, 567 U.S. at 538 (one purpose of the ACA was to "decrease the cost of health care"); *King*, 135 S. Ct. at 2485-86 (defining adverse selection and its effect on health insurance markets).  Plainly, expanded insurance is not the only purpose of the ACA.  And Congress expressly limited enrollment periods so that insurance was not available for purchase year-round.  *See* 42 U.S.C. § 18031(c)(6)(C).  On its face, this is a cost-control mechanism, not just a means of expanding coverage.  Pate Decl. ¶¶ 3-6 (explaining purpose of limited enrollment periods).  The current policy, which includes the loss of coverage SEP and the FEMA SEP, has permitted large numbers of people to purchase health insurance.  *Id.* ¶ 11; AR 575-88.  At the same time, it has avoided the possibility of people who were previously eligible choosing to sign up for insurance now only because they are sick.  Pate Decl. ¶ 14.  This result is also consistent with the purposes of the ACA.

33

3.      **Recent Actions by States or Defendants Do Not Require an SEP Here.**

Plaintiff also argues that the pandemic qualifies as an exceptional circumstance because several SBEs have opened broad, temporary SEPs, and because the federal Government has treated it as an exceptional circumstance in other contexts.  *See* Pl.'s Mot. at 25-27.  As discussed above, the SEP regulation permits SBEs to provide for more permissive SEPs than the FFEs. *See* pp. 9-10, *supra*.  Accordingly, the decisions of the SBEs provide no evidence that HHS's approach is flawed, much less evidence that the agency is acting contrary to a specific statutory command.

Most puzzlingly, Plaintiff claims that CMS is not following its interpretation of the FEMA SEP as applied to Medicare, which also covers individuals who are unable to make an election as a result of the pandemic.  Pl.'s Mot. at 26.  But a similar interpretation applies to the FFEs, *see* Pate Decl. ¶ 11; AR 558-62, and Plaintiff's supposition that "CMS has nonetheless decided to treat the ACA's Exchanges differently" is wrong.  Pl.'s Mot. at 26.  As clarified on HealthCare.gov, individuals who were unable to enroll during an otherwise available SEP because of COVID-19 can use the FEMA SEP to enroll in coverage on the FFEs.  *See* Pate Decl. ¶ 11; AR 560.  The argument of the House seems to rely in part on the same misconception.  *See* ECF No. 8, at 14-15.

Plaintiff also relies on the extension of certain deadlines under the Employee Retirement Income Security Act (ERISA) and the Internal Revenue Code for certain employee benefit plans until 60 days after the end of the declared emergency as evidence that the agency is required to provide for a broad COVID-19 SEP here.  *See* Pl.'s Mot. at 27 (*citing* 85 Fed. Reg. 26,351 (May 4, 2020)).  This Rule involves a separate statutory scheme and separate standard altogether, *see* 85 Fed. Reg. at 26,353 (citing relevant statutory provisions), and it cannot possibly shed light on the appropriate standard for an "exceptional circumstances" SEP, much less provide evidence of

a clear statutory command.  Even if the Court were to accept Plaintiff's analogy, however, the employee benefit extensions are in fact somewhat analogous to the FEMA SEP applied to the Exchanges.  The extension disregards the timeframe of the pandemic as it applies to certain deadlines that would otherwise expire; it does not, for example, provide a freestanding enrollment option for anyone who might be eligible.  (For example, a deadline that passed prior to the pandemic is not extended by this rule).  Accordingly, like the FEMA SEP, it accounts for the difficulty of meeting certain deadlines during the pandemic; it does not create a free-standing right to enroll in benefits or make claims without regard to statutory timeframes.[15]

### 4.    Prior, Unrelated Action Does Not Require a Broad COVID-19 SEP.

Finally, Plaintiff argues that an exceptional circumstances SEP is required here because it is consistent with HHS's own prior interpretations.  Plaintiff's partial quotation of prior rationales for SEPs tends to obfuscate that it has not identified a single prior instance in which HHS created an exceptional circumstances SEP untethered to a particular individual's previous eligibility and applicable to all uninsured individuals.  As set forth above, the exceptional circumstances SEP is generally intended to address exceptional circumstances that would impede an individual's ability to enroll in QHP coverage on a timely basis, through no fault of his or her own.  *See* 76 Fed. Reg. 41,866, 41,884 (July 15, 2011); Pate Decl. ¶ 7.

