## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITY OF CHICAGO,

        *Plaintiff*,

      v.

ALEX M. AZAR, II, in his official capacity
    as Secretary of the United States
    Department of Health and Human
    Services, et al.,

        *Defendants.*

Case No. 1:20-cv-1566 (TJK)

**ORAL ARGUMENT
REQUESTED**

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Introduction ..................................................................................................................... 1

Argument ......................................................................................................................... 3

    I.      Defendants' threshold objections are meritless. ....................................... 3

          A.    Chicago has standing. ............................................................... 3

          B.    Chicago's injuries fall within the applicable zone of interests. ............... 10

          C.    Defendants' decision not to open a special enrollment period constitutes final agency action. ........................................................................... 12

               1.    Defendants decided not to provide a special enrollment period... 13

               2.    Defendants' decision is final and reviewable. .............................. 18

    II.    Defendants' decision not to provide a special enrollment period is unlawful...... 19

          A.    Defendants' determination that the pandemic is not an "exceptional circumstance" is contrary to the Affordable Care Act and its implementing regulations. .............................................................................. 20

          B.    Defendants' decision not to provide a special enrollment period is arbitrary and capricious.......................................................................... 25

               1.    Defendants fail to provide a contemporaneous explanation for their decision not to provide a special enrollment period. .................. 25

               2.    Defendants' post hoc rationale is arbitrary and capricious.......... 28

          C.    In the alternative, Defendants have unlawfully withheld or unreasonably delayed a special enrollment period........................................................ 37

    III.    The Court should vacate Defendants' decision and, if necessary, enjoin Defendants to provide a special enrollment period............................................. 38

Conclusion ....................................................................................................................... 42

i

# TABLE OF AUTHORITIES

## Cases

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ..................................................................37

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011) ..................................................................17

*Air Transp. Ass'n of Am. v. Dep't of Transp.*,
  119 F.3d 38 (D.C. Cir.), *opinion amended on reh'g*, 129 F.3d 625 (D.C. Cir.
  1997) ...........................................................................................................30

\* *Am. Bar Ass'n v. Dep't of Educ.*,
  370 F. Supp. 3d 1 (D.D.C. 2019) (Kelly, J.) ................................... *passim*

*Amador Cty. v. Salazar*,
  640 F.3d 373 (D.C. Cir. 2011) ....................................................................3

*Am. Freedom L. Ctr. v. Obama*,
  821 F.3d 44 (D.C. Cir. 2016) ......................................................................9

*Animal Legal Def. Fund, Inc. v. Perdue*,
  872 F.3d 602 (D.C. Cir. 2017) ..................................................................36

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ................................................................26

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ..........................................................17

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................10, 18

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ......................................................................9

*California v. HHS*,
  351 F. Supp. 3d 1267 (N.D. Cal.), *aff'd*, 941 F.3d 410 (9th Cir. 2019), *cert.
  granted, judgment vacated*, 2020 WL 3865245 (2020) ...........................11

\* *Capital Area Immigrants' Rts. Coal. v. Trump*,
  --- F. Supp. 3d ----, 2020 WL 3542481 (D.D.C. 2020) (Kelly, J.) ............11, 39, 40

*Carlson v. Postal Reg. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ..................................................................29

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017) ..............................................................................4, 8

*Ctr. for L. & Educ. v. Dep't of Educ*,
  396 F.3d 1152 (D.C. Cir. 2005) ...............................................................................10

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000) ...................................................................................................21

*City of Dania Beach v. FAA*,
  628 F.3d 581 (D.C. Cir. 2010) ..................................................................................31

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ....................................................................................3

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) .............................................................................................10, 11

*Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014). .................................................................................18

*Columbia Riverkeeper v. U.S. Coast Guard*,
  761 F.3d 1084 (9th Cir. 2014) ..................................................................................16

*Columbus v. Trump*,
  2020 WL 1820074 (D. Md. 2020) ..............................................................................9

*Comcast Corp. v. FCC*,
  579 F.3d 1 (D.C. Cir. 2009) ......................................................................................40

*Conservation L. Found. v. Pritzker*,
  37 F. Supp. 3d 254 (D.D.C. 2014) ............................................................................40

*CSI Aviation Servs., Inc. v. Dep't of Transp.*,
  637 F.3d 408 (D.C. Cir. 2011) ..................................................................................19

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  793 F.2d 1322 (D.C. Cir. 1986) ..................................................................................8

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017) ..................................................................................................8

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ......................................................................................36

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ................................................................................................9

\* *DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ....................................................................................1, 26, 36, 39

*District of Columbia v. USDA*,
  --- F. Supp. 3d ----, 2020 WL 1236657 (D.D.C. 2020) ...........................................41

*Double R. Ranch Trust v. Nedd*,
  284 F. Supp. 3d 21 (D.D.C. 2018) ..........................................................................10

*Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*,
  153 F. Supp. 3d 338 (D.D.C. 2016) ...........................................................................8

*FBME Bank Ltd. v. Lew*,
  142 F. Supp. 3d 70 (D.D.C. 2015) ...........................................................................41

*Fogo De Chao (Holdings) Inc. v. DHS*,
  769 F.3d 1127 (D.C. Cir. 2014) ...............................................................................21

*Frank Krasner Enterprises v. Montgomery Cty.*,
  401 F.3d 230 (4th Cir. 2005) ...................................................................................10

*Friedman v. FAA*,
  841 F.3d 537 (D.C. Cir. 2016) .................................................................................19

*FTC v. Anderson*,
  631 F.2d 741 (D.C. Cir. 1979) .................................................................................38

*Grace v. Whitaker*,
  344 F. Supp. 3d 96 (D.D.C. 2018), *aff'd in part, rev'd in part on other*
  *grounds*, 2020 WL 4032652 (D.C. Cir. 2020) ........................................................15

\* *Gresham v. Azar*,
  950 F.3d 93 (D.C. Cir. 2020) ..............................................................................29, 30

*Hall v. Sebelius*,
  689 F. Supp. 2d 10 (D.D.C. 2009) ...........................................................................19

*Harris v. FAA*,
  353 F.3d 1006 (D.C. Cir. 2004) ...............................................................................19

*Her Majesty the Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ...............................................................................18

*Hisp. Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) .............................................................................14, 17

*Humane Soc'y v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ............................................................................36, 40

iv

*Ill. Pub. Telecomms. Ass'n v. FCC,*
    123 F.3d 693 (D.C. Cir. 1997) ................................................................. 39

*John Doe, Inc. v. DEA,*
    484 F.3d 561 (D.C. Cir. 2007) ................................................................. 17

\* *King v. Burwell,*
    135 S. Ct. 2480 (2015) ............................................................. 11, 12, 24

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ........................................................................... 21

*League of Women Voters of United States v. Newby,*
    238 F. Supp. 3d 6 (D.D.C. 2017) ........................................................... 41

*Mach Mining, LLC v. EEOC,*
    575 U.S. 480 (2015) ............................................................................... 37

\* *Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ........................................................................... 11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ......................................................................... 10, 11

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ............................................................... 41

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016) ............................................................... 28

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................... 41

\* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................... 28, 35

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) ................................................................... 27

*Nat'l L. Ctr. on Homelessness & Poverty v. Dep't of Veterans Aff.,*
    842 F. Supp. 2d 127 (D.D.C. 2012) ....................................................... 28

*Nat'l Treasury Emps. Union v. Horner,*
    854 F.2d 490 (D.C. Cir. 1988) ............................................................... 33

\* *NFIB v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................... 11

\* *Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)..................................................................................17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)................................................................................21

*Olivares v. TSA*,
    819 F.3d 454 (D.C. Cir. 2016)................................................................27

\* *Olmsted Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002)..................................................................3

*Perrin v. United States*,
    444 U.S. 37 (1979)..................................................................................21

*RELX, Inc. v. Baran*,
    397 F. Supp. 3d 41 (D.D.C. 2019)..........................................................17

*Sackett v. EPA*,
    566 U.S. 120 (2012)................................................................................18

*Safari Club Int'l v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016)..............................................................19

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016)......................................................................38

*San Francisco v. USCIS*,
    944 F.3d 773 (9th Cir. 2019) ....................................................................9

*SecurityPoint Holdings, Inc. v. TSA*,
    769 F.3d 1184 (D.C. Cir. 2014)..............................................................28

*SecurityPoint Holdings, Inc. v. TSA*,
    867 F.3d 180 (D.C. Cir. 2017)................................................................39

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987)................................................................17

*Telecomms. Rsch. & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984)..................................................................38

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2019), *cert. granted*, 140 S. Ct. 1262 (2020) .......9

*Tozzi v. HHS*,
    271 F.3d 301 (D.C. Cir. 2001)..................................................................9

*U.S. House of Reps. v. Price*,
   2017 WL 3271445 (D.C. Cir. 2017) (per curiam) .................................................9

*United States v. Harris*,
   --- F. Supp. 3d ----, 2020 WL 1503444 (D.D.C. 2020) ........................................24

*United States v. Roeder*,
   807 F. App'x 157 (3d Cir. 2020) (per curiam) ...................................................24

*United States v. SCRAP*,
   412 U.S. 669 (1973).................................................................................................8

*United Techs. Corp. v. Dep't of Def.*,
   601 F.3d 557 (D.C. Cir. 2010) .............................................................................32


**Statutes, Regulations, and Rules**

5 U.S.C.
   § 551(4).................................................................................................................17
   § 551(13)...............................................................................................................17
   § 706(2).................................................................................................................17

42 U.S.C.
   § 1395w-101(b)(3)(C).................................................................................21, 22, 37
   § 18031(c)(6) ...................................................................................................21, 37
   § 18091(2)(F).........................................................................................................11

45 C.F.R.
   § 155.420(a)(1) ................................................................................................21, 37
   § 155.420(d)(9) ...............................................................................................25, 38

Fed. R. Evid. 801 .......................................................................................................15

*Medicare Program; Medicare Prescription Drug Benefit*, 70 Fed. Reg. 4,194,
   4,437 (Jan. 28, 2005)............................................................................................22


**Other Authorities**

*Press Briefing*, White House (Apr. 1, 2020),
   https://www.whitehouse.gov/briefings-statements/remarks-president-trump-
   vice-president-pence-members-coronavirus-task-force-press-briefing-16/............15

## INTRODUCTION

In the time since Chicago filed its opening brief, another two million Americans have contracted the novel coronavirus and another 35,000 Americans have died from it—and those are just the confirmed numbers. The gravity of the situation, and the need for reasoned, responsive agency decisionmaking, could not be more apparent. As the Supreme Court recently instructed, "when so much is at stake, … the Government should"—indeed, *must*—"turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (quotation omitted).

