## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CITY OF CHICAGO,                        )
                                        )
      Plaintiff,                        )
                                        )
        v.                             )     Case No. 1:20-cv-01566 (TJK)
                                        )
ALEX M. AZAR, in his official capacity as )
Secretary of Health and Human Services, U.S. )
DEP'T OF HEALTH AND HUMAN               )
SERVICES, SEEMA VERMA, in her official  )
Capacity, and CENTERS FOR MEDICARE AND  )
MEDICAID SERVICES,                      )
                                        )
      Defendants.                       )
_____)


## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.     THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF CANNOT
      DEMONSTRATE STANDING. ......................................................................... 1

     A.    Plaintiff Has Not Demonstrated Article III Standing. ............................................ 2

     B.    Plaintiff Also Lacks Statutory Standing Because the City is not an "Aggrieved
           Person" Within the Zone of Interests of the SEP Requirements. .......................... 8

II.    PLAINTIFF'S SECTION 706(2) CLAIMS FAIL BECAUSE IT IDENTIFIES NO
      FINAL AGENCY ACTION BUT INSTEAD CHALLENGES AGENCY INACTION. 10

III.   PLAINTIFF'S SECTION 706(1) CLAIM FAILS BECAUSE IT HAS NOT
      ESTABLISHED THAT AGENCY ACTION WAS UNLAWFULLY WITHHELD OR
      UNREASONABLY DELAYED. ...................................................................... 16

IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE
      HHS HAS ACTED REASONABLY IN NOT OFFERING A SEP AT THIS TIME...... 20

     A.    The Pate Declaration is Appropriate for the Court to Consider........................... 20

     B.    The Agency Acted Reasonably........................................................................ 22

          1.    Defendants Considered Access to Healthcare Coverage. ........................ 22

          2.    Defendants' Concerns About Adverse Selection are Reasonable. ........... 25

V.    PLAINTIFF'S REQUESTED RELIEF IS OVERBROAD............................................. 28

CONCLUSION.......................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*ABA v. U.S. Dep't of Educ.*,
   370 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................. 14

*Action for Children's Television v. FCC*,
   564 F.2d 458 (D.C. Cir. 1977) ................................................................................ 25

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ................................................................................ 19

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) ................................................................................ 11

*Aracely v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) ......................................................................... 14

*ATA v. Nat'l Mediation Bd.*,
   663 F.3d 476 (D.C. Cir. 2011) ................................................................................ 13

*Bark v. U.S. Forest Serv.*,
   37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................ 14

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................... 8

*D.C. v. U.S. Dep't of Agric.*,
   No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020),
   *appeal docketed*, No. 20-5136 (D.C. Cir. May 14, 2020),...................................... 29

*Democracy Forward Found. v. Pompeo*,
   No. 1:19-CV-01773 (TNM), 2020 WL 4219817 (D.D.C. July 23, 2020) ............... 11

*Dickson v. Sec'y of Def.*,
   68 F.3d 1396 (D.C. Cir. 1995) ................................................................................ 17

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
   606 F. Supp. 2d 59 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011) .......... 21, 22

*Friedman v. FAA*,
   841 F.3d 537 (D.C. Cir. 2016) ................................................................................ 16

*Friends of Capital Crescent Trail v. Fed. Transit Admin.*,
   No. CV 17-1811 (RJL), 2019 WL 1046889 (D.D.C. Mar. 5, 2019)........................... 8

*Friends of the Clearwater v. Dombeck*,
   222 F.3d 552 (9th Cir. 2000) ................................................................................... 21

*Fund for Animals v. U.S. Bureau of Land Mgmt.*,
   357 F. Supp. 2d 225 (D.D.C. 2004), *aff'd*, 460 F.3d 13 (D.C. Cir. 2006) ............................... 12

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990) .............................................................................. 15

*Hisp. Affairs Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ............................................................................... 13

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012) ............................................................................... 12

*In re Barr Labs., Inc.*,
   930 F.2d 72 (D.C. Cir. 1991) ................................................................................. 28

*In re Monroe Comm'ns Corp.*,
   840 F.2d 942 (D.C. Cir. 1988) ............................................................................... 28

*In re Murray Energy Corp.*,
   788 F.3d 330 (D.C. Cir. 2015) ............................................................................... 12

*In re Pub. Emps. for Envtl. Responsibility*,
   957 F.3d 267 (D.C. Cir. 2020) ............................................................................... 19

*Indep. Min. Co. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997) ................................................................................. 21

*John Doe, Inc. v. DEA*,
   484 F.3d 561 (D.C. Cir. 2007) ............................................................................... 14

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ............................................................................. 19

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ............................................................................... 8

*Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir 2014) ............................................................................... 15

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*,
   842 F. Supp. 2d 127 (D.D.C. 2012) ......................................................................... 21

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),
   542 U.S. 55 (2004) ..................................................................................... 13, 17

*Oceana, Inc. v. Pritzker*,
  217 F. Supp. 3d 310 (D.D.C. 2016), *aff'd sub nom. Oceana, Inc. v. Ross*, 920 F.3d 855 (D.C. Cir. 2019) ...................................................................................................................... 20

*Olivares v. TSA*,
  819 F.3d 454 (D.C. Cir. 2016) ............................................................................................ 22

*\*Pub. Citizen, Inc. v. Fed. Energy Regulatory Comm'n*,
  839 F.3d 1165 (D.C. Cir. 2016) .................................................................................... 10, 11

*RCM Techs., Inc. v. DHS*,
  614 F. Supp. 2d 39 (D.D.C. 2009) ...................................................................................... 14

*Rivera-Cruz v. INS*,
  948 F.2d 962 (5th Cir. 1991) ............................................................................................... 26

*S.F. Baykeeper v. Whitman*,
  297 F.3d 877 (9th Cir. 2002) ............................................................................................... 21

*Sackett v. EPA*,
  566 U.S. 120 (2012) ............................................................................................................ 15

*Safari Club Int'l v. Jewell*,
  842 F.3d 1280 (D.C. Cir. 2016) .......................................................................................... 16

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) ....................................................................................... 14, 15

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) .............................................................................................. 8

*\*U.S. Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) .................................................................................................... 7, 27

*U.S. House of Representatives v. Price*,
  No. 16-5202, 2017 WL 3271445 (D.C. Cir. Aug. 1, 2017) ................................................... 7

*Wagdy v. Pompeo*,
  No. 18-5244, 2019 WL 479845 (D.C. Cir. Jan. 31, 2019) .................................................. 11

*Wagdy v. Sullivan*,
  316 F. Supp. 3d 257 (D.D.C. 2018) .................................................................................... 11

**Statutes**

*\*5 U.S.C. § 706 ................................................................................................................... 21

21 U.S.C. § 952(a) ................................................................................ 14

26 U.S.C. § 36B(b) ................................................................................ 4

*42 U.S.C. § 1395w-101(b)(3)(C) ........................................................ 9, 16

*42 U.S.C. § 18031(c)(6)(C) ............................................................ 1, 9, 16

Cal. Gov't Code §§ 100800-100825 ...................................................... 4

**Regulations**

45 C.F.R. § 155.500 .............................................................................. 9

## INTRODUCTION

Congress vested HHS with broad discretion to manage special enrollment periods (SEPs) in health care Exchanges operated by the federal Government under the Affordable Care Act (ACA), and the agency has reasonably explained why it has not opened an SEP as a result of the COVID-19 pandemic (COVID-19 SEP). Plaintiff the City of Chicago has not shown otherwise. First, the City fails to establish that it has an injury caused by the lack of a COVID-19 SEP, because the generalities it recites about the uninsured are insufficient to meet its burden, and the City's purported injury is not within the zone of interests of the SEP provision at issue. Second, Plaintiff fails to grapple with the case law distinguishing "agency action" and "inaction." It challenges only inaction here, and its attempt to identify a decision in March is insufficient to transform inaction into "action." Because Plaintiff challenges only inaction, its claims premised on agency action fail. Third, the challenge to inaction fails because Plaintiff cannot identify a specific statutory command that HHS has failed to satisfy, and the broad discretion conferred on the agency – to provide an SEP under "such exceptional conditions . . . as the Secretary *may* provide," 42 U.S.C. § 18031(c)(6)(C) (emphasis added) – cannot reasonably be read to require the agency to open a COVID-19 SEP. Fourth, even if Plaintiff had standing and had identified a final agency action, the agency has considered relevant factors and reasonably explained its assessment. While Plaintiff disagrees with HHS's current analysis, the agency's reasoned approach to exercising its discretionary authority is all that the APA could require.