For example, Plaintiff quotes a portion of a response to a comment from a 2017 rule for the proposition that the exceptional circumstances SEP "provides an important avenue to

---

[15] Plaintiff's reliance on various pandemic-related "waivers" provided to regulated entities is even more inapposite.  *See* Pl.'s Mot. at 27.  Of course the pandemic has justified new policy measures across government, including alteration or waiver of certain previously existing standards.  It is hard to see, however, what the relevance here is of a waiver that permits additional telehealth services under Medicaid, *see* A-42, at 1, or the suspension of fingerprinting requirements for some practitioners, *see* A-39 at 2.  The pandemic threat should generally maximize the agency's flexibility to choose appropriate responses; nothing in these documents suggests that the pandemic *constrains* the agency's flexibility to respond.

coverage for consumers who experience or are affected by unanticipated events, often outside of their control." 82 Fed. Reg. 18,346, 18,366 (Apr. 18, 2017).  Plaintiff's theory, however, ignores the context of the quote.  HHS was in the process of developing guidelines *to further restrict* the use of this SEP and noted that, in the past, "this special enrollment period has been used to address eligibility or enrollment issues that affected large cohorts of individuals where they had made reasonable efforts to enroll but were hindered by outside events."  *Id*.  Accordingly, HHS determined that it should require "a more rigorous test" while noting that this remained an important avenue for enrollment.  *Id*.  Far from supporting Plaintiff's theory, this rule supports HHS's conclusion that the SEP in the past has provided flexibility specifically to people who were unable to enroll because of outside events.  *See* Pate Decl. ¶ 6.

Much of this portion of Plaintiff's argument focuses on the notion that HHS guidelines do not restrict the use of the SEP only to circumstances that limit an individual's ability to enroll in the first instance, and criticizes HHS for allegedly imposing a higher standard. Pl.'s Mot. at 28. HHS has not, of course, ruled or maintained that alternative or broader uses of the SEP are prohibited.  *See* Pate Decl. ¶ 10.  On the contrary, the statutory and regulatory terminology provide broad discretion to the Exchange to make determinations on a case-by-case basis.  But generally speaking, the past applications of the exceptional circumstances SEP have been to provide a limited enrollment opportunity to people who were previously prevented from enrolling by outside events.  *Id.* ¶¶ 6-7.  Consistent with that past use, the FEMA SEP is being applied now to permit enrollment of people who were prevented from enrolling by circumstances surrounding the pandemic, and until recently, HHS temporarily suspended certain verification

requirements. *Id.* ¶ 4. Neither the statute, the regulations, nor any guidance issued by HHS

provide a command to do more.[16]

Accordingly, Defendants are entitled to summary judgment on Count III.

## IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE HHS HAS ACTED REASONABLY IN NOT OFFERING A SEP AT THIS TIME.

Even if the Court finds that Plaintiff has standing and that there is a final agency action

subject to review in this matter, Defendants are entitled to judgment on Counts I and II because

HHS has acted reasonably in not offering a COVID-19 SEP at this time.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision

based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)

(citing *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420).[17] As relevant here, a court

---

[16] Plaintiff appears to have abandoned any "unreasonable delay" claim raised in the Complaint. *See* Compl. ¶ 187; *see, e.g.*, *Aera Energy LLC v. Salazar*, 691 F. Supp. 2d 25, 34 n.6 (D.D.C. 2010) (an issue raised in the complaint but ignored at summary judgment is abandoned). Such a claim would in any event fail for the same reasons that the "unlawfully withheld claim" does, and also because Plaintiff could not show that any delay was unreasonable. *See generally Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) ("*TRAC*"); *Am. Anti-Vivisection Soc'y*, 946 F.3d at 621. The *TRAC* factors do not show unreasonable delay because there is fundamentally nothing unreasonable about the agency not immediately opening an SEP. Congress has not imposed a timeline by which HHS must act, nor provided any standard by which the Court could evaluate the timeframe for agency action. In light of "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency," *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003), the agency has acted reasonably.