The government did not do so here. Defendants have now produced a post hoc rationalization from an agency official, who purports to explain why the agency decided not to provide a special enrollment period in response to the pandemic, along with an administrative record. Those documents reveal that the agency made no effort to estimate the number of people who might use an SEP to purchase Affordable Care Act-compliant health coverage—or assess how providing an SEP might benefit them, healthcare providers, and the public by encouraging them to seek testing and treatment for the novel coronavirus without the risk of large medical bills. Instead, the agency relies now on generalized concerns about adverse selection that were disputed and discounted at the time by the very industry—insurers—that adverse selection affects the most, failing even to weigh those theoretical concerns against the very real benefits of an SEP.

In defending that decision, Defendants' consolidated opposition to Chicago's motion for summary judgment and cross motion ("Opp."), ECF No. 19, errs in multiple respects.

Defendants first assert that Chicago lacks standing. But the City has shown—through two expert declarations, a declaration from the City's top health official, and the agency's own

1

records—that Defendants' decision not to provide an SEP will prevent Chicago residents from enrolling in health insurance and therefore inflict greater costs on the City.

Defendants contend that their decision not to open an SEP is not final agency action because, they say, they have not ruled an SEP out entirely. But that explanation is contrary to the record, which shows that Defendants definitively rejected an SEP on or around March 30, 2020. The suggestion that they might revisit that decision in the future is legally irrelevant and provides no help to Americans who cannot enroll today.

Defendants dispute that the pandemic—a global health crisis that is still worsening in the United States—is an "exceptional circumstance." But Defendants' constructions of that critical term add words to the statutes and regulations that simply aren't there. Under the ordinary meaning of the phrase, the pandemic is an "exceptional circumstance" that triggers Defendants' duty to provide an SEP.

Equally important, even if the statute did not require the conclusion that the pandemic is an "exceptional circumstance," Defendants acted arbitrarily and irrationally in deciding not to exercise their conceded statutory authority to provide an SEP. Defendants try to reverse-engineer an explanation for denying an SEP but, even if such after-the-fact justifications were relevant, their reliance on unsupported generalizations about adverse selection over documented, concrete concerns about coverage cannot be squared with the administrative record.

The agency's decision must therefore be set aside. And unless and until Defendants are able to come up with a reasoned explanation for denying an SEP, vulnerable Americans should be permitted to obtain the protections offered by ACA-compliant health insurance. Thus, the Court should grant summary judgment to Chicago.

2

**ARGUMENT**

**I.      <u>Defendants' threshold objections are meritless.</u>**

      In an effort to prevent the Court from reaching the merits, Defendants argue that Chicago lacks standing to challenge a decision that prevents thousands of its residents from obtaining health insurance during a global pandemic, that the ACA's enrollment provisions were not intended to protect such interests, and that the agency has not made a decision that both the record and public reporting shows it has. All of Defendants' assertions are incorrect.

      **A.      Chicago has standing.**

      Defendants do not dispute—nor could they—that cities like Chicago have standing to sue "an arm of the federal government when a harm *to the city itself* has been alleged." *Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002); *see, e.g.*, *Amador Cty. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011) (finding standing where action "would increase the County's infrastructure costs and impact the character of the community"). Chicago may therefore sue to protect its "proprietary interests that might be congruent with those of its citizens," including its budget and programs. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quotation omitted).[1]

      Chicago has established—based on uncontroverted declarations from its public health Commissioner and two independent healthcare economists, a mountain of publicly available evidence and agency documents, and now, the administrative record—two forms of proprietary injury in this case. Both stem from the unsurprising fact that preventing individuals from enrolling when demand for health insurance is spiking will necessarily result in a higher uninsured rate than if those individuals could enroll. *See* Pl.'s Mot. for Summ. J. ("MSJ") at 36-

---

[1]      Chicago has not relied on *parens patriae* standing, so Defendants' arguments on that score are irrelevant. *See* Opp. at 17-18.

3

40, ECF No. 4. ***First***, if Chicago's residents cannot obtain affordable, ACA-compliant health coverage, they will be less likely to seek medical care, further spreading the novel coronavirus. That, in turn, places additional strain on the City's health systems and other City programs. *Id.* at 36-38. ***Second***, there is a direct and indisputable connection between the uninsured rate in a given jurisdiction and the cost of uncompensated care paid for by local authorities. Defendants' decision to prevent individuals from enrolling thereby imposes additional costs on the City, including to manage conditions that have nothing to do with the pandemic. *Id.* at 38-39.

Defendants do not dispute that these sorts of injuries are cognizable, and they have virtually nothing to say about the evidence put forward by the City to document those injuries. Instead, Defendants object, without any evidence or factual support of their own, that the City's harms are "speculative." *See, e.g.*, Opp. at 19. But the City's evidence, bolstered by the administrative record—and, indeed, by common sense—is more than sufficient to establish that Defendants' decision not to provide an SEP has inflicted harm on the City, and that providing an SEP would redress that harm. *Cf. Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) ("Causation and redressability typically overlap as two sides of a causation coin.") (quotation omitted).

To start, it beggars belief to suggest that preventing people from enrolling in health insurance will not result in fewer people with health insurance than would otherwise be the case. Opp. at 19, 21. Defendants themselves recognize that an SEP would have resulted in "increased enrollment activity." Decl. of Randolph Pate ("Pate Decl.") ¶ 13, ECF No. 18-1. The administrative record ("AR") also shows that the states that provided broad SEPs experienced significant enrollment. AR691-92; *see also* AR859, 1011, 1050-51, 1064; Br. of Amici States California et al. ("States *Amicus* Br.") at 13-15, ECF No. 9 (providing partial enrollment figures).

4

Many enrollees would have been eligible for subsidies that defray the cost of health insurance; in Florida alone, a broad SEP could have allowed "*up to 1.123m Floridians*" to obtain health insurance "without worrying about financial hardship." AR838. There were "similar numbers of uninsured in the subsidy-eligible range" in other states. *Id.* These figures are consistent with the estimates provided by Chicago's expert, Dr. Emily Gee, who projects that several hundred thousand Americans—and potentially millions—would seek to enroll on a federal pandemic-related SEP. Gee Decl. ¶¶ 5, 25. It follows that many of those individuals reside in Chicago, which is the third largest city in the country and has a population of nearly 2.7 million. *See* Arwady Decl. ¶ 5.

Defendants object that a significant portion of these enrollees would be covered by existing SEPs, including the FEMA SEP. Opp. at 19, 21. But that is incorrect in several respects. Existing SEPs provide access to enrollment only for individuals who experience a qualifying life event, like losing coverage, and not for the millions of Americans, including many in Chicago, who lacked coverage before the pandemic. *See, e.g.*, Gee Decl. ¶ 19; AR767, 838. The agency's own tracking chart suggests that, for the five states which provided comparable numbers, around 46% of those who sought to enroll through an SEP on the state Exchanges did so through a broad coronavirus-related SEP, not the existing SEPs that would also be available on the federal Exchange. AR691-92. A broad SEP would also have "spillover effects that boost enrollment in other public programs, including among those eligible for Medicaid and the Children's Health Insurance Program (CHIP)." Gee Decl. ¶ 26.

Even for those who are eligible, however, existing SEPs impose verification requirements that "may discourage some people from seeking coverage or completing applications." Gee Decl. ¶¶ 17-18; AR1000. The Administration's temporary suspension of its verification program has

lapsed, meaning that individuals must attest to their eligibility and then wait for evaluation by a caseworker. Pate Decl. ¶ 11. In comparison, a broad SEP would "cut unnecessary red tape and lift a paperwork burden off individuals who are already facing challenges from a sudden and significant change in circumstances." AR914. "Opening and widely publicizing a federal marketplace special enrollment period would streamline enrollment and minimize confusion and administrative burden." AR982. Indeed, Defendants' own numbers suggest that the number of individuals who have enrolled using existing SEPs is a small fraction of the millions who lost their jobs, many of whom also lost their employer-provided coverage. *Compare* AR577 (enrollment numbers) *with* AR633 (job loss numbers).

Defendants then assert that Chicago cannot show that the uninsured "will get sick and cause a drain on City resources." Opp. at 19. Chicago can and has shown precisely that. The City provides, funds, or supports uncompensated care through health clinics, Arwady Decl. ¶ 11, community health centers, *id.* ¶ 13 & n.7, safety net hospitals, *id.* ¶¶ 16-17, and its emergency medical services, *id.* ¶ 22 & n.13, all of which face greater costs if the uninsured rate is higher than it would otherwise be. There is a well-established link between higher uninsured rates and greater uncompensated care costs; "[f]or example, studies show that uncompensated care declined as a share of hospitals' operating costs in the wake of the ACA's Medicaid expansion." Gee Decl. ¶¶ 11-12; AR722. Indeed, Defendants themselves have published several studies which attest that "uncompensated care costs … fall substantially following major insurance coverage expansions." RJN Ex. A-37; *see also* RJN Ex. A-38 at 1-2. The administrative record here also repeatedly refers to the uncompensated care costs that are borne by entities like Chicago, especially during a pandemic. *See, e.g.*, AR693-98, 722, 763, 825, 838, 975-76.