## ARGUMENT

### I.   THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF CANNOT DEMONSTRATE STANDING.

As explained in Defendants' opening memorandum, Plaintiff cannot demonstrate standing because it has not shown the existence of a concrete, specific injury of its own that is both caused by Defendants and redressable by this Court. Defs.' Combined Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in support of Defs.' Mot. to Dismiss or, in the Alternative, for

1

Summ. J. ("Defs.' MSJ"), at 15-21, ECF No. 18.  Indeed, Plaintiff's submission appears to show that SEP enrollment in Federally-facilitated Exchanges (FFEs) and State-based Exchanges using the federal platform (SBE-FPs) largely met Plaintiff's predicted enrollment rate for a COVID-19 SEP, so it can hardly claim injury from the lack of such an SEP.  And Plaintiff cannot demonstrate statutory standing because it is not within the zone of interests of the SEP provisions of the ACA.

      **A.**      **Plaintiff Has Not Demonstrated Article III Standing.**

      Plaintiff now disclaims any assertion of the interests of its citizens and asserts only its own "proprietary" interests as a city.  It claims that uninsured individuals in general are (1) less likely to seek medical care and therefore may contribute to the spread of the virus; and (2) will themselves impose additional costs on the City when they become sick.  *See* Pl.'s Consol. Opp'n to Defs.' Mot. to Dismiss, or in the Alternative, for Summ. J. and Reply in Support. of Pl.'s Mot. for Summ. J. ("Pl.'s Opp."), at 4-10, ECF No. 20.  But generic statements that uninsured individuals impose costs upon the City are insufficiently specific to show that Plaintiff's alleged injury (costs incurred by providing uncompensated care to the uninsured) was caused specifically by any action of Defendants or that it is redressable by this Court.

      First, Plaintiff cannot rely on any costs imposed by the newly uninsured during the pandemic because those newly uninsured have been eligible for other SEPs.  *See* Pl.'s Opp. at 5-6.  Plaintiff's Gee Declaration speculates that such individuals may have been deterred by the paperwork requirements for other SEPs but does not base that conclusion on any cited data or evidence about enrollment activity, and with respect to the temporary waiver of these requirements, it notes only that the appearance of possible documentation needs on the website "*may* discourage some people from seeking coverage or completing applications."  *See* Gee Decl. ¶ 18, ECF No. 4-3 (emphasis added).  Placing unadorned speculation in a declaration does not make it any less speculative.  Nor is this particularly credible speculation.  Enrolling in health insurance, even during open enrollment, always requires the completion of a certain amount of

paperwork, and some people may theoretically be deterred by that paperwork. But the possibility that one may have to eventually submit additional paperwork (that was not even required prior to enrollment during the months relevant to Plaintiff's analysis) does not seem likely to have a deterrent effect beyond the general requirements associated with applying for health insurance. While those verification requirements have now been reinstated, the uninsured had maximum flexibility to enroll during the early months of the pandemic, the exact time that Plaintiff claims a COVID-19 SEP was required. If an individual could attest that she failed to take advantage of another SEP as a result of the pandemic, then she could qualify for the FEMA SEP. AR 515. There is no evidence in the record to support the notion that the newly uninsured are not enrolling for lack of a COVID-19 SEP.[1]

Plaintiff's Gee Declaration does not establish that that there would be increased enrollment in Chicago during a COVID-19 SEP and in fact strongly suggests that the actual SEP enrollment numbers in FFEs and SBE-FPs met her projected numbers for a COVID-19 SEP, or closely approximated them. *See, e.g.*, Pl.'s Opp. at 4-5. Dr. Gee's numbers are speculative, unconnected to the City of Chicago, and likely inflated. She posits that, if there had been a nationwide COVID-19 SEP covering the FFEs and SBE-FPs, those Exchanges would all experience increases in enrollment similar to California. *See* Gee Decl. ¶¶ 21-24. That premise is unfounded, as different States have not been affected by the pandemic in the same way at the same time. Indeed, California had some of the earliest cases and might logically be expected to have higher enrollment as a result, and California has more generous subsidy structures than other Exchanges in general, which likely boosted enrollment. *Compare* Cal. Gov't Code §§ 100800-100825 (providing for financial assistance to those with household incomes at or below

---

[1] Plaintiff's analysis is flawed in other ways as well. Enrollment data is not terribly meaningful without an understanding of the SEP data and the methodology for its collection. For example, the methodology for the public SEP report counts only the latest SEP for each person in the coverage year and does not count anyone who had coverage at the time of application, but neither the Gee Declaration nor the record includes any documentation of California's methodology, such as whether they included terminated or cancelled plans.

600 percent of the federal poverty line) *with* 26 U.S.C. § 36B(b) (making the ACA's premium

tax credits available only to applicable taxpayers whose household incomes are at or below 400

percent of the federal poverty line); *see also* AR 843-44.

    Using two different points of comparison, Dr. Gee estimates that if the FFEs and SBE-

FPs had adopted a COVID-19 SEP lasting from March 20 through May 16, those Exchanges

would have had between 422,000 to 667,000 new SEP enrollments.  Leaving aside the flaws in

her analysis, we now know the actual number of enrollments in the FFEs and SBE-FPs during

that timeframe – about 530,147 over March, April, and May – is about in the middle of her

predicted range for enrollment with a COVID-19 SEP.  *See* AR 584 (chart in SEP report

containing monthly enrollment numbers for the first half of 2020).  To make a closer comparison

of data, pro-rating the total number of SEP enrollments in March and May 2020 from the chart at

AR 584 against the number of March and May days in Gee's chosen time period, plus the total

SEP enrollments in April, gives approximately 361,434 new SEP enrollments in that period.

This is very close to the lower end of Dr. Gee's estimate for a 60-day COVID-19 SEP, a

difference that could be accounted for by factors unique to California.  Plaintiff's evidence, such

as it is, does not support the conclusion that large numbers of additional uninsured would have

signed up during a COVID-19 SEP; if anything, it supports the conclusion that they very well

might not have, at least not in significant numbers.  While Dr. Gee noted that higher estimates

exist, she does not adopt them and only cites to a single blog post that does not contain verifiable

information or analysis, nor does it seem to be by a credentialed expert in the field.  *See* Gee

Decl. ¶ 25 n.19 (citing http://acasignups.net/20/04/16/update-18-24-million-more-americans-

would-likely-getcovered-if-healthcaregov-launched).[2]  Defendants acknowledge that a new SEP

---

    [2] The blogger purported to "extrapolate" nationwide numbers from California and other
States' early per-day enrollment of 2900/day for 60-90 days.  *See* Gee Decl. ¶ 25 n. 19.  It is unclear
what his sources are in any event or what methodology they used, or the bases for his various
"extrapolations."  For example, with regard to the California SBE's SEP data from March 20
through April 10—which included only data for how many total SEP enrollments occurred in that
period—he seems to assume that the increase in SEP enrollment in California's SBE from

would result in some overall increased enrollment, *see* Pate Decl. ¶ 13, ECF No. 18-1, but that is insufficient for Plaintiff to meet its burden that the City of Chicago in particular is currently being harmed by the lack of a COVID-19 SEP.