[17] Plaintiff submits several declarations and other information that have not been provided to the agency decisionmakers and thus form no part of the administrative record. *See* ECF Nos. 4-1, 4-2, 4-3, 4-4, 4-5. Similarly, the amici rely on extra-record materials. "[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (per curiam); *Fla. Power & Light Co.*, 470 U.S. at 743-44. Significantly, this requirement applies whether a court is reviewing agency action or inaction. *See* 5 U.S.C. § 706; *see, e.g.*, *Biodiversity Legal Found. v. Norton*, 180 F. Supp. 2d 7, 10 (D.D.C. 2001). In cases alleging inaction, it may be that "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record," *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *compare with*

should uphold an agency decision unless it is, among other things, "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under

this deferential standard, the agency's decision is presumed valid, and a court reviews only

whether that decision "was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An

agency's decision may be deemed arbitrary and capricious only in circumstances where the

agency "has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency," or its decision "is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n

of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court may not

"substitute its judgment for that of the agency," *id.*, and must "uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned," *Nat'l Shooting Sports Found.,

Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43).  And the

agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*

    The ordinary deference due the agency under the APA contexts is underscored by the

broad discretion conferred by the statutory text.  As set forth in Part II, the statutory language

leaves it to the Secretary to determine what SEPs are "similar," because it does not define

"exceptional circumstances" or the factors to be considered, and because it explicitly leaves the

---

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127,
130 (D.D.C. 2012) (permitting supplementation where no administrative record was ever filed),
and courts have permitted review of supplemental agency declarations in such circumstances, *see,
e.g.*, *Independence Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) (noting that when a suit
challenges agency inaction, district court can consider agency supplements).  It does not follow,
however, that Plaintiff's extra-record material forms any part of this Court's inquiry into whether
the alleged agency action was proper, and the Court should disregard this material.

creation of new exceptional circumstances SEPs to the Secretary, who "may provide" the

conditions that an individual must meet.  *See* Part III, *supra*.  This type of language confers a

substantial degree of discretion, when it is reviewable at all.  *See, e.g.*, *Nicopure Labs, LLC v.*

*FDA*, 266 F. Supp. 3d 360, 393 (D.D.C. 2017) (although not committed to agency discretion,

"the language of the deeming provision — with its use of the words 'may' and 'deem,' is the

kind of language that, even if judicial review is permitted, 'fairly exudes deference'" (quoting

*Webster v. Doe*, 486 U.S. 592, 600 (1988)).

The evaluation of a potential COVID-19 SEP readily satisfies these deferential standards.

As set forth above, the agency has acted reasonably in light of the statutory language and

purpose, information on the availability of existing SEPs, and the availability of other

supplemental funding measures.  *See* Part III.B, *supra*.  Existing SEPs provide considerable

flexibility to expand coverage, especially for those who have become uninsured during the

pandemic.  *See* Pate Decl. ¶ 11.  There has been a corresponding increase in use of existing

SEPs.  *Id*.  And the Government is implementing numerous other measures to mitigate the

impact on the uninsured and their healthcare providers.  Pate Decl. ¶ 12.  In light of other

coverage options, the risk of adverse selection, and these other mitigating measures, HHS has

acted reasonably in not opening a broad COVID-19 SEP at this time.[18]

Plaintiff argues that the decision not to open an SEP was "irrational" because Defendants

have not provided a reason.  Pl.'s Mot. at 33-34.  That makes little sense.  It is true there is no

formal written decision rejecting a COVID-19 SEP, but that is because Defendants have not

---

[18] The Complaint also specifically seeks a "retroactive" SEP, although this is not mentioned in Plaintiff's motion, and neither Plaintiff nor anyone else has specifically presented it to the agency.  Compl. ¶ 176.  The danger of adverse selection is amplified if the Government were to provide for a retroactive SEP.  The sole reason for a retroactive SEP is to cover healthcare expenses already incurred, magnifying the risks.  Pate Decl. ¶ 13.  Accordingly, to the extent Plaintiff is pressing this claim, Defendant is plainly entitled to summary judgment.

issued any final agency action and are not required to do so.  Even if the Court finds that there is

a final agency action, the agency Declaration, together with the gathered administrative record,

provides an adequate basis to fairly discern the reasoning.  *Cf. Nat'l Shooting Sports Found., Inc*,

716 F.3d at 214; *Independence Min. Co.*, 105 F.3d at 511 (noting that when a suit challenges

agency inaction, district court can consider agency supplements).  And these concerns are

consistent with what has been publicly communicated to States and others.