Defendants object that there is no evidence that those who lack insurance "are more likely to engage in risky behavior that spreads the virus," but that is beside the point. Opp. at 19; *see also id.* at 22 ("get sick and behave in ways that contribute to the spread of the virus"). Chicago's standing has nothing to do with whether individuals are more or less likely to engage in "risky behavior." Many Americans have contracted the novel coronavirus through no fault of their own. And when they do so, their lack of insurance discourages them from seeking the testing and treatment necessary to slow the spread of the virus. As Christen Linke Young explains, multiple studies have concluded that uninsured individuals refrain from seeking treatment, delay seeking treatment, and seek treatment in venues where they can spread the virus to others. Young Decl. ¶¶ 6-17. Again, the administrative record corroborates these facts, noting dozens of times that individuals who lack health coverage may not seek testing and treatment, exacerbating the spread of the virus. *See, e.g.*, AR731, 739, 763, 767, 788, 791, 805, 810, 814, 825, 838, 846, 861, 879, 914, 939, 941, 944, 948, 952, 956, 962, 971, 979, 982, 991, 994, 999, 1006, 1031, 1056.

And Defendants claim that Chicago's injuries will be defrayed by "existing federal reimbursement for COVID-19 testing and treatment of the uninsured." Opp. at 20. But that, too, is incorrect. As Christen Linke Young explains, those funds "do not provide the assurance of actual health coverage" to uninsured patients. Young Decl. ¶ 4. For example, the testing fund cannot be accessed if a provider does not ultimately order a test, *id.* ¶ 20; other services cannot be reimbursed, *id.* ¶ 21, including the cost of a hospital admission, *id.* ¶ 22; and uninsured individuals cannot access the fund directly, *id.* ¶ 23. The treatment fund suffers from many of the same shortcomings, but also can only be used if COVID-19 is the primary diagnosis, *id.* ¶ 30; cannot be used for related services or illnesses, *id.* ¶¶ 30-33; and may have been exhausted by the

time an individual seeks treatment, *id.* ¶ 34. Given these gaps, these funds do not provide the same or even comparable reassurance to vulnerable Americans as does comprehensive coverage. *Id.* ¶ 36; *see also* AR763, 846-47, 956-57.

Nor do these funds provide adequate compensation to Chicago. They cannot cover all or even a substantial amount of the coronavirus-related costs that Chicago asserts, *see, e.g.*, Arwady Decl. ¶¶ 28-40, and the record contains persistent complaints from stakeholders about the structure, disbursement, and effectiveness of the funds, *see, e.g.*, AR946-47, 975-76, 1002-03, 1008, 1027-28, 1031, 1056. The funds also obviously do not cover non-coronavirus conditions ranging from sexually transmitted infections to heart attacks; the more people who are uninsured, the more Chicago will have to bear in uncompensated care costs to address these conditions. Thus, these funds have no bearing at all on much of Chicago's second theory of injury.

At bottom, many of Defendants' arguments run not to *whether* Chicago has suffered an injury, but to the likely *size* of such an injury. For the reasons explained above, Chicago's injuries are substantial. Regardless, there is "no requirement that [the plaintiff's] injury be important or large," *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1331 (D.C. Cir. 1986); "an identifiable trifle is enough for standing," *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973). For financial injuries, too, "the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council*, 854 F.3d at 5; *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). And even if a plaintiff's injury has been "partially redressed" by other actions, it "may proceed to seek redress of [its] entire injury." *Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 341 (D.D.C. 2016).

The relevant question is thus whether Chicago has shown that Defendants' decision not to open an SEP is harming the City, and not that injury's size. As to *that* question, Chicago's showing is on all fours with the many cases which have recognized municipal and state standing to challenge federal action based on downstream costs. The City's "standing … does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). All the City need show, as Defendants concede, Opp. at 21, is that their decision not to provide an SEP "is at least a substantial factor motivating the third parties' actions." *Tozzi v. HHS*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quotation omitted). The City has shown at least that much. In circumstances like these, courts have repeatedly recognized standing based on third-party action causing downstream costs like those suffered by Chicago. *See, e.g.*, *U.S. House of Reps. v. Price*, 2017 WL 3271445, at *1 (D.C. Cir. 2017) (per curiam); *San Francisco v. USCIS*, 944 F.3d 773, 786-88 (9th Cir. 2019); *Texas v. United States*, 945 F.3d 355, 386-87 (5th Cir. 2019), *cert. granted*, 140 S. Ct. 1262 (2020); *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018); *Columbus v. Trump*, 2020 WL 1820074, at *11 (D. Md. 2020).

The City's showing is considerably more than the "unadorned speculation" that the D.C. Circuit rejected in *American Freedom Law Center v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016). In that case, the plaintiffs alleged that HHS's decision to delay the ACA's individual market reforms had increased their insurance premiums. *Id.* But the "only evidence" that the plaintiffs offered was their insurer's 2014 rate filing, which may not have even applied to their plan, and in any event failed to account for price decreases for other plans offered by their insurer. *Id.* at 49-50. That is a far cry from what the City has shown here, drawing on multiple expert declarations, HHS's own statements, and the underlying administrative record.

9

The other cases cited by Defendants are similarly inapposite. *See* Opp. at 21.

- In *Frank Krasner Enterprises v. Montgomery County*, the plaintiff sought to challenge a county ordinance that denied public funding to venues hosting gun shows. 401 F.3d 230, 232 (4th Cir. 2005). But the plaintiff's injury, increased prices for its gun shows, was several steps removed from the ordinance: the ordinance did not bar the venue from doing business with the plaintiff, *id.* at 236; the venue might not receive any county funding in the future anyway, *id.* at 233 n.4; the venue independently wished to "steer clear of taking a political position," *id.* at 233 (quotations omitted); and, presumably, the plaintiff could simply find other space.

- In *Center for Law & Education v. Department of Education*, the plaintiff challenged a federal rule that granted discretion to state agencies to implement their own rules. 396 F.3d 1152, 1160 (D.C. Cir. 2005). But the plaintiff's harms stemmed from the state rule, and even then, only from the risk that it might lead to improper classification of students—meaning that "the [federal] agency action and the alleged injury stand at opposite ends of a long chain." *Id.*

- In *Double R. Ranch Trust v. Nedd*, a property owner sought to challenge the designation of a stretch of river under a federal conservation law. 284 F. Supp. 3d 21, 26 (D.D.C. 2018). But that designation would need to be approved by several layers of bureaucracy before being converted to a report to Congress that might then theoretically lead to the plaintiff's injuries. *Id.*

The lengthy and uncorroborated chains at issue in these cases bear no resemblance to what Chicago has produced here. For these reasons, Chicago has shown that it has Article III standing.

   **B.**      **Chicago's injuries fall within the applicable zone of interests.**

Defendants nevertheless contend that Chicago's injuries do not fall within the "zone of interests" protected by the ACA's special enrollment provisions. Again, they are wrong.

A plaintiff need only show that their injuries "arguably fall within the zone of interests protected or regulated by the statutory provision … invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). That prudential test "is not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the word 'arguably' in the test … indicate[s] that the benefit of any doubt goes to the plaintiff," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). "The test forecloses suit only when a

10

plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quotation omitted).

Chicago easily clears that "low hurdle." *Capital Area Immigrants' Rts. Coal. v. Trump*, --- F. Supp. 3d ----, 2020 WL 3542481, at *11 (D.D.C. 2020) (Kelly, J.). In enacting the ACA, Congress expressly found that the statute's provisions would "significantly reduc[e] the number of the uninsured," and thereby reduce "[t]he cost of providing uncompensated care to the uninsured," which it estimated to be $43 billion in 2008. 42 U.S.C. § 18091(2)(F). The Supreme Court has explained three times that increasing enrollment and thereby reducing those costs was one of the ACA's core objectives. *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1315 (2020); *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015); *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012). As a city that incurs the costs of providing uncompensated care to its residents, Chicago therefore suffers precisely the kind of injury that Congress intended to guard against in enacting the ACA's enrollment provisions. *See also* AR977-78; *California v. HHS*, 351 F. Supp. 3d 1267, 1284 (N.D. Cal.), *aff'd*, 941 F.3d 410 (9th Cir. 2019), *cert. granted, judgment vacated*, 2020 WL 3865245 (2020).

Defendants' responses distort the zone of interests test in several ways. To start, Defendants assert that a statute's zone of interests is limited only to "the subject of the contested action" and those "directly affected" by the challenged action. Opp. at 23. But the zone-of-interests test is *designed* for "cases where the plaintiff is not itself the subject of the contested regulatory action." *Clarke*, 479 U.S. at 399. The fact that Chicago's harm is indirect does not defeat its standing; a contrary reading would be inconsistent with the many cases permitting challenges based on harm from third-party action. *See supra* page 9.

Defendants next insist that the SEP provisions are narrowly focused on "provid[ing] some flexibility for individuals to enroll outside the open enrollment periods." Opp. at 23. But the reason for that flexibility is to allow individuals to obtain health insurance and thereby reduce uncompensated care costs from uninsured individuals, among other things. Chicago need only show that "its interests in the agency action in practice can be expected to police the interests that the statute protects," which it has. *Am. Bar Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019) (Kelly, J.) (quotation omitted).

Defendants then assert that Chicago cannot challenge their decision because the State of Illinois has a federally facilitated Exchange (FFE). Opp. at 24. But that makes little sense. In declining to operate its own Exchange, as it had every right to do, *see King*, 135 S. Ct. at 2485; AR10, the State did not forever waive its right to challenge policies that undermine the Exchanges and prevent its residents from obtaining health insurance—much less could it do so on behalf of its cities. Defendants harp on the characterization that Illinois "must defer" to the federal government's choice, but that is wordplay; all the City meant is that the federal government operates the Illinois Exchange, not the State. In any event, Defendants do not explain why their argument has any bearing on the zone-of-interests test or Chicago's standing.

**C.      Defendants' decision not to open a special enrollment period constitutes final agency action.**

Finally, Defendants assert that Chicago has not identified a reviewable final agency action because, "while the agency has not opened a COVID-19 SEP, and believes it is not warranted at this time, HHS has not ruled it out in the future." Opp. at 26-27. That assertion is incorrect—both legally and factually. Leaving aside the reporting on the subject, the record shows that Defendants made a decision not to provide an SEP, communicated it to stakeholders, and relied upon it. However that decision is characterized, it is both final and reviewable. It

12

reflects the consummation of the agency's decisionmaking process, notwithstanding the legally irrelevant suggestion that the agency might revisit that decision at some undefined point in the future, and it has the serious legal consequence of preventing uninsured individuals from seeking to enroll in health insurance at a moment of unprecedented need.