Plaintiff also cites unemployment data for the proposition that millions more people have lost jobs than have enrolled. *See* Pl.'s Opp. at 6. But that data does not reflect any likelihood that such people would enroll under a COVID-19 SEP. CMS has assessed that the overall impact of "COVID-19 job losses on demand for SEPs remains unclear." AR 577-78. After all, at this point, those individuals have chosen not to enroll under the loss-of-coverage SEP or the FEMA SEP, despite the temporary lack of any pre-enrollment verification requirements. Their failure to enroll could reflect a decision not to spend the money, or an evaluation that their job loss was temporary, or it could reflect COBRA continuation or other coverage through the former employer, or preexisting coverage under a spouse's or parent's plan. *Id.*; *see also* AR 645-48. It could also reflect the availability of federal Government-funded testing and treatment for COVID-19 for certain uninsured individuals that may make the pandemic less of a factor in people's insurance decisions. And unemployment has been declining since April. *See, e.g.*, AR 649. In short, Plaintiff's suppositions that "millions" more people might enroll, and at least some of them must live in Chicago, is merely speculation.

Plaintiff also argues that existing SEPs must be insufficient because in those States with a broad COVID-19 SEP, people used that SEP instead of only relying on existing SEPs. *See* Pl.'s Opp. at 5. Given the choice between an SEP with verification requirements and an SEP without such requirements, it makes sense that people chose the SEP without them; that does not show that all or even some of those individuals would not have enrolled if there had not been a

---

historical numbers was entirely attributable to that SBE's COVID-19 SEP. He offers no reason to believe this is true, and in fact it is very likely not, given that SEP enrollments in the FFEs/SBE-FPs increased substantially during this same time period *without* a COVID-19 SEP. *See* AR 577. This basic flaw carries through the remainder of his analysis, and is magnified when, for example, he appears to multiply the numbers based on increased unemployment figures.

COVID-19 SEP in those States.  Dr. Gee's analysis tends to confirm that possibility as likely, given that the enrollment numbers for FFEs and SBE-FPs were about on target for what she expected if there had been a COVID-19 SEP.

Outside the category of people who were already eligible for SEPs, Plaintiff also relies on the pre-existing uninsured – i.e., those individuals who chose not to purchase insurance during the last open enrollment period.  Plaintiff speculates that such people might choose to enroll now in light of the pandemic, but offers no enrollment data or specific evidence to support that conclusion, and certainly no enrollment data or specific evidence to support that conclusion with respect to residents of Chicago specifically.  After all, these are people who chose not to utilize the previous open enrollment period, and Plaintiff can only speculate that these independent actors may use a new SEP.  *See* Defs.' MSJ at 19-22.

Thus, Plaintiff fails to establish a key premise of its standing argument – that a COVID-19 SEP would necessarily result in higher enrollment in Chicago.  But even if the City had shown otherwise, its alleged proprietary injury rests on other, equally unsupported premises.  Plaintiff's first "form of injury" – that the uninsured will generally be less likely to seek testing and treatment for COVID-19, and will thus exacerbate its spread – is based on the assumption that the uninsured are generally less likely than the insured to seek health care.  *See* Pl.'s Opp. at 7 (citing Young Decl. ¶¶ 6-17).  But the only evidence presented in the Young Declaration that people avoid seeking testing and treatment for COVID-19 specifically is an April Gallup poll in which a certain number of respondents – not differentiated by coverage status – reported that they would avoid seeking care due to associated costs; it therefore says nothing about the likely behavior of the uninsured versus the insured with respect to COVID-19 (much less the uninsured in Chicago who were not eligible for other SEPs).  Young Decl. ¶ 14.[3]  It also does not account

---

[3] Plaintiff also cites multiple pages in the AR where others made similar assertions in their communications with HHS, *see* Pl.'s Opp. at 7; multiple people saying it could be true does not, however, make it so, and Plaintiff does not describe any evidence to support that conclusion.

for the free testing and treatment currently available to certain uninsured individuals, paid for by the federal Government.  Ultimately, Plaintiff and Young seem to mostly rely on the fact that there could be costs that are not reimbursed, depending on the circumstances (just as there are typically costs not covered by insurance, including deductibles and co-pays).  While the Young Declaration asserts various inadequacies in such programs, including whether or not they will be sufficient to reimburse providers, Young's assertions are not accompanied by data or other evidence about how the uninsured will behave, nor in particular those uninsured who were not eligible for existing SEPs.

Plaintiff's second "form of injury" – that it will absorb part of the costs of uncompensated care – relies on a general link between the rate of uninsured and costs borne by a city.  *See* Pl.'s Opp. at 6.  Even if true in general, however, Plaintiff has not established here that a lack of a COVID-19 SEP specifically has caused the City to bear specific costs.  Plaintiff has not identified, for example, an uninsured patient in Chicago who was not eligible for other SEPs but has shown that they would have enrolled in a COVID-19 SEP, and who has gotten sick in the intervening months and sought care from a city institution that was not reimbursable through federal funds.  While such a person could exist, Plaintiff has no made no effort to show as much, and cases like *Department of Commerce v. New York* are readily distinguishable.  There, the trial court found that the proposed census question would have the predictable effect of causing many noncitizens to avoid the census, with knowable effects on the State.  *See U.S. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).[4]  Here, Plaintiff has adduced no evidence that there are uninsured Chicago residents who are ineligible for other SEPs but who would enroll under a

---

[4] Similarly, the *Price* case is distinguishable.  While the opinion contains little description, the States' standing to challenge a decision to terminate certain payments to insurers was adequate, at least for the purposes of intervention, where the record included evidence that "termination of the payments . . . *would lead directly and imminently* to an increase in insurance prices, which in turn will increase the number of uninsured individuals for whom the States will have to provide health care."  *U.S. House of Representatives v. Price*, No. 16-5202, 2017 WL 3271445, at *1 (D.C. Cir. Aug. 1, 2017).

new COVID-19 SEP and who are imposing or will impose particular costs on the City.  Plaintiff

instead argues that even a very small injury will suffice, but the City has not met its burden to

establish even a very small injury to itself.  *Cf. Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235,

244 (D.C. Cir. 2015) (finding, in the organizational standing context, that even "a statistical

probability of injury to an unnamed member is insufficient to confer standing on the

organizations").

> **B.      Plaintiff Also Lacks Statutory Standing Because the City is not an
> "Aggrieved Person" Within the Zone of Interests of the SEP Requirements.**

Plaintiff has not established statutory (or "prudential") standing because it is not within

the zone of interests of the relevant SEP provision in the ACA.  Defs.' MSJ at 22-24.  Plaintiff

remonstrates that it must be within the zone of interests because it is within the zone of interests

of the ACA in general, in light of Congress's findings about the value of universal health

insurance.  Pl.'s Opp. at 11-12.  Defendants agree that the costs of uncompensated care were

arguably among Congress's concerns when, for example, it mandated that individuals purchase

health insurance.  The pecuniary interests of the City, however, are at best marginally related to

*the SEP provisions* of the statute.  In APA cases, the zone-of-interests inquiry turns on "the

particular provision of law upon which the plaintiff relies," rather than the "the overall purpose

of the Act in question."  *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997); *see, e.g.*, *Friends of

Capital Crescent Trail v. Fed. Transit Admin.*, No. CV 17-1811 (RJL), 2019 WL 1046889, at *5

(D.D.C. Mar. 5, 2019) (parsing zone of interests inquiry for various provisions of the Federal

Transit Act).  Congress's purposes in enacting the overall statutory scheme are relevant only

insofar as they may help reveal its purpose in enacting the particular provision.  *See Mova

Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074-75 (D.C. Cir. 1998).

Here, Plaintiff concedes it is not directly affected and that it never even requested an

SEP.  Plaintiff does not respond to the self-evident point that the purpose of limiting enrollment

periods in general is to prevent adverse selection.  That is not an interest that the City of Chicago

"can be expected to police."  Pl.'s Opp. at 12.  Rather, it argues that special enrollment periods were intended not just to give individuals flexibility, but also to reduce uncompensated care costs that could potentially fall on municipalities.  Pl.'s Opp. at 12.  They cite no law, legislative history, regulatory interpretation, or case for this supposition.  Nor does it make much sense in the context of the exceptional circumstances SEP.  This particular provision directs the Secretary to establish SEPs similar to those in another statute, including one for eligible individuals "who meet such exceptional conditions . . . as the Secretary may provide."  42 U.S.C. § 18031(c)(6)(C); 42 U.S.C. § 1395w-101(b)(3)(C).  This language confers broad discretion on the Secretary to provide relief to individuals meeting certain exceptional conditions.  Nothing about it purports to promote the interests of governmental providers or to address uncompensated care.