Plaintiff argues that the provider reimbursement funds are an inadequate substitute for

health insurance through the ACA because they "do not provide the assurance of actual health

coverage."  Pl.'s Mot. at 34.  Defendants do not doubt that there are important benefits to health

insurance coverage and have encouraged those eligible (i.e., anyone who lost coverage during

the pandemic) to enroll through existing SEPs that do not increase the risk of adverse selection.

But the reimbursement funds also mitigate the impact on those who remain uninsured, as well as

the providers.  Pate Decl. ¶¶ 12-14.  Reimbursements are also targeted specifically to COVID-

related expenses and thus at the problems specifically created by the current emergency (and not

anticipated during the previous OEP).  *Id.*  They are certainly, therefore, a relevant factor in the

agency's consideration.

Plaintiff also argues, without basis, that Defendants failed to consider "the regulatory text

or the overarching purpose of the ACA" or the "experiences of states."  Pl.'s Mot. at 34-35.  The

record supports the opposite conclusion – that all of these facts are before the agency and are

being given due consideration.  *See* Pate Decl. ¶¶ 3-9 (discussing text, background and purpose

of SEPs); *see, e.g.*, AR 791-92, 814-15, 822, 879, 914, 921-29, 960-61, 1004-26, 1049-54,

(communications with States); AR 691-92, 740-48, 771-87, 810-11, 816-17, 819-21, 830-32, 855-58, 895-96 (State SEPs); AR 575-692 (SEP and enrollment data).[19]

Plaintiff asserts that there has been "virtually unanimous" support for a COVID-19 SEP among States and insurers. Pl.'s Mot. at 34-35. Even if Plaintiff supported that assertion with evidence – and it has not – the APA is not a popularity contest. It is Plaintiff who has failed to consider an important aspect of the problem – the potential impact on the Exchanges and overall healthcare costs. Moreover, insurer support appears to have been contingent on receiving additional funds from Congress to pay anticipated claims and guard against losses. *See, e.g.*, Pate Decl. ¶ 8; AR 827-29 (letter from insurer seeking, *inter alia*, "risk mitigation program"), 833-35 (similar email noting that a new SEP "should be coupled with risk mitigation funding"), 859-60 (email describing call with insurers, noting opinion that "if CMS decides to offer a SEP, there should be funding to mitigate costs that weren't reflected in 2020 rates, but acknowledged that this would take Congressional action"),  869 (email explaining that if an SEP is opened, "it is critical Congress include risk mitigation protection given all uncertainties."). In other words, insurers do fear the risk of additional losses and the effect of adverse selection and have supported an SEP only so long as any potential downside is borne by Congress – that is to say, if Congress is willing to bail them out if the SEP results in significant losses. Accordingly, as things stand now, the potential downside would be borne in the short-term by the insurers, and then by consumers in the form of increased premiums.

---

[19] Amici argue that the experience of the SBEs shows that an SEP is warranted here. *See* ECF No. 9, at 12-16. The cited information, however, shows that many people signed up for insurance during the SEP; it does not compare the number of people who signed up during the COVID-19 SEP to the number of people who would have signed up during pre-existing SEPs. And it does not (and cannot) fully predict the downstream effects of adverse selection. Similarly, amici's argument that additional coverage will improve public health outcomes does not account for the existence of provider reimbursement programs that, unlike insurance, do not impose costs on the patient.

Unable to show that HHS has acted unreasonably—much less in violation of any statutory duty—Plaintiff cannot salvage its case by resorting to speculation, based on largely anonymous sources in press accounts, that HHS's consideration of this issue has been improperly tainted by the President's general opposition to the ACA.  To start, even if one assumed that Plaintiff's speculation about consultations with the White House were true, there is nothing at all remarkable, let alone improper, about an agency's consulting with the White House about matters of public importance, including to discuss the relative efficacy of different policy solutions for a particular problem.   Indeed, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).  Rather, "such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)."  *Id*.  Such commonplace considerations do not invalidate an otherwise reasonable agency decision.  *Id*.