### 1.    *Defendants decided not to provide a special enrollment period.*

The record shows that Defendants decided not to provide an SEP on or around March 30, 2020. In mid- to late March, as the pandemic grew worse, requests for an SEP poured in from a diverse range of stakeholders. *See, e.g.*, AR760, 763, 767, 788, 791, 794, 805, 807, 812, 814, 822, 823, 825, 828, 836, 838, 846-47, 861, 869, 874-75, 877, 879, 900, 909, 915. At the same time, HHS and CMS were actively discussing whether to open an SEP with interested parties. A Blue Cross Blue Shield representative emailed CMS staff on March 18 to note that "things are probably crazy and have changed since we spoke … it sounds like there are a lot of stakeholders [] asking for a SEP at this point," and asked that "[i]f you have a chance to call, it would be great to calibrate how the SEP conversation is going." AR823. On March 19, that same representative followed up with "hard facts about what the impact of a[n] SEP might be," stating that "I look forward to touching base and learning if there is anything else I might do to get the SEP ASAP." AR838. CMS held calls with insurance industry personnel on March 20 that solicited "[f]eedback on [a] possible CMS SEP," in which "Randy [Pate] noted CMS might offer one, asked attendees' thoughts." AR859. Another representative emailed one of Secretary Azar's senior advisors on March 21, noting that they were "hearing CMS may soon issue guidance for [an] SEP (which we support)." AR869. Notably, the record does not include similar correspondence after April 1, 2020—indicating that HHS or CMS were no longer in active discussions with stakeholders at that point.

13

Then, around March 30, Defendants made the decision not to open an SEP, and communicated that action through correspondence with stakeholders. For example, an Oregon liaison for the state's FFE began emailing CMS on a regular basis in early March asking about the possibility of a federal "exceptional circumstances" SEP. On the morning of March 30, the CMS representative responded "I don't have any new updates to share at this time." Later that day, however, the same agency employee sent "an updated response," which included a formal statement from CMS announcing its decision that it would "not currently offer[] a Special Enrollment Period specifically designated for COVID-19." AR917-20. On March 31, another CMS representative sent the same formal statement to a group of Arizona Department of Insurance representatives in an email titled "No FFE COVID-19 SEP" and explaining "[a]t this time, we've decided not to offer a COVID-19 SEP." AR921. A few minutes later, he sent the same formal statement and explanation to Hawaii's Insurance Commissioner and his state colleagues. AR925.

Thereafter, CMS relied on the same statement in rejecting requests by individual consumers who sought an SEP: "CMS is not currently offering a Special Enrollment Period specifically designated for COVID-19." AR1039, 1045. That sort of "routine and repeated" treatment shows that the agency had at least adopted a "*de facto* policy"—*i.e.*, that the pandemic is not an "exceptional circumstance"—and began treating requests accordingly. *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018).

Consistent with the evidence that the agency made a decision in late March, and beginning on April 1, the record reveals responses to the decision—including expressions of disappointment and requests for reconsideration from various Members of Congress, AR944, 952-53, House and Senate leadership, AR962-63, and state governors and attorneys general,

AR956-58, 994-95, who had previously requested an SEP. At no time did Defendants do anything to disabuse these stakeholders of this understanding or state publicly that an SEP was still under consideration.

Although the record provides sufficient evidence to conclude that Defendants have taken action, the statements by agency spokespeople outlined in Plaintiff's opening brief provide still more. MSJ at 12-13. They reflect the same timeline—first revealing the plans to issue an SEP, and then an abrupt decision not to (at the direction of the White House, no less). An HHS spokesperson responded to questions about the decision not to open an SEP by stating "[t]his has been publicly addressed during White House press briefings and we would point you to those comments," while Secretary Azar "insisted that paying providers directly" would be preferable to reopening the Exchanges. Orbea Decl. Ex. B-2; *see also id.* Ex. B-3 (explaining that the discussions were "over"). Indeed, during those press briefings, the President himself was asked to explain the "rationale" behind the "determination" not to reopen the Exchanges, and he responded, "I'll tell you," before deferring to the Vice President.[2]

---

[2]     *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, White House (Apr. 1, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-16/. The Court may consider these statements, even though Defendants did not include them in the record, because extra-record evidence may be used to establish that the agency took or did not take a specific action—*i.e.*, that Defendants refused to provide a special enrollment period. *See, e.g.*, *ABA*, 370 F. Supp. 3d at 38; *Grace v. Whitaker*, 344 F. Supp. 3d 96, 113-14 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds*, 2020 WL 4032652 (D.C. Cir. 2020). Nor are these statements inadmissible hearsay, Opp. at 27, given that they come from federal officials. *See* Fed. R. Evid. 801(d)(2). And even if the Court were inclined to treat these statements as hearsay, that only prevents considering them for the truth of the matter that they assert—namely, that Defendants made a decision. *Id.* 801(c)(2). In contrast, it would not be relying on hearsay to consider Defendants' failure to deny the reports or the Pate Declaration's similar failure to dispute them.

Try as it might, the Pate Declaration fails to reopen the door that Defendants shut. As Mr. Pate explains, HHS communicated to state officials that "[t]he Department is not offering a COVID-19 exceptional circumstances SEP at this time," Pate Decl. ¶ 10, because, he understands, "the Administration determined that current information does not establish that a COVID-19 SEP is warranted at this time," *id.* ¶ 15. That is a decision, plain and simple. Even more striking, Mr. Pate does not dispute the veracity of the news coverage of the March 31 decision, cited in Plaintiff's opening brief, or the statements of agency spokespeople cited therein, which he would be well-positioned to do if they were incorrect. Nor, for that matter, does Mr. Pate identify any steps the agency is taking to further consider and decide whether to provide an SEP. In sum, the evidence demonstrates that Defendants decided around March 30 not to provide an "exceptional circumstances" SEP despite requests to do so.

Defendants also place more weight on the agency's use of the term "currently" than it can bear. Opp. at 27. As this Court has explained, such "allegedly less-than-definitive language … does not undermine the conclusion that [the agency's decision] was a final agency action." *ABA*, 370 F. Supp. 3d at 20-21; *see also Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094 (9th Cir. 2014) ("[A]n agency's characterization of its action as being provisional or advisory is not necessarily dispositive."); *infra* page 18. The term, at most, suggests that the agency might reach a different conclusion in the future—not that it had not made a decision then. To the contrary, it suggests that Defendants had made up their minds and decided not to provide an SEP as of March 30, even if that decision might hypothetically be revisited later.[3]

---

[3]   Although it is clear that Defendants have taken action, should the Court have any doubt as to the factual question of whether such a decision occurred, it would be appropriate to deny Defendants' motion as to Counts 1 and 2 and permit limited discovery on the question. Such an

That decision is best understood as a denial of relief, a specific form of agency action set forth in the Administrative Procedure Act, 5 U.S.C. § 551(13), or as a policy of denying relief. As explained above, interested parties asked the agency for an SEP—repeatedly—and were told no. Under established law, the "agency's act of saying no to [] request[s]" to open an SEP is final agency action challengeable under 5 U.S.C. § 706(2). *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004); *cf.*, *e.g.*, *John Doe, Inc. v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007) (denial of permit); *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 50 (D.D.C. 2019) (denial of H-1B petition); *ABA*, 370 F. Supp. 3d at 20-21 (denial of loan forgiveness eligibility); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) (policy of denying parole requests). Alternatively, Defendants' action can be understood as a rule interpreting "exceptional circumstances" to exclude the pandemic. It is an "agency statement of general … applicability" that implements a "law or policy" that individuals cannot seek to enroll. 5 U.S.C. § 551(4). Even unwritten policies may be reviewable final agency actions where, as here, their effects are sufficiently concrete. *See, e.g.*, *Hisp. Affs. Project*, 901 F.3d at 387; *Aracely, R.*, 319 F. Supp. 3d at 138-39.

Either way, what is clear is that the mere fact that the agency chooses to characterize its decision as inaction does not defeat review. Opp. at 24-26. It is well-established that "inaction may represent effectively final agency action that the agency has not frankly acknowledged." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). "When administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Id.* (quoting *Envtl. Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099

---

eventuality would necessarily be the result of an incomplete record, one of the limited circumstances where discovery may be permitted in an APA case. *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

(D.C. Cir. 1970)). And "the absence of a formal statement of the agency's position, as here, is not dispositive," *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990), where it is clear from the circumstances that the agency has denied relief.

### 2.   *Defendants' decision is final and reviewable.*

Defendants' decision not to provide an SEP is also final within the meaning of the APA. It represents the "'consummation' of the agency's decisionmaking process," and it is an action in which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett*, 520 U.S. at 178 (citations omitted).

*First*, the record shows that the agency deliberated and reached a decision not to provide an SEP. Defendants' suggestion that "HHS has not ruled … out" that it might change its mind "in the future," Opp. at 27, does not defeat finality. "The mere possibility that an agency might reconsider in light of 'informal discussion' … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). The D.C. Circuit rejected strikingly similar agency assertions in *Clean Air Project v. EPA*, concluding that a challenged directive constituted final agency action despite the agency's assertion that it was "still 'assessing what additional actions may be necessary,' and '[its] deliberations surrounding the matter are ongoing.'" 752 F.3d 999, 1006 (D.C. Cir. 2014). As the Court explained, an agency action may be final even if the agency's position is "subject to change" in the future. *Id.* (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)); *see also Her Majesty the Queen in Right of Ontario*, 912 F.2d at 1530 (agency letter was final agency action, even though letter stated "we will continue to assess our ability to take action on your petition"). Besides, Defendants' expressions of open-mindedness about an SEP do not point to any record evidence of actual ongoing consideration, making them half-hearted at best.