Plaintiff also argues that it did not "waive" its right to challenge enrollment decisions when the State failed to establish an Exchange and chose to rely on the federal Exchange.  Pl.'s Opp. at 12.  But the question is whether Congress intended to permit suit by States or their subdivisions under these circumstances.  Congress has provided another option for States that wish to quibble with CMS's enrollment policies – they can run their own Exchange.  This does not, of course, mean that no one can ever challenge enrollment decisions.  Here, it is not hard to imagine that an actually aggrieved person might exist.  There could be an individual who sought to enroll in an Exchange, was not eligible for existing SEPs, and who sought and was denied the use of an exceptional circumstances SEP.  *See* 45 C.F.R. § 155.505(b)(iii) (right of appeal with respect to enrollment).  Whether or not such a person could otherwise state a claim, she would presumably have standing to try.  The City of Chicago, however, is not within the zone of interests of the exceptional circumstances SEP.

**II.    PLAINTIFF'S SECTION 706(2) CLAIMS FAIL BECAUSE IT IDENTIFIES NO FINAL AGENCY ACTION BUT INSTEAD CHALLENGES AGENCY INACTION.**

As explained in Defendants' opening memorandum, Plaintiff is challenging only agency inaction, rather than agency action, and its claims challenging agency action must fail.  *See* Defs.' MSJ at 24-28.  Plaintiff devotes several pages to tracing the course of internal and external deliberations at the agency, hunting for clues in press reporting and references in the administrative record, all attempting to prove that HHS made a "decision" not to offer a COVID-19 SEP sometime in late March. Pl.'s Opp. at 13-17.  The agency is constantly evaluating available policy options and processes; here, it has been evaluating whether to offer an SEP since at least mid-March and has not made a decision to open an SEP, because the agency believes the current information does not warrant a COVID-19 SEP.  *See* Pate Decl. ¶¶ 8, 10, 13, 15.  However, the fact that the agency has not announced a COVID-19 SEP and does not believe that current information supports it, does not mean the agency has taken "final agency action."  The agency continues to consider whether such an SEP is warranted, including consideration of "the availability of reimbursement funds, overall costs, and whether there is data suggesting that the COVID-19 public health emergency has impeded consumers' ability to enroll in individual market coverage."  *Id*. ¶¶ 10, 15.  Deliberations and opinions that do not result in any concrete policy action that determine legal rights and responsibilities are not agency action under the APA.  And here, despite its hunt for the "decision," Plaintiff has identified no discrete action that would qualify as an "agency action" rather than "inaction."

For example, in *Public Citizen, Inc. v. Federal Energy Regulatory Commission*, 839 F.3d 1165, 1172 (D.C. Cir. 2016), the plaintiff alleged that FERC failed to act to prevent unjust and unreasonable rates from going into effect, pointing to statutory language that such rates are "unlawful."  The Court explained that "[i]naction is reviewable only where the agency fails to take a 'discrete' action it is legally required to take" and that this Circuit has imposed "strict limits" on reviewable inactions.  *Id*. at 1171-74.  Ultimately, the Court examined the

discretionary language at issue and held that FERC's supposed failure to act did "not reflect an agency decision that fully resolved the issue or completed the process," and therefore "lacks the requisite finality" to constitute final agency action. *Id. See also Anglers Conservation Network v. Pritzker*, 809 F.3d 664 (D.C. Cir. 2016) (alleged failure to propose amendments to a fishery plan after public consideration of the amendment was not agency action); *Wagdy v. Sullivan*, 316 F. Supp. 3d 257, 263 (D.D.C. 2018) (Kelly, J.) (failure to delete information allegedly known to be erroneous was not reviewable agency action), *aff'd sub nom. Wagdy v. Pompeo*, No. 18-5244, 2019 WL 479845 (D.C. Cir. Jan. 31, 2019).

Plaintiff tries to recharacterize various public statements by the Administration. None of these gets around the central problem – that, pursuant to the reasoning in *Anglers* and *Public Citizen*, Plaintiff is challenging inaction, not action. But Plaintiff's recharacterization efforts are also wrong. For example, at a White House briefing, in response to a question about an SEP, the Vice President spoke instead about other ways of reimbursing providers and did not mention the Exchanges. *See* Remarks (April 1, 2020), available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-16/ (last visited August 3, 2020). In follow-up, the President acknowledged that the question had not been answered and stated that "it's really a fair question and it's something we're looking at." There is no statement remotely suggesting that a COVID-19 SEP had definitively been ruled out; on the contrary, the President said they were still looking at it, even while pursuing other options to make sure the uninsured could receive testing and treatment. That is entirely consistent with the Pate Declaration.[5]

---

[5] The newspaper articles Plaintiff relies on continue to be extra-record material. But even if citing such extra-record material were appropriate, it is inadmissible hearsay. *See Democracy Forward Found. v. Pompeo*, No. 1:19-CV-01773 (TNM), 2020 WL 4219817, at *10 (D.D.C. July 23, 2020) (explaining that extra-record "newspaper articles constitute inadmissible hearsay" because they "usually provide no evidence of the reporter's perception, memory or sincerity") (citation omitted).

Plaintiff also suggests that various communications with "stakeholders" are evidence of an agency action.  These letters and emails communicate the agency's current course of action in response to inquiries.  *See, e.g.*, AR 917 ("CMS is not currently offering a Special Enrollment Period specifically designated for COVID-19."), 921 (same; stating also, "*At this time*, we've decided not to offer a COVID-19 SEP" (emphasis added)), 925 (same).  Nothing about these remarks reflects the consummation of the agency's decisionmaking process.  Rather, these letters communicate that the agency is not currently taking action that stakeholders had asked about.  *Cf. Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (FDA warning letter not final agency action because it "communicates the agency's position on a matter" but "compels action by neither the recipient nor the agency"); *In re Murray Energy Corp.*, 788 F.3d 330, 336 (D.C. Cir. 2015) (holding that public statements regarding the agency's position were not final agency action); *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 357 F. Supp. 2d 225, 229 (D.D.C. 2004) (finding that Bureau strategy document was not final agency action because "despite the fact that any decisionmaking process related to setting the Strategy may in fact be 'final,' it is not the type of decision that will directly affect the parties" and "further agency action is necessary before any concrete action will be taken by the agency that might affect the rights of the plaintiffs"), *aff'd*, 460 F.3d 13 (D.C. Cir. 2006).  In this case, the communications are consistent with the Pate Declaration's explanation that the agency does not currently believe an SEP is warranted, but no more.  They are evidence of inaction, not action.

Plaintiff also argues that no one has specifically denied making a decision or indicated that they are still considering an SEP.  The latter point is wrong, as suggested in the White House remarks above.  *See also* Pate Decl. ¶¶ 10, 15; AR 917, 921, 925 ("We will continue to work closely with states and health plans around the country to assess what additional actions are necessary . . . .").  The former point – that no one has denied making a decision – is because the

agency does in fact currently have an opinion on the matter; that opinion, however, has not resulted in any discrete agency action that determines legal rights and obligations.[6]

Plaintiff makes no effort to engage with *Anglers*, discussed in Defendants' opening memorandum, or related case law, instead reaching to try to analogize to cases in which there was in fact agency action. These analogies fail. For example, Plaintiff argues that there is "*de facto*" agency action. Pl.'s Opp. at 14, 17. In *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018), the D.C. Circuit held that "[a]n agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable, separate and apart from adoption of the regulation itself." The court found that the plaintiff had alleged a "*de facto*" policy of repeatedly authorizing long-term visas. No remotely similar circumstances appear here. Plaintiff does not identify a departure from a written regulation, nor a repeated action. On the contrary, the agency has taken no action to change written guidance or issue new guidance. This is pure inaction.