In any event, Plaintiff's narrative is unsupported by its own extra-record evidence – four articles that purport to describe internal deliberations that included the White House.  *See* Pl.'s Mot. at 32.  For example, a March 21, 2020 *Politico* article indicates that the administration was "considering" an SEP.  *See* Orbea Decl. B-1.  It also indicated disagreement, noting that the health insurance lobby was also asking for a stimulus package to offset predicted losses from covering more people.  An April 3, 2020 *Politico* article states, without sources, that "administration officials sent word to insurers that the call would soon be official" but the anticipated announcement never came.  *See* Orbea Decl. B-2.  The article notes the existence of concerns that "insurers calling loudly for reopening the markets would return weeks later seeking a bailout" and statements that the administration was "exploring alternative options."  *Id*.  A *New*

*York Times* article cites an opinion of a health insurance executive that the administration was "divided about whether to proceed, especially given the president's support for the lawsuit that would overturn the" ACA.  Orbea Decl. B-3.  Far from showing that HHS's consideration of this issue was improperly tainted by the President's views of the ACA, these articles reflect a deliberative process in which there was vigorous debate about the appropriate policy response.[20]

Moreover, it bears noting that the current course of action might reasonably be considered *more protective* of the Exchanges than the option Plaintiff prefers.  *See* Pate Decl. ¶¶ 9, 13.  Encouraging large numbers of sick people to enroll in coverage would likely drive up healthcare costs and premiums, generate large losses, and potentially drive insurers out of the Exchanges – which is precisely why so many have urged that any SEP be coupled with risk-mitigation funding.  *See supra* p. 41.  Accordingly, the greater risk to the ACA framework itself may be Plaintiff's proposed course of action, not the agency's.

Plaintiff's reliance on *Gresham v. Azar* is misplaced.  *See* 950 F.3d 93, 96-97 (D.C. Cir. 2020).  There, the D.C. Circuit found that the agency acted arbitrarily because it failed to consider whether its action would promote the statutory objective of providing coverage but did explicitly consider whether other non-statutory objectives would be furthered.  *Id.*  Here, the agency has considered both insurance coverage and controlling costs, the key objectives of the ACA.  *See* Pate Decl. ¶¶ 3-6.  Plaintiff may disagree with the policy outcomes to date, but there is no reasonable argument that the agency is not seriously engaged with the relevant factors.  The APA requires no more than Defendants have already shown.

---

[20] Similarly, the amicus brief of the House of Representatives lists several healthcare-related policies – unconnected with the present matter – with which the House disagrees as supposed evidence that the President is attempting, in general, to undermine the Exchanges.  *See* ECF No. 8, at 15-18.  This does not establish Plaintiff's contention.

## V.     PLAINTIFF'S REQUESTED RELIEF IS OVERBROAD.

Finally, although Defendant is entitled to judgment on all claims, it also bears noting that the remedy Plaintiff has sought here is wholly inappropriate and unwarranted.  First, "under settled principles of administrative law, when a court reviewing  agency action determines that an agency made an error of law, the court's inquiry is at an end:  the case must be remanded to the agency for further action consistent with the correct legal standards."  *Palisades Gen'l Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *see also Fla. Power & Light v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  The Court should not be in the business of fashioning the precise contours of SEP guidance during a pandemic; at most, the Court could remand to HHS for additional explanation or consideration. Moreover, both Article III and well-established principles of equity require that any injunctive relief be limited to the injury alleged by this particular Plaintiff.  *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (holding that plaintiff's remedy "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in a case);  *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) ("[U]niversal injunctions are legally and historically dubious.").  Plaintiff's apparent demand that the Court define the terms, scope, and timing of a nationwide COVID-19 SEP applicable to all uninsured Americans is thus inconsistent with fundamental principles of standing, equity jurisdiction, and APA review.

## **CONCLUSION**

For the foregoing reasons, the Court should enter judgment for Defendants.


Dated:  July 20, 2020                                    Respectfully Submitted,

                                                         ETHAN DAVIS
                                                         Acting Assistant Attorney General

                                                         ERIC BECKENHAUER
                                                         Assistant Director, Federal Programs Branch

                                                         */s/Amy E. Powell*
                                                         AMY E. POWELL
                                                         Senior Trial Counsel, Federal Programs
                                                         Branch
                                                         Civil Division, Department of Justice
                                                         c/o U.S. Attorney's Office
                                                         150 Fayetteville St., Suite 2100
                                                         Raleigh, NC 2760
                                                         Phone: 919-856-4013
                                                         Email:  amy.powell@usdoj.gov