***Second***, the agency's decision not to open an SEP fixes rights and obligations and has (immensely significant) legal consequences. Thousands, if not millions, of individuals who wish to obtain health insurance via the federal Exchange, and who are not eligible for another SEP, are prevented from so doing because of Defendants' decision. They cannot do so today even if Defendants might hypothetically change their minds a month from now. "For all practical purposes," the agency's decision "represent[s] a *de facto* denial of [permission]" to enroll. *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016). The decision to make available (or conversely to deny the availability of) a benefit like this results in legal consequence and determines rights and obligations. *See, e.g.*, *Harris v. FAA*, 353 F.3d 1006, 1011 (D.C. Cir. 2004) (recruitment notice which constituted formal offer of employment); *ABA*, 370 F. Supp. 3d at 23 (letters determining that employers did not qualify for loan forgiveness program); *Hall v. Sebelius*, 689 F. Supp. 2d 10, 20 (D.D.C. 2009) (rule that made it impossible to withdraw from Medicare Part A without also withdrawing from Social Security). Those legal consequences also impose an "immediate and significant practical burden" on Chicago, as outlined above. *CSI Aviation Servs., Inc. v. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011).

All told, the record "suggest[s] the [agency] has made up its mind, yet it seeks to avoid judicial review by holding out a vague prospect of reconsideration." *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016). Whatever Defendants might say about their willingness to consider opening an SEP in the future, they have definitively refused to do so right now—preventing Americans from using it to enroll.

## II.   Defendants' decision not to provide a special enrollment period is unlawful.

Defendants' March 2020 decision not to open an SEP was final agency action that grievously harms the City of Chicago. It is also unlawful for two independent reasons.

19

*First*, Defendants' decision not to provide an SEP rests on the confounding view that a public health crisis that has already killed 150,000 Americans and sickened over four million more is not an "exceptional circumstance" as that term is used in the Nation's landmark private health insurance legislation and its implementing regulations. The ordinary meaning of that language indicates precisely the opposite, and so Defendants were required to provide an SEP.

*Second*, even if Defendants were not *required* to provide an SEP, they do not dispute that they are *permitted* to do so. And the administrative record—which contains nearly unanimous support for an SEP—now reflects just how unreasoned and reckless Defendants' decision not to open an SEP was. In an effort to paper over the flaws in their decisionmaking, Defendants have produced an impermissible post hoc rationalization. But even taking that rationale on its own terms, it reveals that Defendants disregarded the clear benefits of an SEP in favor of generalized concerns about adverse selection that were debunked by the very industry—insurers—that conceivably had the most to lose. That failure to consider important aspects of the problem is the essence of arbitrary and capricious action.

If the Court determines that Defendants' decision is best understood as agency inaction, these same arguments demonstrate that Defendants have unlawfully withheld an SEP. On any of these theories, summary judgment is warranted.

**A.      Defendants' determination that the pandemic is not an "exceptional circumstance" is contrary to the Affordable Care Act and its implementing regulations.**

Defendants wisely do not dispute that the pandemic is "'exceptional' or 'extraordinary' in general." Opp. at 30. Nor do they contest Chicago's exhaustive factual demonstration of the severity of the pandemic or the cases that have treated the pandemic as an "exceptional circumstance." MSJ at 9-10, 23-24. They attempt to elide the gravity of the pandemic by analogizing it to a more run-of-the-mill declaration of a public health emergency, Opp. at 31, but

20

the novel coronavirus is plainly of a different scale than prior emergencies like hurricanes,

earthquakes, and the Zika virus. The pandemic therefore triggers Defendants' mandatory duty

"to provide for … special enrollment periods," 42 U.S.C. § 18031(c)(6), in response to

"exceptional circumstances," *id.* § 1395w-101(b)(3)(C); *see also* 45 C.F.R. § 155.420(a)(1),

(d)(9). That should end this case.

Defendants rest their contrary argument on the assertion that "exceptional circumstances"

has a special—and far narrower—meaning in the context of the ACA. Opp. at 31.[4] But their

argument is in significant tension with the rule of construction that, "unless otherwise defined,

words will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v.

United States*, 444 U.S. 37, 42 (1979). And the "ordinary meaning" of "exceptional" is

"uncommon," "rare," or "not ordinary." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,

572 U.S. 545, 553 (2014) (citations omitted); *see also* MSJ at 22-23. The overall structure and

purpose of the ACA informs what circumstances are "exceptional"—they must relate to a need

for health coverage—but it does not otherwise narrow the types of "exceptional circumstances"

that warrant an SEP.

Moreover, the agency itself has rejected the idea of limiting "exceptional circumstances."

To the contrary, it has emphasized repeatedly that "exceptional circumstances" is broad and

open-ended: it "provides an important avenue to coverage for consumers who experience or are

---

[4]   On this question, Defendants receive no deference, nor do they claim any. Their
interpretations of the statutory language were articulated in documents like "opinion letters[,] …
policy statements, agency manuals, and enforcement guidelines, all of which lack the force of
law" and therefore "do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529
U.S. 576, 587 (2000). Their interpretations of their own regulations likewise do not receive *Auer*
deference; setting aside "the limits inherent in the *Auer* doctrine," *Kisor v. Wilkie*, 139 S. Ct.
2400, 2415 (2019), "[n]o deference is due" where, as here, HHS's SEP regulations largely
"paraphrase the statutory language." *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127,
1135 (D.C. Cir. 2014) (quotation omitted).

affected by unanticipated events, often outside of their control," and "account[s] for the inherent unpredictability of exceptional circumstances." AR450; *see also* AR252 ("unforeseen circumstances"); *Medicare Program; Medicare Prescription Drug Benefit*, 70 Fed. Reg. 4,194, 4,437 (Jan. 28, 2005) ("situations that are not specifically contemplated in the statute"). Contrary to Defendants' contention, "the context of th[is] quote," Opp. at 36, only helps Chicago's argument. While the agency was seeking in that rulemaking to limit the use of special enrollment periods, it justified doing so in part because the term itself retained "enough flexibility to account for the inherent unpredictability of exceptional circumstances," AR450—like a once-in-a-generation pandemic.

The limiting constructions offered by Defendants are also untenable. To start, Defendants say that "exceptional circumstances" is limited to "the circumstances of the individual," rather than broad conditions that affect large groups of Americans. Opp. at 31. But nothing in the statutory language precludes an "exceptional condition" from being a condition that is widely shared. 42 U.S.C. § 1395w-101(b)(3)(C). Indeed, the agency has offered SEPs to "large cohorts of individuals," AR449, and maintained that SEPs "should be granted as consistently as possible … while still allowing enough flexibility," AR450. Specifically, the agency has granted SEPs to groups of individuals impacted by the same event, including the millions of people in regions that have experienced natural disasters, RJN Ex. A-6, AmeriCorps service members, *id.* Ex. A-8, or even ad hoc categories like a group of coal miners, Orbea Decl. Ex. B-14. A hurricane "does not sound at all like 'exceptional conditions' applicable to a particular individual" any more than a pandemic. Opp. at 31. The agency's prior actions therefore belie its current argument.

Defendants propose another limit as well: that the provision applies only to "exceptional circumstances *interfering with a particular person's ability to enroll in a health plan*." Opp. at

32 (emphasis added). But Congress easily could have said that, and it did not do so. Defendants'
argument is therefore self-defeating—it shows that, to defend their conclusion, Defendants must
add words to the critical statutory phrase that "appear[] nowhere in the text … itself." *ABA*, 370
F. Supp. 3d at 31. As Defendants do not dispute, where Congress or an agency has limited the
circumstances that qualify as "exceptional," they have done so expressly. MSJ at 29. While
Defendants defend their limited interpretation as consistent with HHS's past practice, Chicago's
reading is also consistent with HHS's past practice. And, crucially, that practice is not a binding
interpretation of the term—nor has the agency ever faced a global pandemic of this magnitude—
so its past practice should hardly limit its current response. *See* AR450 (noting that "exceptional
circumstances" are "unanticipated" and "inherent[ly] unpredictab[le]").

Defendants' limited interpretation of "exceptional circumstances" also ignores that
individuals could not possibly have anticipated a black-swan event like the pandemic, and so
could not have made a fully informed decision about whether to enroll during open enrollment in
the Fall of 2019. Prior to the pandemic, a "moderate-income adult might have made a rational
decision to skip coverage or buy one of the extremely limited, short-term plans now available
under federal rules." AR879. If, as a group of senators noted, "Congress included the authority to
establish SEPs because [it] understood that everyday Americans may face extenuating
circumstances for which they should not be penalized," that authority must certainly be exercised
"during perhaps the largest extenuating circumstance of our lifetimes." AR977; *see also* Br. of
U.S. House of Reps. as *Amicus Curiae* in Supp. of Pl. at 13, 19, ECF No. 8 (explaining how a
SEP is "consistent with Congress's plan").

In any event, Defendants do not dispute that, by its plain meaning, "exceptional
circumstances" must include extreme events besides those that prevent individuals from

enrolling. To the contrary, they try to reserve HHS's authority to allow "alternative or broader uses of the SEP." Opp. at 36. But that gives the game away. If "exceptional circumstances" retains its ordinary meaning—encompassing all forms of health-related extraordinary occurrences—then the pandemic simply has to qualify. *Cf.*, *e.g.*, *United States v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020) (per curiam) (concluding that the pandemic has given rise to "exceptional and exigent circumstances"); *United States v. Harris*, --- F. Supp. 3d ----, 2020 WL 1503444, at *5 (D.D.C. 2020) (same). It defies logic to insist that a true public health catastrophe is not an "exceptional circumstance" as that term is commonly understood simply because Defendants have never encountered such a grave threat before. That's the point. And because the pandemic is an "exceptional circumstance," it therefore triggers Defendants' mandatory duty to open an SEP. MSJ 18-22; *see also* AR814.

This conclusion is buttressed by the primary purpose of the ACA—"to expand coverage in the individual health insurance market," *King*, 135 S. Ct. at 2485—as well as by the Secretary's statutory responsibility to respond to public health emergencies, which Defendants do not address. MSJ at 24. The ACA's purpose is reflected in the requirement that Exchanges provide SEPs and in the broad language that both Congress and the agency chose to adopt. To be sure, increased coverage is not the ACA's only purpose, Opp. at 33, but, as the Supreme Court has stressed, it is the overarching purpose of the ACA's "interlocking reforms," *King*, 135 S. Ct. at 2485. Nor does the mandate to expand coverage seriously conflict with the ACA's other goals in this case because, as discussed below, an SEP in these circumstances does not actually create a significant risk of adverse selection.