Plaintiff also argues the lack of an SEP "is best understood as a denial of relief." Pl.'s Opp. at 17. But the Supreme Court has specifically distinguished a "failure to act" from a "denial," reasoning that the "latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request – for example, the failure to promulgate a rule or take some decision by a statutory deadline." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 63 (2004). The "denial" cases cited by Plaintiff are generally cases in which a denial was itself an agency action because the requestor was denied a

---

[6] Plaintiff suggests in a footnote that it may be entitled to discovery as to whether there is an agency decision, although it does not ask for discovery. Pl.'s Opp. at 16 n.3. Discovery is generally unavailable in record review cases, and this case is no exception. Plaintiff has not made a "strong showing" that there is an "incomplete record" or that any other exception to record-review principles applies here. *See* Defs.' MSJ at 37 & n.17; *ATA v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011). Rather, the parties seem to be in agreement that HHS has taken no action to create an SEP; the only disagreement is a legal one – whether that lack of action is reviewable as an "agency action." That does not hinge on any facts that could be turned up in discovery.

specific, discrete benefit to which she individually was allegedly entitled by statute, and where the statute or regulation entitles them to a formal decision on the request.  *See, e.g.*, *John Doe, Inc. v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007) (finding that DEA's denial of an application for an import permit was final agency action, where permit was denied pursuant to regulations promulgated under 21 U.S.C. § 952(a), which required a particularized determination to be made with respect to the specific shipment proposed to be imported); *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018) (finding that plaintiffs had been denied parole and had alleged that there was an "unwritten policy" of denying parole requests that was inconsistent with agency directives requiring certain procedural rights, and that this resulted in "specific, discrete steps when evaluating [plaintiffs'] parole status"); *ABA v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 20 (D.D.C. 2019) (finding that letters specifically denying individual requests for public service loan forgiveness based on the ABA's status as a legal services provider were final agency actions).  In *Aracely*, for example, the court specifically distinguished cases in which the plaintiff challenged alleged unwritten policies without immediate practical effect on the plaintiff.  *See* 319 F. Supp. 3d at 139; *see also RCM Techs., Inc. v. DHS*, 614 F. Supp. 2d 39, 43-46 (D.D.C. 2009) (finding no agency action in a challenge to alleged policy of requiring foreign occupational and physical therapists to have master's degrees in order to obtain H–1B visas, even though the specific denial of a visa application made pursuant to the alleged policy may be justiciable); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50-51 (D.D.C. 2014) (rejecting challenge to "a generalized, unwritten administrative 'policy,'" but permitting challenge to five specific purported applications of that alleged policy).  Here, the City of Chicago has not sought or been denied a COVID-19 SEP, and no statutory or regulatory process entitles a State or municipality to ask for an SEP and receive a formal decision.  This is not akin to a denial of a permit.

Plaintiff cites two cases for the proposition that inaction sometimes can amount to action, but neither is analogous.  In *Sierra Club v. Thomas*, 828 F.2d 783, 793-94 (D.C. Cir. 1987), the D.C. Circuit acknowledged in the abstract that there could be a case where inaction was really

the equivalent of a denial if "inaction has precisely the same impact on the rights of the parties as denial of relief," but did not find such to be the case in EPA's failure to issue a final rule, instead analyzing the "failure to act" as an "unreasonable delay" claim. *Id.* at 793. In particular, the Court noted that there was nothing to suggest that the "EPA's failure as yet to issue a final rule reflects an acknowledged EPA decision." *Id.* The same is true here. And in *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990), the D.C. Circuit found that letters with provisional language were nonetheless final agency action denying a rulemaking petition because they "clearly and unequivocally rejected" a request for a separate proceeding, and they did so in a manner that was "unambiguous and devoid of any suggestion that it might be subject to subsequent revision." *Id.* at 1531-32. But here, Plaintiff can point to no such agency statement unequivocally rejecting the notion of opening a COVID-19 SEP. Indeed, although Plaintiff repeatedly characterizes the alleged final agency action here as a "determination that the pandemic is not an 'exceptional circumstance,'" Pl.'s Opp. at 20; *see also id.* at 17 (HHS's "action can be understood as a rule interpreting 'exceptional circumstances" to exclude the pandemic"); *id.* at 14 (the "agency ha[s] at least adopted a 'de facto policy' . . . that the pandemic is not an 'exceptional circumstance'"), it identifies no agency statement reaching such a conclusion, and the agency declaration unambiguously establishes otherwise. In short, this situation is not remotely analogous to the cases Plaintiff cites; accordingly, the agency inaction at issue should be reviewed under the proper standard in Section 706(1).

Plaintiff also argues that the alleged "March" decision on the SEP is final under the applicable standard, despite the fact that the agency continues to consider the issue. Pl.'s Opp. at 18-19. In most of the cited cases, however, there were formal agency actions that changed the rights of parties, and the mere use of provisional language or informal discussions was insufficient to make the action non-final. *See, e.g.*, *Sackett v. EPA*, 566 U.S. 120 (2012) (a binding enforcement order issued by the EPA Administrator was deemed the consummation of the agency's decisionmaking); *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d

15

999, 1007 (D.C. Cir 2014) (finding that a binding directive provides "firm guidance to enforcement officials about how to handle permitting decisions" despite language also indicating it was subject to change); *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (published agency findings indicating that all permits would be denied constituted "final and binding determination" notwithstanding the lack of a decision on particular permits). Here, there is no such formal action, much less final action that determines rights and obligations. And in *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016), the court had effectively denied an application by formally refusing to rule on it in light of the plaintiff's refusal to submit information he claimed was not required. Here, the agency has not bound itself or anyone else with respect to a COVID-19 SEP. It continues to consider evidence related to a potential COVID-19 SEP but has not yet determined that any action is warranted.

Accordingly, Defendants are entitled to judgment on the Section 706(2) claims because Plaintiff has not challenged a final agency action.

## III.   PLAINTIFF'S SECTION 706(1) CLAIM FAILS BECAUSE IT HAS NOT ESTABLISHED THAT AGENCY ACTION WAS UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED.

Plaintiff has not established a claim under Section 706(1) because it cannot show that Defendants failed to take discrete action that they are specifically required to take. *See* Defs.' MSJ at 28-37. Plaintiff continues to insist that the statutory language is mandatory because it provides that the Secretary "shall require an Exchange to provide for" certain SEPs. *See* Pl.'s Opp. at 37-38. But the statute does not mandate that there be an SEP anytime there is an "exceptional" circumstance. On the contrary, the Secretary is directed to provide for SEPs "similar" to those in another statute, 42 U.S.C. § 18031(c)(6)(C), including one for eligible individuals "who meet such exceptional conditions . . . as the Secretary *may provide*," *id.* § 1395w-101(b)(3)(C) (emphasis added). The language thus confers broad discretion on the Secretary to provide relief to individuals meeting certain exceptional conditions. Plaintiff

consistently elides or ignores the layers of discretionary language in the statute.  The SEPs need only be "similar."  The Secretary "may provide" for the "exceptional conditions."  And the content of those conditions is left entirely to the Secretary.  This discretionary language is fatal to a claim under Section 706(1), *see SUWA*, 542 U.S. at 64, and to any other claim that the agency is required to provide for an SEP.  After all, it cannot possibly be *required* where the statute says only that the Secretary "may" do so.

Plaintiff insists that because the pandemic is an "exceptional" event, then an "exceptional circumstances" SEP is required.  Pl.'s Opp. at 20-21, 38 (claiming the "only question" is whether there are exceptional circumstances).  First, that claim ignores the discretionary nature of the statutory language, which on its face does not require an SEP anytime there is an exceptional circumstance, only that the Secretary "may provide" for the terms of such an SEP.  Accordingly, an SEP is never *required* by this provision, even when there *is* an exceptional circumstance. Second, the discretionary language also calls for considerable deference to the agency decisionmaker about what constitutes an exceptional circumstance.  *See* Defs.' MSJ at 38-39; *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination.").