Defendants also give short shrift to the fact that virtually all of the state Exchanges, which are charged with interpreting the very same language, have provided special enrollment

periods in response to the pandemic. MSJ at 25-26; *see, e.g.*, AR816, 819. Defendants note that "the SEP regulation permits SBEs to provide for more permissive SEPs" than are federally required, Opp. at 34, but that is beside the point: the state Exchanges expressly relied on Section 155.420(d)(9), which applies with equal force to the federal Exchange, not any additional state-specific authority. *See* MSJ at 11-12. The fact that Defendants are on the short side of a twelve-to-two split is powerful evidence that their interpretation of the statutory language is wrong—as well as arbitrary and capricious, as explained below.

### B.  Defendants' decision not to provide a special enrollment period is arbitrary and capricious.

Leaving aside whether Defendants were *required* to implement an SEP in response to the pandemic, Defendants admit that the statutory and regulatory language does not *preclude* them from offering an SEP. *Cf.* Opp. at 28 ("HHS remains just as capable of opening an SEP now."). The Administrative Procedure Act therefore required Defendants to weigh the costs and benefits of providing an SEP and to articulate a reasoned explanation for their decision.

They did neither, and so their decision fell well short of that mandate. Defendants have provided only an impermissible post hoc rationalization for their decision, and their decision should be set aside for that reason alone. But even with the benefit of hindsight, Defendants still prioritized an imaginary risk of adverse selection over the manifest benefits of making coverage available to millions during a global pandemic. That decision was arbitrary and capricious.

### 1.  Defendants fail to provide a contemporaneous explanation for their decision not to provide a special enrollment period.

Chicago challenges Defendants' decision at the end of March 2020 not to open an SEP. That means that the relevant rationale for purposes of review is what the agency thought in March 2020, and the record against which that rationale must be tested is the record as it stood then. The Pate Declaration, however, purports to explain why the Administration *currently*

believes an SEP is unwarranted, not what it decided in March 2020, and it relies on documents and facts that were generated *after* March 2020. Defendants have therefore failed to provide a contemporaneous explanation for their decision, as the APA requires.

As Defendants must concede, *see* Opp. at 6 n.3, "it is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). An agency's explanations must "'be viewed critically' to ensure that [its decision] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Id.* at 1908 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). "Considering only contemporaneous explanations for agency action … instills confidence that the reasons given are not simply 'convenient litigating position[s],'" and avoids "forcing both litigants and courts to chase a moving target." *Id.* at 1909 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)); *see also ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (explaining that courts may not "consider the agency's post-hoc rationalizations").

The Pate Declaration is precisely the sort of post hoc rationalization that the *Chenery* doctrine forbids. It is flawed in at least three critical respects. ***First***, the Pate Declaration, which is dated almost four months after Defendants refused to implement an SEP in March 2020, does not even purport to describe Defendants' decisionmaking at that time. It instead states that the "Administration *currently* believes that granting a broad special enrollment period to all uninsured individuals is not an appropriate remedy." Pate Decl. ¶ 13 (emphasis added); *see also id.* ¶ 15 ("[I]t is my understanding the Administration determined that *current* information does not establish that a COVID-19 SEP is warranted at this time.") (emphasis added). ***Second***, it attempts to characterize the reasoning of the "Administration" as a whole, rather than the

26

agencies charged with deciding whether to provide an SEP. *Id.* And **third**, it is carefully worded to avoid stating definitively what the agency actually concluded; it speaks only to what Mr. Pate "understand[s]" that the Administration "believes." *Id.* For these reasons, the Pate Declaration cannot carry Defendants' burden to provide a contemporaneous explanation for their decision.

These same deficiencies echo throughout the Pate Declaration and the underlying record. The Pate Declaration relies on at least four publications that are not contained in the record, including reports drawing a link between rising premiums and enrollment rates that Mr. Pate cites for the general principle of "the importance of preventing adverse selection." Pate Decl. ¶¶ 4-5. The record itself contains dozens of documents—428 pages, or roughly 35% of the total—dated after Defendants had publicly refused to open an SEP, and which therefore could not have affected their decision. *See, e.g.*, AR Index; AR520-24, 529-45, 550-692, 941-1207. These materials could not have formed the basis for Defendants' decision in March, and cannot be used to attempt to justify it now.

Defendants contend that the Pate Declaration may be considered because "there has not been a final agency action here," and so the record is not limited to any particular point in time. Opp. at 6 n.3, *see id.* at 39-40. But that is incorrect. As explained above, Chicago challenges Defendants' March 2020 decision not to open an SEP. With respect to *that* decision, the Pate Declaration, which purports to describe the Administration's current views, and the accompanying record materials are efforts to supplement "the original record," not to "expla[in]" its development. *Olivares v. TSA*, 819 F.3d 454, 464 (D.C. Cir. 2016) (citation omitted). Yet Defendants "have made no attempt to demonstrate the type of unusual circumstances that would allow" the Court to consider such materials. *Mozilla Corp. v. FCC*, 940 F.3d 1, 61 (D.C. Cir. 2019). "[J]udicial review" therefore remains "limited to the administrative record in existence at

27

the time of the agency's decision." *Nat'l L. Ctr. on Homelessness & Poverty v. Dep't of Veterans Aff.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012). Because Defendants have failed to provide any explanation of how that record supports their decision, it must be set aside.

**2.    Defendants' post hoc rationale is arbitrary and capricious.**

Even on its own terms, however, Defendants' explanation falls short of established legal standards. According to Mr. Pate, he understands the Administration to believe that an SEP "would significantly increase the risk of adverse selection," Pate Decl. ¶ 13; that it would result in "administrative costs connected with the increased enrollment activity," *id.*; and that "currently available SEPs" and "directly compensating providers for uncompensated COVID-19-related care" provide alternatives to opening a broad SEP, *id.* ¶ 14. Far from justifying the agency's decision, that description shows just how inadequate the agency's explanation was.

a.     To start, missing in Mr. Pate's description is any indication that the agency considered, estimated, or appropriately weighed the primary benefit of opening an SEP: providing increased access to health insurance for millions of Americans who would not otherwise have the opportunity to enroll amidst a global pandemic. An agency must consider all "important aspect[s] of the problem" before it, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), including "potential harms" and "additional … costs," *SecurityPoint Holdings, Inc. v. TSA*, 769 F.3d 1184, 1188 (D.C. Cir. 2014); *see also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 733 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("[C]ommon administrative practice and common sense require an agency to … reasonably decide and explain whether the benefits outweigh the costs."). "An agency also violates this standard if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments" or, here, the points made in the requests for an SEP contained in the

28

record. *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation omitted). Such crucial omissions necessarily render an agency's decision arbitrary and capricious. *Id*.

The record extensively corroborated the likely coverage gains of a broad SEP. The agency's own spreadsheet tracking state and federal Exchange SEPs since March 2020 is incomplete, but it shows that the states which provided broad SEPs experienced significant enrollment. AR691-92; *see also* AR859, 1011, 1050-51, 1064 (providing additional enrollment numbers). It also shows that, for the five states which provided comparative numbers, about 46% of SEP enrollments were through a pandemic-related SEP (as opposed to an existing SEP). AR691-92. If the same proportion applies to FFE enrollments, then approximately 323,000 people would have enrolled through a pandemic-related SEP, not to mention the many others who would have been spurred to enroll in existing SEPs or in programs like Medicaid. Many of these enrollees would be eligible for subsidies that would make the cost of health insurance free: a Blue Cross Blue Shield (BCBS) representative estimated that, in part due to these subsidies, in Florida alone, "*up to 1.123m Floridians could use the SEP to reconsider their decision not to buy health insurance* without worrying about financial hardship." AR838. That representative saw "similar numbers of uninsured in the subsidy-eligible range" in other states. *Id.*

Yet Defendants never addressed these figures or even attempted to estimate the sizable coverage gains that would result from a federal pandemic-related SEP. In that respect, this case is strikingly similar to *Gresham v. Azar*, where the D.C. Circuit affirmed the vacatur of HHS's approval of state work requirements for Medicaid. 950 F.3d 93, 95 (D.C. Cir. 2020). At the outset, the D.C. Circuit explained that both the Affordable Care Act and Medicaid were intended to expand "health care coverage to a larger group of Americans." *Id.* at 100. How a policy might affect the availability and rate of coverage is necessarily an "important aspect" of the problem

29

when designing policies to implement those statutes. *Id.* at 102. Much like here, however, HHS "fail[ed] to consider" whether its policy would result in fewer Americans with health coverage, even though commenters had detailed "the potential for substantial coverage loss" at length. *Id.* at 103. That lapse alone is more than enough reason to set aside Defendants' decision.

Defendants insist that the agency "considered … insurance coverage," Opp. at 43, but the sections of the Pate Declaration to which they point do not even acknowledge, let alone estimate, how a pandemic-related SEP would increase insurance coverage. To the contrary, the closest Mr. Pate comes to acknowledging the potential coverage gains is to note that an SEP "could have caused significant increases in administrative costs connected with the increased enrollment activity." Pate Decl. ¶ 13. That objection is like refusing a heart transplant because you might have to sign some forms. Taken at face value, it also shows that the agency was aware that an SEP would have resulted in a significant volume of enrollments; considered the associated administrative costs (which are themselves vague and unquantified) as a reason not to open the SEP; but simultaneously refused to consider the massive benefit of increased health coverage. Such "internally inconsistent" treatment is the epitome of arbitrary and capricious action. *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir.), *opinion amended on reh'g*, 129 F.3d 625 (D.C. Cir. 1997).