Nor is it obvious that a pandemic is the sort of "exceptional condition" mentioned in the statute.  Far from being required by the statutory language, the proposed COVID-19 SEP is in considerable tension with it.  While Plaintiff correctly notes that the language in the statute and the regulations is flexible, Defendants' opening memorandum explains that, consistent with the purpose of limited enrollment periods, the exceptional circumstances SEP has generally been used to benefit individuals and groups meeting limited conditions and/or individuals or groups who experienced circumstances interfering with their ability to enroll.  *See* Defs.' MSJ at 30-37. Plaintiff proffers examples of past SEPs that have been offered to larger groups of individuals

17

that meet particular conditions.  *See* Pl.'s Opp. at 22.  But none of these are remotely close to what Plaintiff has proposed here – which is, in effect, not an SEP at all.  It is effectively a second *open enrollment period*, open to all uninsured Americans regardless of previous opportunities to enroll, and regardless of individual circumstance – indeed, irrespective of a need for care related to COVID-19 itself.  The plain text of the statute, which distinguishes between open and special enrollments, does not contemplate a second open enrollment.  Even assuming this novel interpretation of an SEP is permissible in light of the pandemic, it cannot reasonably be said to be required by the statutory language.

Plaintiff then proposes an alternative definition of "exceptional circumstances" – "encompassing all forms of health-related extraordinary occurrences" – that appears nowhere in the statute.  Pl.'s Opp. at 24.  Such a definition would encompass an individual's major illness, or rare illness, or just about any public health threat.  It has never been read so broadly, and to do so would pose serious risks of adverse selection.  *Cf.* Pate Decl. ¶¶ 4, 6, 10, 13-15.  Plaintiff downplays the risks of adverse selection but does not acknowledge that prevention of adverse selection is the primary purpose of having limited enrollment periods.  Plaintiff's demand to do away with any meaningful limit on enrollment periods beyond timing thus is in considerable tension with these provisions.

Plaintiff notes that 12 of the 13 State-based Exchanges (SBEs) have had COVID-19 SEPs of varying duration, relying on the "exceptional circumstances" regulation.  That regulation, of course, intentionally grants flexibility to the SBEs to provide for the terms of such an SEP, and none of the States have suggested that the SEP was mandatory.  That some, but not all, SBEs have exercised their discretion to do so does *not* mean that such an SEP is required, only that those SBEs have found it permissible and reasonable under the circumstances.  *See* Defs.' MSJ at 34.  It is certainly not a specific statutory command to create an SEP.  Nor is there any suggestion in the statutory text that the agency is compelled to mirror the actions of SBEs.

18

Finally, Plaintiff devotes a single paragraph to the argument that if there is no agency decision with respect to an SEP, the agency has unreasonably delayed such a decision.  Pl.'s Opp. at 38.  Plaintiff cannot overcome the fact that there is no discrete agency action to which it is entitled; Plaintiff is not entitled to a COVID-19 SEP or a formal decision on such an SEP (and indeed, Plaintiff has never even requested such a decision).  *See* Defs.' MSJ at 37 n.16.  Moreover, Plaintiff makes no effort to show unreasonable delay under the *TRAC* factors because Congress has neither imposed a timeline by which HHS must act nor provided any standard by which the Court could evaluate the timeframe for agency action.  *See* Defs.' MSJ at 37 n.16.  And while the decision about an SEP relates to health care, it does not directly place "human health or welfare" at stake.  *Cf. Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016) (recognizing impact on human health and welfare where there was specific evidence that hospital's operations were jeopardized by delays).  Rather, the agency has prioritized other responses to the pandemic, including funding care for the uninsured and encouraging the use of existing SEPs, and it continues to consider whether an SEP would be helpful.  Pate Decl. ¶¶ 10, 15.  For now, the agency does not currently believe that the evidence of additional demand justifies the risk of adverse selection.  *Id*.  The D.C. Circuit has opined that a reasonable time for action depends on "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).  Here, the record shows that the agency has consulted with relevant stakeholders, gathered enrollment data, and considered options available to ensure access to health care.  This weighing of competing factors and the demand on agency resources is well within the agency's discretion.  *Cf. In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d 267, 274 (D.C. Cir. 2020) (finding that the agencies failed to comply with a clear statutory mandate for nineteen years).

Accordingly, Plaintiff cannot show that the agency has violated a specific statutory mandate or failed to do so within a reasonable timeframe, and Defendants are entitled to judgment on Count III.

## IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE HHS HAS ACTED REASONABLY IN NOT OFFERING A SEP AT THIS TIME.

Defendants are entitled to judgment on Counts I and II because even if HHS were considered to have taken final agency action, the agency has exercised its discretionary authority reasonably.  Plaintiff argues that the Pate Declaration is improperly considered and that the agency's decisionmaking was in any event irrational.  Plaintiff would reach a different decision and would weigh the benefits of enrollment more heavily than the risk of adverse selection.  But Plaintiff is not charged with deciding whether there should be an SEP, and the only question here is, assuming that there is some agency action at issue, has HHS made a reasoned decision?  The answer is yes.

### A.   The Pate Declaration is Appropriate for the Court to Consider.

Plaintiff argues that the Pate Declaration does not explain the agency's "March 2020" decision not to open an SEP and is "an impermissible post hoc rationalization" because it considers later information.  Pl.'s Opp. at 25-28.  Plaintiff is correct that the Pate Declaration and the record go beyond March 2020.  That is because the agency does not believe that there is a discrete agency action dated March 2020.  But even assuming Plaintiff is correct that the agency made a final, conclusive decision not to do something in March, the agency has continued its consideration of the issue and continues to believe that a COVID-19 SEP is unwarranted.  *See* Pate Decl. ¶¶ 10, 13, 15.  The declarant's certification that the materials in the record are those considered by the agency to date is entitled to a presumption of regularity.  *See, e.g.*, *Oceana, Inc. v. Pritzker*, 217 F. Supp. 3d 310, 316 (D.D.C. 2016), *aff'd sub nom. Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

20

In agency inaction cases, courts have acknowledged that the "record" is a bit different than in ordinary cases where the agency has taken specific action.  Although review is still limited to a record that is before agency decisionmakers, *see* 5 U.S.C. § 706, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *cf. Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (permitting supplementation where no administrative record was ever filed).  Courts have permitted review of supplemental agency declarations in such circumstances.  *See, e.g.*, *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) (noting that when a suit challenges agency inaction, district court can consider agency supplements); *see also S.F. Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (explaining that in an agency inaction case, nothing has occurred that could "close[] the administrative record or explain the agency's actions").  Consideration of this type of ongoing process makes sense as well from a practical perspective; this is an "agency inaction" case, and therefore the full time period of the agency's assessment is relevant.

Plaintiff rejoins that it is only challenging the March decision, not any decisionmaking thereafter.  But Plaintiff cannot choose the point in time at which they wish the agency had stopped considering the issue, in light of undisputed evidence that the agency does in fact continue to consider the issue.  *See* Pate Decl. ¶¶ 10, 15.[7]  In short, in light of Defendants'

---

[7] Plaintiff also criticizes the Pate Declaration for including citations to articles that are not part of the record.  Those articles, cited to explain the agency's background understanding of adverse selection and enrollment trends in general, were not specifically considered by the agency with respect to a COVID-19 SEP; therefore, they are not part of the record.  But there was nothing inappropriate about the Pate Declaration's citation of them as background information to illuminate the context of the agency's decisionmaking – and Plaintiff takes no issue with their contents in any event.  *See, e.g.*, *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 69 (D.D.C. 2009) (noting that an agency "declaration provides background information that illuminates reasons for [the agency's] decision that were implicit but obscured in the administrative record"), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011); *see also Olivares v. TSA*, 819 F.3d 454, 464 (D.C. Cir. 2016) (agency declarations that illuminate the agency's original rationale are acceptable).  In light of the fact that the record is not closed,

21

position that there is no agency action, the agency has not attempted to limit the record provided to the Court to any agency action taken in "March 2020." Rather, the agency has explained the basis for the agency's current thinking and consideration to date. If the Court disagrees and believes that the agency must provide a record specific to a "March 2020" decision, such as it is, the Court should direct the agency to identify a subset of the record specific to the agency's reasoning as of March 2020, and not on an ongoing basis.