Compounding their error, Defendants also failed to grapple with the substantial public health benefits of increased coverage, which were likewise well-documented in the record. As members of Congress, Exchange administrators, hospitals, governors, insurance commissioners, advocacy organizations, and many others informed the agency, "access to health care" is crucial to "encouraging people who may have been exposed to COVID-19 to come forward, get tested, and seek treatment" without fear of large medical bills. AR763; *see, e.g.*, AR731, 739, 767, 788,

791, 805, 810, 814, 822, 846, 861, 879, 914, 939, 941, 944, 948, 952, 956, 962, 971, 979, 982, 991, 994, 999, 1006, 1031, 1056. "Every person who forgoes testing because they're worried about their personal finances, or goes to an [emergency department] because they lack telehealth, will make it harder for us to recover from this crisis." AR838. The record also refers, at length, to how providing comprehensive insurance coverage would ensure that providers receive full compensation for their substantial costs. *See, e.g.*, AR693-97, 722, 763, 825, 838, 975-76. Yet, again, Defendants did not even attempt to estimate how many individuals might defer testing or treatment as a result of not having insurance, how that would disrupt efforts to combat the pandemic, or how their lack of coverage would shift costs to providers and others.

In this regard, existing SEPs, including the FEMA SEP, do not provide nearly enough "flexibility," Opp. at 39, to match a broad SEP. Most obviously, they offer no protection to the millions of individuals who lacked health insurance before the pandemic and might now conclude that the benefits of health insurance outweigh its costs, *see, e.g.*, AR838, 977, a population whose access to health insurance Defendants do not appear to have considered. But they also impose verification hurdles for the millions of individuals who lost coverage, *see, e.g.*, AR436-38, 1000; Gee Decl. ¶¶ 17-18,[5] that would not be present in a broad SEP, *see, e.g.*, AR914, 982. Notably, Defendants point to no record evidence that they made concerted efforts to alert the public to the potential availability of existing SEPs, which discounts their suggestion that they believed these would adequately respond to the urgent need for health insurance. As explained above, the experiences of states that have offered broad SEPs show that hundreds of

---

[5]    While not part of the record before the agency, the Gee and Young Declarations provide important "background information" that illustrates how the agency failed to "consider[] all the relevant factors." *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quotation omitted).

thousands of people would seek to enroll who are not currently able to do so. Defendants' failure to acknowledge, much less evaluate, the difference in accessibility and reach (and associated enrollments) between the limited federal SEPs and a blanket SEP is arbitrary and capricious.

Nor do the two "provider reimbursement funds" substitute for the "important benefits [of] health insurance coverage." Opp. at 40. As commenters explained to the agency, "[e]ven if the test for COVID-19 is made available for free, uninsured consumers may still delay care due to associated costs of screening, such as facility and provider fees for administering the test." AR846. And "[w]hile tests for the disease are free, treatment may not be," exposing Americans to bills that can run "in the tens of thousands of dollars." AR957; *see also* AR953, 1008. "Those who are uninsured and otherwise struggling to navigate these challenging times may avoid seeking medical treatment altogether as a result." AR962. Even those who seek treatment risk being "turned down for being uninsured." AR981. The record also reflects persistent complaints from stakeholders about the structure, disbursement, and effectiveness of the funds. *See, e.g.*, AR946-47, 975-76, 1002-03, 1008, 1027-28, 1031, 1056. As Christen Linke Young has explained, both funds suffer from severe limitations that keep them from encouraging individuals to seek testing and treatment and from fully compensating providers. Young Decl. ¶¶ 19-36. Defendants again failed to consider these important aspects of the problem evident in the record.

b.      On the other side of the ledger, Defendants' purported concerns about adverse selection are entirely unsubstantiated. The Court cannot simply "defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)). And an agency cannot simply appeal to its "expert judgment"; it must identify "data of the sort it would have considered if it had considered [the issue] in any meaningful way."

*Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988). As Mr. Pate

explains, adverse selection is fundamentally about the "expected risk of the insured pool." Pate

Decl. ¶ 4. But Defendants provide no evidence of, for example, the risk profiles of those who

might seek to enroll during an SEP, how many individuals would enroll immediately versus

waiting to enroll until they get sick, the extent to which any adverse selection would increase

insurers' costs, and whether those costs would be so significant that they would be passed down

to consumers in premiums. Without these crucial data points, the agency cannot rationally have

decided that the risk of adverse selection outweighed the potential gains in coverage.

   If anything, the evidence in the record regarding these questions affirmatively

undermines Defendants' concerns. As Mr. Pate acknowledges, adverse selection generally

results in "financial risks to *issuers*." Pate Decl. ¶ 4 (emphasis added). But America's Health

Insurance Plans (AHIP), the trade association for insurers, as well as BCBS, a federation of

many of the nation's largest insurance companies that provides insurance to over 106 million

people, and others advocated strenuously, repeatedly, and uniformly *for* an SEP. *See, e.g.*,

AR774, 794, 807, 812, 818, 823, 825, 828, 835, 836, 851, 869, 874-75, 901, 960, 1030, 1056. As

a BCBS representative informed the agency, "the cost of delaying action and leaving people

uninsured seems higher than any adverse selection risk from a[n] SEP" because "getting people

to be comfortable with protective testing requires them to have insurance." AR807. Thus,

because the industry "want[ed] to do what we can to reduce the number of uninsured, … an

'open the gates' SEP makes sense from a public health perspective." AR812. The industry's

strong support for an SEP is particularly telling given its past opposition to expanded use of

SEPs. *See, e.g.*, AR252 (explaining that "health insurance issuers … asked HHS not to add any

additional special enrollment periods").

Defendants respond that insurer support for an SEP "appears to have been contingent on receiving additional funds from Congress." Opp. at 41; Pate Decl. ¶ 8. That is incorrect. The insurance industry recommended that Congress establish a risk mitigation program—including because the pandemic itself imposed "additional risk" on insurers, AR794—but did not suggest that an SEP depended upon it. BCBS noted that "[i]f there are adverse selection risks, that might be mitigated through risk adjustment, but there will be time to figure that out later"; either way, "the cost of delaying action … seems higher than any adverse selection risk." AR807. To defray the risk of adverse selection, AHIP requested that any SEP be open to everyone, not just individuals who had been diagnosed with the novel coronavirus. AR859; *see also* AR878 (explaining that "allowing an ongoing COVID-19 SEP would support insurance carriers by collecting premium"). Insurers also requested a risk mitigation program across "the individual, small employer, Medicare and Medicaid markets," AR794—one that would be "triggered only if real-world health insurer costs are significantly higher than expected," AR828; *see also* AR834—reflecting that the need for a program stemmed from the pandemic itself and not because an individual market SEP would uniquely increase adverse selection.

Moreover, insurers explained why the characteristics of those who would enroll during an SEP would reduce overall risk, further mitigating any threat from adverse selection. As BCBS explained, "most" enrollees "are healthy and will be healthy (especially if they can access care safely)" and therefore serve to dilute the risk pool. AR838. Specifically, "the uninsured population likely also includes many younger, healthier individuals who may have chosen not to obtain coverage" before, but would now do so out of fear of contracting the novel coronavirus. AR941. Those points have since borne out: "Several [state-based Exchanges]," including Maryland, Massachusetts, Rhode Island, and D.C., "have found that SEPs are leading to

enrollment growth in younger populations, a group that is more likely to be uninsured and important to marketplace stability." AR1065. If anything, "[l]imiting the SEP to defined groups who must verify eligibility" for an existing SEP "would only delay access to care and deter enrollment by consumers who are young and healthy, potentially endangering the individual-market risk pool." AR847; *see also* AR436-38, 861; Gee Decl. ¶ 27. Defendants do not acknowledge, much less explain their apparent rejection of, any of this record evidence.

Defendants' argument also fails to account for the experience of the twelve state Exchanges—covering roughly a third of the country—that implemented SEPs in the absence of a federal risk mitigation program. There is no evidence in the record that risk pools in these states became distorted or that insurers in these states were crushed by additional costs. To the contrary, those states continued to urge the federal government to establish a federal SEP, *see, e.g.*, AR956-58, 1006-08, 1049-52, and extended their own SEPs, *see, e.g.*, AR931, 1091, 1202. Moreover, some insurers in FFE states decided to provide SEPs for employer-provided insurance plans even without the backstop of a federal risk mitigation program. *See, e.g.*, AR1117, 1154, 1181, 1195. Again, the agency's decision "runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43.

The record also does not reflect that Defendants gave any consideration to how an SEP might be structured to mitigate adverse selection concerns—by, for example, providing a one-time, limited-duration SEP that requires individuals to choose now whether to procure insurance rather than waiting to become sick, much like how open enrollment functions. These limitations were proposed in the record, *see, e.g.*, AR794, 828, but the Pate Declaration nevertheless fails to show that the agency gave any consideration to how such features might limit adverse selection while still providing a reasonable opportunity to enroll. That failure to consider "reasonable

alternatives" was also arbitrary and capricious. *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015) (setting aside agency action where agency failed to assess whether "a more limited rule would not achieve the same outcome without posing risks").

      c.    The record evidence outlined above, coupled with the extraordinary breadth and near-unanimity of support for an SEP in the record, confirms that refusing an SEP was irrational. The record contains evidence of a *single* opponent of an SEP amidst hundreds of supporters, and that entity submitted a letter bereft of any reasoning or evidence. *See* AR943. To be sure, the APA is "not a popularity contest." Opp. at 41. But while an agency can choose to swim against the tide, the agency must at least confront it, and exert more force—*i.e.*, a better explanation for rejecting an ocean of contrary evidence and recommendations—than the agency did here.

      Seemingly recognizing that the agency's decision was seriously deficient, Defendants incorrectly assert that the statute confers discretion beyond what the agency would normally possess under arbitrary-and-capricious review by giving the Secretary the authority to formulate guidelines concerning "exceptional circumstances." Opp. at 38-39. But "[a]gency action may be consistent with the agency's authorizing statute and yet arbitrary and capricious under the APA," because "[t]he court's inquiry on the latter point depends not solely on the agency's legal authority, but instead on the agency's ability to demonstrate that it engaged in reasoned decisionmaking." *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017); *see also Humane Soc'y v. Zinke*, 865 F.3d 585, 600 (D.C. Cir. 2017) ("Holding that the [agency] has the legal authority" to take action "does not mean it did so properly."). Put differently, an agency must use its powers reasonably. The agency's purported discretion cannot excuse its arbitrary reasoning. *Cf. Regents*, 140 S. Ct. at 1914 (holding that the agency's action was arbitrary and capricious even though the agency had "considerable flexibility").