> **B.     The Agency Acted Reasonably.**

As explained in Defendants' opening memorandum, the agency has properly considered the risks and benefits of a COVID-19 SEP and solicited and considered relevant information. Any agency decision therefore reflects the reasoned decisionmaking required by the APA. *See* Defs.' MSJ at 39-43. Plaintiff argues that Defendants fail to consider the benefits of increased access to health care and exaggerate the risk of adverse selection. *See* Pl.'s Opp. at 28-36. Plaintiff may disagree with Defendants' policy assessment, but it is wrong to suggest that the agency failed to consider the issues.

> **1.     Defendants Considered Access to Healthcare Coverage.**

First, Defendants considered the issue of whether a COVID-19 SEP was necessary to ensure access to health care, and whether insurance coverage was preferable to other options. The agency explicitly considered whether there were other options to ensure access to health care that did not pose the same risk of adverse selection, including flexibility with respect to existing SEPs and federal reimbursement programs for COVID-19-related testing and treatment. *See* Pate Decl. ¶¶ 11-14. For example, Mr. Pate explains that "currently available SEPs offer many people who have lost coverage due to the COVID-19 public health emergency the opportunity to maintain continuous enrollment in coverage without causing an unforeseeable and substantial increase in adverse selection risk" and that "directly compensating providers for uncompensated

---

however, if Plaintiff wishes the articles to be included formally in the record, Defendants would not oppose.

COVID-19-related care targets aid directly at those who have provably suffered from COVID-19 (or, in the case of testing, those who are seeking to determine if they are suffering from COVID-19) and the costs of care to treat that suffering." *Id.* ¶ 14. The record also shows that the agency solicited and considered enrollment data and the extent to which existing SEPs would account for increased demand. *Id.* ¶ 11; AR 577-78 (CMS assesses that effects of job loss on current demand remain unclear), 859-60 (CMS solicits feedback from insurers on ongoing SBE SEPs and possible CMS SEP), 915-16 (CMS requests research on SBEs in connection with COVID-19 SEP correspondence), 1064 (SBE enrollment data).

Defendants do not dispute or ignore that some additional people could enroll if there were a COVID-19 SEP. Indeed, the risk of adverse selection necessarily means that more sick people could enroll, a risk that potentially endangers the Exchanges. *See* Pate Decl. ¶¶ 9, 13. But Plaintiff's figures are likely exaggerated. As explained in Part I, the actual enrollment in FFEs and SBE-FPs was largely similar to the number of people that Plaintiff predicted would enroll if there were a COVID-19 SEP. *See supra* pp. 3-6. Plaintiff also assumes, incorrectly, that just because a certain number of people used COVID-19 SEPs in the SBEs that offered one, those same people would not have enrolled in other SEPs. That supposition is not tenable and not supported by Plaintiff's own data. *See id.* And Plaintiff's further insistence that large numbers of people would be eligible is not a meaningful estimate of the actual enrollment that would result from a COVID-19 SEP. Pl.'s Opp. at 29.

Plaintiff supposes that the agency must necessarily weigh "coverage gains" more heavily than access to health care in general. But, as Mr. Pate explained, maximizing enrollment is not the purpose of an SEP, and attempting to maximize enrollment through SEPs would pose an unacceptable risk of adverse selection. *See* Pate Decl. ¶¶ 3-6, 9, 13. SEPs exist not to maximize enrollment, but to provide limited flexibility in the face of individual circumstances. They are necessarily *limited* to prevent adverse selection, and Plaintiff's narrow focus on maximizing enrollment is inconsistent with statutory and regulatory goals. *Id.* Defendants appropriately

found that existing SEPs and reimbursement programs mitigate the problems posed by lack of insurance coverage during a pandemic and that the COVID-19 SEP poses an unacceptable risk of adverse selection in the absence of further information.[8]

Plaintiff believes that these provider reimbursement measures for COVID-19 testing, testing-related services, and treatment for uninsured individuals are not as useful as health insurance coverage.  For example, Plaintiff criticizes the agency for not estimating "how many individuals might defer testing or treatment as a result of not having insurance, how that would disrupt efforts to combat the pandemic, or how their lack of coverage would shift costs to providers and others."  Pl.'s Opp. at 31.  Plaintiff does not propose a way of making that estimate, of course, and Defendant has explicitly considered whether there are other ways to cover and incentivize testing and treatment through reimbursement programs.  Pate Decl. ¶¶ 12-13.  Plaintiff criticizes those programs for a variety of reasons, but, at the moment, COVID-related testing and treatment for certain uninsured individuals can be reimbursed under these programs, and funds are available.  *Id.* ¶ 12.[9]  Both the Government and providers are promoting these programs, and if the uninsured have concerns about whether they will have to pay for COVID-related testing or treatment, they can ask, just as they might for other conditions.

Plaintiff also criticizes existing SEPs for pre-enrollment verification requirements, but the agency temporarily suspended those requirements and has generally maximized flexibility with respect to existing SEPs in response to this consideration.  *See* Pate Decl. ¶ 11.  And the agency has acted to encourage enrollment in these SEPs.  *Id.*; *see also* AR 558-74 (website); 578-79

---

[8] Plaintiff also seems to suggest that it is somehow inappropriate for the agency to even think about the increased administrative costs associated with creation and administration of a new COVID-19 SEP.  Pl.'s Opp. at 30.  While those costs are not borne by Plaintiff, they are costs to the agency and the taxpayer, and any responsible agency decisionmaker must generally consider the resources available in connection with the risks and benefits of proposed agency action.

[9] Plaintiff's criticism that these programs do not cover non-COVID-related illness falls particularly short.  *See* Pl.'s Opp. at 31.  An SEP is specifically being considered in light of the pandemic.  For the ordinary risks associated with being uninsured, there is no reason for the SEP analysis to change during a pandemic.

(SEP report on efforts to encourage enrollment).  Plaintiff cannot credibly say that the agency
failed to consider this issue.

> **2.    Defendants' Concerns About Adverse Selection are Reasonable.**

Plaintiff's second overall criticism is that the agency has failed to support its concerns
about adverse selection.  In particular, Plaintiff argues that Defendants fail to provide precise
numbers related to "the risk profiles of those who might seek to enroll during an SEP, how many
individuals would enroll immediately versus waiting to enroll if they get sick, the extent to which
any adverse selection would increase insurers' costs, and whether those costs would be so
significant that they would be passed down to consumers."  Pl.'s Opp. at 32-36.  The demanded
numbers, of course, are not readily available and may not exist yet, and there is no statutory or
regulatory demand to develop them.  Clearly, some insurers had concerns about adverse
selection risk that they communicated to the agency, as they coupled their support for a COVID-
19 SEP with a request for "risk mitigation" funding – adverse selection and higher costs being
the "risk" to be mitigated.  AR 794, 835, 869, 906, 945, 991, 1031.[10]  The agency reasonably
relied on these concerns and its background knowledge about adverse selection over time and
general understanding of recurring market stability concerns to opine that "opening up a
COVID-19 SEP would substantially loosen the protections the existing SEP policy provides for
the individual market risk pool provided through the statute and subsequent regulatory actions"
and "significantly increase the risk of adverse selection."  Pate Decl. ¶¶ 3-6, 9, 13; *cf. Action for
Children's Television v. FCC*, 564 F.2d 458 (D.C. Cir. 1977) (explaining that agency "may draw
upon its own expertise in interpreting the facts or upon broader policy considerations not present
in the record"); *Rivera-Cruz v. INS*, 948 F.2d 962 (5th Cir. 1991) (explaining that agency "may
take official notice of commonly acknowledged facts and technical or scientific facts that are

---

[10] For example, the Association for Community Affiliated Plans letter to CMS made its
concerns about adverse selection explicit, stating that "we also believe that a risk mitigation
program . . . should be paired with any new SEP in order to ensure that premiums do not skyrocket
in 2021 due to adverse selection and unanticipated, mid-year changes to the risk pool."  AR 1031.

within the agency's area of expertise"). The agency has adequately explained the basis for that decision. The APA does not require the precise data demanded by Plaintiff, particularly where, as here, the agency is given broad discretion to make policy decisions and has reasonably determined that the current information does not justify an SEP. If additional information becomes available, the agency will consider it.