All of this—*e.g.*, a contrived post-hoc rationale, the agency's willful blindness to the importance of increased coverage, its failure to grapple with contrary record evidence, and its reliance on imprecise harms that the affected industry has rejected—individually and collectively renders the Defendants' actions arbitrary and capricious. In this case, however, the agency's decision is all the more arbitrary because it is a smokescreen for Defendants' true reasons. There is of course no bar to an agency consulting with the White House. Opp. at 42. But, as Defendants seem to admit, an agency cannot base its decision on "non-statutory objectives," *id.* at 43, and "may not ignore statutory mandates … merely because of policy disagreement with Congress," *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). That is precisely what the reporting regarding Defendants' switch-in-time reflects, *see* MSJ 12-13, and what the President's established hostility to the ACA would predict, *id.* at 13-14. Nevertheless, the Court need not go beyond the four corners of the agency's explanation and the administrative record to set aside Defendants' irrational decision not to open an SEP.

## C.   In the alternative, Defendants have unlawfully withheld or unreasonably delayed a special enrollment period.

If the Court determines that Defendants' challenged conduct is better considered agency inaction, Chicago remains entitled to relief on its Section 706(1) claim for the same reasons that the agency's decision is contrary to the statute and arbitrary and capricious. The crux of Defendants' response is that the ACA does not compel Defendants "to issue any defined 'exceptional circumstances,'" like the pandemic. Opp. at 29. But that conflates two separate analytical steps. "The Secretary *shall require* an Exchange to provide for … special enrollment periods," 42 U.S.C. § 18031(c)(6) (emphasis added), including in response to "exceptional circumstances," *id.* § 1395w-101(b)(3)(C)—"[t]hat language is mandatory, not precatory." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015); *see also* 45 C.F.R. § 155.420(a)(1), (d)(9).

The only question is whether the relevant triggering event here—"exceptional circumstances"—has occurred. That determination is not left to Defendants' discretion simply because "the Exchange may provide" for "exceptional circumstances." 45 C.F.R. § 155.420(d)(9). As Chicago explained in its opening brief, that language simply reflects that Defendants are charged with assessing, in the first instance, whether "exceptional circumstances" exist—it does not permit them to refuse to do so or to do so arbitrarily. MSJ 20-21. In that respect, the statute and regulations are like others that give an agency "some discretion in making [an] initial triggering decision," but that "discretion is not unfettered." *Salazar v. King*, 822 F.3d 61, 80 (2d Cir. 2016).

Regardless, if Defendants truly have not decided whether to grant an SEP, after months of requests and in the face of a widely expected surge in infections in the Fall, then the proper response is to compel them to do so. *See FTC v. Anderson*, 631 F.2d 741, 750 (D.C. Cir. 1979) ("A citizen may be entitled to a court ruling that an agency exercise its discretion even though the court cannot say which way the discretion is to be exercised."). In these circumstances "the agency's delay is so egregious" as to warrant relief; "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake," and the "interests prejudiced by delay" here are indisputably severe. *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). Defendants must make up their minds.

### III.   The Court should vacate Defendants' decision and, if necessary, enjoin Defendants to provide a special enrollment period.

The record nonetheless shows that Defendants did make up their minds, and unlawfully decided not to provide a special enrollment period in response to a global health crisis. If the Court agrees that the pandemic is an "exceptional circumstance" that triggers Defendants' duty to provide an SEP, or that Defendants cannot rationally have decided against exercising their

undisputed authority to provide an SEP, then the Court should vacate their decision and require

the agency to implement an SEP. If the Court instead finds that Defendants' decision not to

provide an SEP was poorly explained, it should put Defendants to the choice described in

*Regents*: they can either offer "a fuller explanation of the agency's reasoning" as of March 2020,

or they "can deal with the problem afresh" by reexamining whether to provide an SEP now. 140

S. Ct. at 1907-08 (quotations omitted). But while that remand is pending, the Court should set

aside Defendants' prior decision. And given the serious public health implications of

Defendants' conduct, the Court should enjoin Defendants to permit enrollment in the interim

and/or to reach a new decision by a date certain. In all events, the priority should be ensuring all

Americans can access ACA-compliant health coverage quickly and easily.

When the court concludes that agency action is unlawful, "the practice of the court is

ordinarily to vacate the rule." *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir.

1997). Admittedly, "the D.C. Circuit has held—despite the text of the APA—that in some cases,

a court may remand a defective rule without vacating it." *Capital Area Immigrants' Rts. Coal.*,

2020 WL 3542481, at *21. Courts weigh two factors: "the seriousness of the order's deficiencies

… and the disruptive consequences of an interim change that may itself be changed." *Id.*

(quoting *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

Both factors support vacatur here.

**First**, Defendants' interpretation of "exceptional circumstances" is legally erroneous.

Under any reasonable interpretation, the pandemic is an "exceptional circumstance"—meaning

that Defendants do not have the discretion to refuse an SEP. And even as to Chicago's arbitrary

and capricious claim, "the court must vacate a decision that 'entirely failed to consider an

important aspect of the problem.'" *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C.

Cir. 2017) (quoting *State Farm*, 463 U.S. at 43); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 8

(D.C. Cir. 2009) (explaining that the D.C. Circuit has "not hesitated to vacate a rule when the

agency has not responded to empirical data or to an argument inconsistent with its conclusion").

Where there is "substantial doubt whether the [government] chose correctly … [,] [t]hat makes

vacatur appropriate." *Humane Soc'y*, 865 F.3d at 614-15 (citation omitted). Moreover, the

agency's errors here were not merely a failure of explanation—based on the evidence before it,

the agency cannot rationally have decided not to open an SEP.

  ***Second***, there is minimal risk of disruption because, as explained above, there is little

risk of adverse selection or other significant harm, and the industry likely to be most impacted by

an SEP had, in fact, requested it. Defendants certainly have not pointed to any record evidence of

likely disruption. Moreover, allowing individuals to enroll now would not prevent Defendants

from closing enrollment at a later date. The Court also cannot "turn a blind eye to the danger of

leaving the current rule in place," *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 271

(D.D.C. 2014): preventing individuals from obtaining badly needed health care during a global

pandemic. The "overall equities" therefore favor vacatur. *Capital Area Immigrants' Rts. Coal.*,

2020 WL 3542481, at *21 (citation omitted).

  The Court should therefore vacate Defendants' decision, and thereby prevent it from

being used as a basis for denying individuals the ability to enroll, as it currently is. *See, e.g.*,

AR1039, 1045. That sort of remedy, as this Court has explained, is not limited to the plaintiffs in

the case. *Capital Area Immigrants' Rts. Coal.*, 2020 WL 3542481, at *22 & n.28. On remand,

Defendants would also be bound by this Court's conclusions of law, including any determination

that the law obligates Defendants to provide an SEP. Depending on the Court's conclusions as to

various claims, that may provide sufficient remedy for Chicago's harms.

To the extent injunctive relief remains necessary, however, it is warranted here. In APA cases, "injunctive relief, preliminary or permanent, is available in the district court." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982). Courts may therefore enjoin agency action during the pendency of a remand to the agency. *See, e.g.*, *League of Women Voters of United States v. Newby*, 238 F. Supp. 3d 6, 17 (D.D.C. 2017); *FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 75 (D.D.C. 2015). To decide whether an injunction is warranted, courts apply the "traditional four-factor test," balancing the harm to the parties and the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

For the reasons explained in Plaintiff's opening brief, the equities favor broad injunctive relief. MSJ at 36-43. Specifically, opening enrollment is required to avert harm to Chicago and cities across the country. Where an agency's unlawful actions "have 'nationwide impact' and … cause injuries of 'sufficient similarity to the [plaintiff's]' to other [governments] and individuals throughout the country," comparably broad relief is warranted. *District of Columbia v. USDA*, --- F. Supp. 3d ----, 2020 WL 1236657, at *35 (D.D.C. 2020) (quoting *California*, 911 F.3d at 584); *see* States *Amicus* Br. at 15-16. Besides, it is not clear how Defendants could feasibly and fairly limit enrollment only to Chicago residents. The Court may therefore direct Defendants to implement an SEP, leaving it to the agency to "fashion[] the precise contours of SEP guidance," like "the terms, scope and timing," Opp. at 44, pursuant to its standard practices.[6] But what the

---

[6]   In particular, the Court need not decide whether any SEP should be retroactive. *See* Opp. at 39 n.18. Regardless, SEPs routinely offer retroactive coverage dates. AR492-93; *see also* AR505 (explaining that "exceptional circumstances" coverage dates "[v]ary based on circumstances"). Several of the state SEPs have offered retroactive coverage dates, s*ee, e.g.*, AR855, 1014, as does the FEMA SEP repeatedly cited by Defendants, which would presumably create the very same adverse selection risk that Defendants claim to fear, *see, e.g.*, Pate Decl. ¶¶ 11, 13.

41

Court should not do is allow Defendants to continue unlawfully preventing Americans from getting needed care during the most challenging public health crisis the Nation has ever faced.

## CONCLUSION

The Court should grant Chicago's motion for summary judgment, vacate Defendants' decision not to provide a special enrollment period, and, if necessary, enjoin them to do so.

Dated: July 27, 2020                                    Respectfully submitted,

*/s/ John T. Lewis*
John T. Lewis (D.C. Bar No. 1033826)
Robin F. Thurston (D.C. Bar No. 1531399)
Benjamin Seel (D.C. Bar No. 1035286)
Travis Annatoyn (D.C. Bar No. 462679)
Sean A. Lev (D.C. Bar No. 449936)
Democracy Forward Foundation
1333 H Street NW
Washington, DC 20005
(202) 448-9090
jlewis@democracyforward.org
rthurston@democracyforward.org
bseel@democracyforward.org
tannatoyn@democracyforward.org
slev@democracyforward.org

Mark A. Flessner
Stephen J. Kane
Rebecca Hirsch
Affirmative Litigation Division
City of Chicago Department of Law
121 N. LaSalle St., Room 600
Chicago, IL 60602
mark.flessner@cityofchicago.org
stephen.kane@cityofchicago.org
rebecca.hirsch2@cityofchicago.org

*Counsel for Plaintiff*