Plaintiff also asserts that insurers supported the SEP in March and supposes that they would not have done so if there were a risk of adverse selection, despite insurers' expressed concerns about exactly that. Pl.'s Opp. at 33-35. But it is not hard to understand why insurers might have supported the SEP in March. Insurers faced the possibility of short-term profits in the form of immediate new enrollments and premium payments (especially in March, when fewer people were sick), and they hoped to pass any long-term risks to Congress through the aforementioned "risk mitigation" funding. *See* Defs.' MSJ at 41 (citing specific communications in the record for the proposition that insurer support was *explicitly* connected to such funding).[11]

Plaintiff also argues that the agency failed to consider the experiences of SBEs with respect to adverse selection, arguing "there is no evidence in the record that the risk pools in these states became distorted or that insurers in these states were crushed by additional costs." Pl.'s Opp. at 35. The record also, however, does not reflect reliable data that those States' risk pools have not been distorted or that risk levels have remained constant. And comprehensive information may not exist yet. Adverse selection results in increased costs which are then later passed on in the form of increased premiums and cost-sharing, which then lead to declining

---

[11] Nor is there any evidence that enrollees would be largely healthy. Plaintiff quotes a portion of an email from Florida Blue suggesting that most of the people who would be *eligible* for COVID-19 SEP enrollment may be young and healthy. At most, this suggests that most uninsured people are young and healthy, not that most enrollees would be young and healthy. *Compare* Pl.'s Opp. at 34 *with* AR 838. After all, the demonstrated evidence behind adverse selection is that young, healthy people are more likely to forgo insurance. And while early reporting in May suggested that at least some of the States saw increased enrollment among younger people, there is no evidence as to whether they are enrolling *sick* people irrespective of age. *See* AR1065.

enrollment; in other words, the overall effects might not yet be obvious, and the long-term effects on the market tend to show up over time. *See generally* Pate Decl. ¶¶ 4, 13.  In light of the obvious risks and the lack of reliable information, the agency has acted reasonably in not opening a COVID-19 SEP at this time.  The SBEs may also have acted reasonably, of course, if they assessed the policy objectives differently.  That does not provide any evidence that the agency acted irrationally.

Plaintiff also argues that the agency failed to assess alternatives that could limit the risk of adverse selection.  Pl.'s Opp. at 35-36.  It is true that an SEP of shorter duration may pose less of a risk than a longer one, but that does not get at the structural problem.  Offering what Plaintiff admits is effectively a second open enrollment period is inconsistent with the purpose of limited enrollment periods and will always provide some increased risk of adverse selection. Pate Decl. ¶¶ 3-4, 6, 9-10, 13, 15.  That danger is particularly acute in the midst of a pandemic.

At bottom, Plaintiff urges the Court to conclude that the circumstances here "led ineluctably to just one reasonable course of action," *U.S. Dep't of Commerce*, 139 S. Ct. at 2571 – to open a COVID-19 SEP, and a nationwide one at that.  But when there are a variety of potential policy responses to a given problem, under the APA it falls to the agency – not the courts – to "weigh[] . . . incommensurables under conditions of uncertainty" and "make policy choices within the range of reasonable options." *Id.*  Here, HHS has taken no action, but to the extent Court finds otherwise, the agency plainly considered the evidence before it and reasonably explained its current thinking.  It is "not for [the courts] to ask whether [an agency's] decision was 'the best one possible' or even whether it was 'better than the alternatives,'" *id.*, and the Court should decline Plaintiff's invitation to substitute its judgment for that of the agency.[12]

---

[12] Plaintiff continues to insist that the President's general objections to the ACA were the motivation for lack of action here, but there is no evidence that the agency "ignored statutory mandates" or otherwise failed to make a reasoned decision.  Pl.'s Opp. at 37.  As set forth in Defendants' opening memorandum, background policy and political concerns do not render an otherwise proper agency decision improper.  Defs.' MSJ at 42-43.

Defendants are entitled to judgment on these claims.

## V.      PLAINTIFF'S REQUESTED RELIEF IS OVERBROAD.

Plaintiff continues to argue for overbroad relief, asking for "vacatur" of a "rule."  *See*

Pl.'s Opp. at 38-42.  There is, of course, no rule to vacate, and a court's ability to "set aside" an

agency decision does not encompass the power to write new policy.  Plaintiff apparently asks

this Court to write a new SEP under the guise of vacating a non-existent rule.  No such relief is

available.  At most, under well-established principles of administrative law, if the Court

concluded that there was an agency action and that it was unreasonable, the Court could order

the agency to reconsider the issue.  *See* Defs.' MSJ at 44.  Indeed, further relief would risk

significant disruption to agency resources, to insurers, and to the market.  *See* Pate Decl. ¶¶ 9, 13.

And even if the agency somehow incorrectly assessed things in March, as Plaintiff insists, it is

possible that the proper outcome could be different now than it was then; there is more data

available now and there are also more people infected with COVID-19 (increasing the risk of

adverse selection).  The mandatory relief Plaintiff seeks is particularly unwarranted in these

circumstances.[13]

Finally, Plaintiff continues to press its argument that relief is warranted across all of the

FFEs and SBE-FPs nationwide, and the Court should make an SEP available to uninsured

Americans nationwide.  Pl.'s Opp. at 41.  Plaintiff does not have standing to seek such relief, nor

---

[13] Even where an agency violates a statutory mandate, equitable relief is not always appropriate.  Importantly, equitable relief "does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  *See In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991) (citing *In re Monroe Comm'ns Corp.*, 840 F.2d 942, 946 (D.C. Cir. 1988)).  In *Barr Laboratories*, for example, the D.C. Circuit agreed that the FDA had violated a statutory mandate to act on the petitioner's applications but nonetheless refrained from compelling particular agency action.  Here, too, the Court should refrain from commandeering the agency's prerogative to balance competing priorities and focus on the most urgent issues based on the most current evidence.

is it equitably justified.  *See* Defs.' MSJ at 44.[14]  At most, Plaintiff could demand consideration

of an SEP for its own residents.  Risk pool considerations and enrollment concerns could vary

across different FFEs and SBE-FPs, where different States have different enrollment rates and

different risk profiles, and the pandemic has affected different States differently over time.

Indeed, Plaintiff has suggested that the agency's decision is somehow infirm for failure to

consider such data.  Accordingly, ordering a nationwide SEP is particularly inappropriate.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in Defendants' Memorandum in

Support of its Motion to Dismiss, or in the Alternative, for Summary Judgment, the Court should

enter judgment for Defendants.


Dated:  August 3, 2020                    Respectfully Submitted,

                                          ETHAN P. DAVIS
                                          Acting Assistant Attorney General

                                          ERIC BECKENHAUER
                                          Assistant Director, Federal Programs Branch

                                          */s/Amy E. Powell*
                                          AMY E. POWELL
                                          Senior Trial Counsel, Federal Programs Branch
                                          Civil Division, Department of Justice
                                          c/o U.S. Attorney's Office
                                          150 Fayetteville St., Suite 2100
                                          Raleigh, NC 27601
                                          Phone: 919-856-4013
                                          Email:  amy.powell@usdoj.gov

---

[14] Plaintiff omits that the injunction decision relied upon is currently on appeal, *see D.C. v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657, at *35 (D.D.C. Mar. 13, 2020), *appeal docketed*, No. 20-5136 (D.C. Cir. May 14, 2020), and fails to address the relevant Supreme Court precedent, *see* Defs.' MSJ at 44.  The case is also distinguishable because it involved the setting aside of a final rule.

29